# EXHIBIT 1

Filing # 109368358 E-Filed 06/24/2020 08:00:45 PM

IN THE CIRCUIT COURT OF THE 4TH
JUDICIAL CIRCUIT IN AND FOR
DUVAL COUNTY, FLORIDA

CIRCUIT CIVIL DIVISION

CASE NO.:

POWER RENTAL OP CO, LLC,

      Plaintiff,

vs.

VIRGIN ISLANDS WATER AND
POWER AUTHORITY,

      Defendant.

_____/

## COMPLAINT

    Plaintiff, POWER RENTAL OP CO, LLC sues defendant, VIRGIN ISLANDS WATER

AND POWER AUTHORITY, and alleges as follows:

### I. PARTIES AND JURISDICTION

    1.    This is an action for damages in excess of Thirty Thousand Dollars ($30,000.00),

exclusive of interest, costs and attorney's fees.

    2.    Plaintiff, POWER RENTAL OP CO, LLC (hereinafter "OpCo" or "Plaintiff"), is

a Florida limited liability company with its principal place of business in Jacksonville, Florida.

    3.    Defendant, VIRGIN ISLANDS WATER AND POWER AUTHORITY

(hereinafter "WAPA" or "Defendant"), is a municipal corporation existing under the laws of the

United States Virgin Islands, which has conducted business relating to the matters asserted in

this Complaint in Duval County, Florida. Specifically, WAPA has contracted with OpCo, which

is based in Duval County, Florida, has communicated and conducted commerce with OpCo

relating to the provision of power generation services pursuant to the parties' underlying

agreement and relating to requests for payment extensions in Duval County, Florida, and was required to make and did make payment for services provided by OpCo pursuant to the parties' underlying agreement in Duval County, Florida.

4.      Jurisdiction and venue are proper in this court because WAPA expressly consented to venue in any court having jurisdiction over WAPA, including, Duval County, Florida, under the Promissory Note entered into and executed by the parties dated May 19, 2019 (the "Note").  A true and correct copy of the Note is attached hereto as Exhibit "A" and is incorporated by reference.  *See* Note at pg. 5.

5.      WAPA expressly waived immunity and consented to the jurisdiction of this court pursuant to the Promissory Note.  *See* Exhibit "A" at pg. 4.

6.      All conditions precedent to the bringing of this action have occurred, have been performed, or been waived.

## II.  FACTUAL BACKGROUND

7.      On February 15, 2012, General Electric International, a subsidiary of General Electric Company ("GE"), entered into a contract for the rental of certain power generation equipment and water treatment system and provision of services with WAPA, wherein GE agreed to lease power generation equipment to WAPA, specifically one (1) large General Electric TM2500+ turbine and associated equipment and to provide the associated and necessary services to install, test and operate the equipment, including, but not limited to: (i) the turbine, generators and auxiliary equipment necessary to generate electricity; (ii) mobilization and installation of the equipment at the site; (iii) commissioning services and testing of the equipment; (iv) training for use of the equipment and provision of advice and support to maintain plant safety; (v) operation of the equipment for a two-month period; (vi) planned and unplanned maintenance of the equipment; (vii) maintenance supervisor support; (viii) provision of key

consumables and spare parts; and (ix) decommissioning of the equipment (the "Rental Agreement"), in the United States Virgin Islands. A true and correct copy of the Rental Agreement (without exhibits) is attached hereto as Exhibit "B."

8.    In exchange therefor, WAPA was required to make monthly rental payments to GE in accordance with the terms of the Rental Agreement.

9.    In October 2013, APR Energy plc, a global leader in the provision of mobile power plants for large-scale electricity needs, acquired the power rental business from GE, including the Rental Agreement with WAPA. In connection with this transaction, APR Energy plc acquired two subsidiaries of GE: OpCo, the entity that owns the Rental Agreement and the Plaintiff herein, and Power Rental Asset Co, the entity which holds title to and owns the turbines at issue in the Rental Agreement. Consequently, once the acquisition of GE's power rental business was concluded on October 28, 2013, APR Energy plc, through its newly acquired subsidiaries, OpCo and Power Rental Asset Co, assumed the beneficial ownership of the Rental Agreement and assumed ownership of the turbines. Consequently, from October 2013 to the present WAPA has been required to make its rental payments under the Rental Agreement to OpCo.

10.    The Rental Agreement between WAPA and OpCo has been amended and extended on numerous occasions through various change orders, as requested by WAPA, including, specifically, two change orders through which WAPA sought to lease from OpCo two additional turbines and associated equipment, increasing the number of turbines leased by WAPA from OpCo to three (3), together with the associated power generation equipment. Copies of the change orders to the Rental Agreement are attached hereto as Composite Exhibit "C."

11.     GE, and subsequently OpCo, duly performed their obligations under the Rental Agreement, delivered the turbines to the WAPA site, and began installation and preparation of the facility to generate electricity.   As required, GE, and subsequently OpCo, installed the equipment and prepared the facility for operation in accordance with the Rental Agreement.

12.     Since October of 2013, OpCo has delivered power generation services consisting of electrical power services for the citizens and residents of the Unites States Virgin Islands. Unfortunately, over time, WAPA failed to make the monthly rental payments to OpCo as required under the Rental Agreement.  As of April 30, 2019, the total amount due and owing by WAPA to OpCo under the Rental Agreement was $14,291,986.00, which included $981,015.00 of accrued but unpaid interest.

13.     Thereafter, the parties agreed to certain accommodations as to some of the debt owed by WAPA to OpCo, wherein OpCo agreed to a reduction of the then outstanding balance to $9,310,971.00, representing a reduction in excess of 30% of the overdue rental payments, in exchange for a promissory note by WAPA in favor of OpCo for the agreed upon reduced amount memorializing the terms of the parties' agreement.

14.     There are additional amounts due and owing by WAPA to OpCo for services provided by OpCo to WAPA under the Rental Agreement, which accrued after May 1, 2019, and which the parties are discussing.  However, any such amounts were not included in the parties' agreement that resulted in the promissory note and accordingly remain due and payable.

15.     By reason of the aforesaid default, Plaintiff has been required to employ the law firm of Shutts & Bowen LLP to seek recovery of the indebtedness on the Note and to institute and prosecute this action.  For such employment, Plaintiff has become obligated and has agreed to pay its counsel a reasonable attorney's fee.

## COUNT I –BREACH OF PROMISSORY NOTE

16.    Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 15, as if fully set forth herein.

17.    On May 19, 2019, Defendant executed and delivered to Plaintiff the Note in the amount of Nine Million Three Hundred Ten Thousand Nine Hundred Seventy One Dollars ($9,310,971.00) in the U.S. Virgin Islands, representing the agreed upon reduced amount owed by WAPA to OpCo as of April 30, 2019.  Pursuant to the Note, WAPA was required to make twenty (20) monthly payments each in the amount of $507,354.00 until the Maturity Date of December 1, 2020.  *See* Exhibit "A."

18.    Plaintiff presently owns and holds the Note.

19.    Defendant has failed to comply with the terms and conditions of the Note by failing to pay when due the monthly payments as described in the Note, commencing on January 2020, and the Note is now in default.

20.    By reason of the foregoing default, Plaintiff has declared the full amount payable under the Note to be immediately due and payable and does hereby demand payment of all monies due and payable in accordance with the terms and provisions of the Note.

21.    In addition, Plaintiff provided WAPA notice of default and an opportunity to cure on February 6, 2020, and again on February 27, 2020, by letters from its General Counsel, Joseph G. DiCamillo.  *See* letters from Joseph G. DiCamillo dated February 6, 2020 and February 27, 2020, respectively, attached hereto as Composite Exhibit "D."

22.    Defendant has breached the terms and conditions of the Note by failing to make payments when due.

23.     The total amount of Five Million Three Hundred Ninety Three Thousand Five Hundred Twenty One Dollars and Eighty-One Cents (US $5,393,521.81) representing outstanding principal, plus accrued interest at the rate of 13% on the outstanding balance, is due and owing under the Note.

24.     Defendant has not disputed and cannot dispute the amount currently due and owing under the Note and has waived any defenses and right of set off or any other claim against Plaintiff under the Note.  *See* Exhibit "A" at pg. 4.

25.     Since May 1, 2019, there are additional amounts due and owing by WAPA to OpCo relating to OpCo's performance under the Rental Agreement, which are not included in the amounts due under the Note and which are the subject of discussions between the parties.

26.     Plaintiff is entitled to reasonable attorney's fees and court costs under the terms of the Note.

WHEREFORE, plaintiff, POWER RENTAL OP CO, LLC, demands judgment against defendant, VIRGIN ISLANDS WATER AND POWER AUTHORITY, for damages, costs, interest and reasonable attorney's fees, and for such other and further relief as this Court deems just and proper.

## COUNT II – SERVICES RENDERED

27.     Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 15, as if fully set forth herein.

28.     WAPA knowingly and voluntarily requested and accepted the power generation equipment and services provided by OpCo and agreed to pay to OpCo for those power generation services.

29.     OpCo faithfully and diligently provided the power generation services in the ordinary course of business as requested.

6

30.     OpCo reasonably expected to be paid for the power generation services provided to WAPA through April 30, 2019.

31.     WAPA has failed, and continues to fail, to pay OpCo for the agreed upon reasonable value of the power generation services that OpCo provided to WAPA through April 30, 2019.

32.     OpCo has sustained damages in the amount of US $5,393,521.81, which is the reasonable value of the power generation services provided by OpCo to WAPA through April 30, 2019.

33.     Since May 1, 2019, there are additional amounts due and owing by WAPA to OpCo relating to OpCo's performance under the Rental Agreement, which are not included in the amounts due under the Note, which are the subject of discussions between the parties, and are thus not sought herein.

WHEREFORE, plaintiff, POWER RENTAL OP CO, LLC, demands judgment against defendant, VIRGIN ISLANDS WATER AND POWER AUTHORITY, for the reasonable value of the power generation services that OpCo provided to WAPA in the amount of US $5,393,521.81, plus court costs and attorney's fees, and for such other and further relief as this Court deems just and proper.

## COUNT III - QUANTUM MERUIT

34.     Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 15, as if fully set forth herein.

35.     WAPA knowingly and voluntarily requested and accepted the power generation equipment and services from OpCo and agreed to pay to OpCo the reasonable value of the power generation services.

36.     OpCo faithfully and diligently provided the power generation services as requested.

37.     WAPA has failed, and continues to fail, to pay OpCo for the agreed upon reasonable value of the power generation services that OpCo provided to WAPA, and WAPA has been unjustly enriched thereby

38.     Since May 1, 2019, there are additional amounts due and owing by WAPA to OpCo relating to OpCo's performance under the Rental Agreement, which are not included in the amounts due under the Note, which are the subject of discussions between the parties, and are thus not sought herein.

WHEREFORE, plaintiff, POWER RENTAL OP CO, LLC, demands judgment against defendant, VIRGIN ISLANDS WATER AND POWER AUTHORITY, for the reasonable value of the power generation services that OpCo provided to WAPA, plus pre-judgment interest, court costs and attorney's fees, and for such other and further relief as this Court deems just and proper.

Dated: June 24, 2020

SHUTTS & BOWEN LLP
Attorneys for Plaintiff
200 S. Biscayne Boulevard
Suite 4100
Miami, Florida 33131
(305) 358-6300
(305) 381-9982 Facsimile
hpatricoff@shutts.com

By:___ /s/*Harold E. Patricoff*_____
Harold E. Patricoff
Florida Bar No. 508357

MIADOCS 20342967 6

EXHIBIT "A"

# PROMISSORY NOTE

This Promissory Note (this *"Note"*) is made as of May 1, 2019 (the *"Effective Date"*) by VIRGIN ISLANDS WATER AND POWER AUTHORITY, a municipal corporation existing under the laws of the United States Virgin Islands (*"Maker"*), to the order of POWER RENTAL OP CO LLC, a Florida limited liability company (*"Payee"*).

WHEREAS, Maker entered into that certain Contract dated as of February 15, 2012 with General Electric International, Inc. (predecessor in interest to Payee), as modified by the following change orders between Maker and Payee (as so modified, and as may be hereafter further modified by the parties thereto, the *"Contract"*): (i) Contract Change Order No. 1 dated November 8, 2013; (ii) Contract Change Order and Addendum No. 2 dated November 30, 2014; (iii) Contract Third Contract Change Order and Exhibits No. 3 dated effective November 30, 2016; (iv) Contract Fourth Contract Change Order and Exhibits No. 4 dated April 22, 2017; (v) Contract Fifth Contract Change Order and Exhibits No. 5 dated November 30, 2017; (vi) Contract Sixth Contract Change Order and Exhibits No. 6 dated March 6, 2018; (vii) Contract Seventh Contract Change Order and Exhibits No. 7 dated March 7, 2018; (viii) Contract Eighth Contract Change Order and Exhibits No. 8 dated March 7, 2018; (ix) Contract Ninth Contract Change Order and Exhibits No. 9 dated May 8, 2018; (x) Contract Tenth Contract Change Order and Exhibits No. 10 dated June 25, 2018; (xi) Contract Eleventh Contract Change Order and Exhibits No. 11 dated August 17, 2018; (xii) Contract Twelfth Contract Change Order dated October 29, 2018; and (iii) Contract Thirteenth Contract Change Order dated May 1, 2019 with Exhibit A thereto (the *"Thirteenth Change Order"*). This Note is the "promissory note" incorporated by reference in the Thirteenth Change Order as its Exhibit A.

WHEREAS, pursuant to the Contract, Payee is providing electrical power to Maker utilizing three turbine units referred to in the Contract as Units #25, #26 and #27 (the *"Current Turbines"*), with a current rental term scheduled through December 31, 2020.

WHEREAS, Maker is required under the Contract to maintain for the benefit of Payee a letter of credit to support Maker's obligations under the Contract (as the same may be extended, amended or replaced from time to time, the *"Letter of Credit"*), which currently consists of that certain letter of credit in the amount of $5,871,560.21 issued by Banco Popular de Puerto Rico on April 4, 2017 as letter of credit number S001175 and, through subsequent amendments, has a current expiration date of October 31, 2019.

WHEREAS, as of April 30, 2019, Maker was arrears in the aggregate amount of $14,291,986.00, which included $981,015.00 of accrued but unpaid interest ("Contract Arrearage").

WHEREAS, as of the Effective Date, Maker and Payee have agreed to reduce the Contract Arrearage to $9,310,971.00 (the *"Agreed Contract Arrearage"*).

WHEREAS, Maker has requested that Payee refrain from declaring Maker to be in default under the Contract as a result of the Agreed Contract Arrearage and, instead, to accept this Note

1

from Maker in substitution of the Agreed Contract Arrearage on the terms and conditions set forth herein.

WHEREAS, Payee is willing to accept this Note from Maker in substitution of the Agreed Contract Arrearage on the terms and conditions set forth herein.

NOW, THEREFORE, FOR GOOD AND VALUABLE CONSIDERATION RECEIVED BY MAKER (including, without limitation, Payee refraining from declaring Maker in default under the Contract as a result of the Agreed Contract Arrearage), Maker hereby promises to pay to the order of Payee at 3600 Port Jacksonville Parkway, Jacksonville, Florida 32226 (or at such other address as Payee may designate in writing to Maker), in lawful money of the United States of America, the principal sum of NINE MILLION THREE HUNDRED TEN THOUSAND NINE HUNDRED SEVENTY ONE AND 00/100 DOLLARS ($9,310,971.00), plus interest accruing from the Effective Date as hereinafter provided, payable as set forth below.

Maker hereby promises to pay interest on the unpaid principal amount outstanding hereunder accruing at a simple interest rate of ten percent (10%) per annum until all principal hereunder is paid in full (whether at maturity, upon acceleration, by prepayment or otherwise). Interest shall be calculated on the basis of a 365/366 day year for the actual number of days elapsed. Maker shall pay the principal and interest hereunder to Payee (without further notice or demand by Payee) in twenty equal monthly installments of Five Hundred Seven Thousand Three Hundred Fifty Four and 00/100 ($507,354.00) each, on the first calendar day of each month commencing on May 1, 2019 and continuing through and including December 1, 2020 (the "*Maturity Date*"), subject, however, to the right of Payee to accelerate the Maturity Date (in which case all then outstanding principal, together with all accrued but unpaid interest, shall be immediately due and payable) upon the occurrence of any of the following: (i) an Event of Default (defined hereinafter); (ii) the expiration or termination of the Contract for any reason whatsoever; (iii) the expiration or non-renewal of the Letter of Credit (or any failure of Maker to replenish the Letter of Credit in connection with any draw made thereunder) at any time prior to the expiration or termination of the Contract; or (iv) any failure of Maker to perform any of its obligations under the Contract (beyond any applicable notice or cure periods therein).

If at any time and for any reason whatsoever, the interest rate payable hereunder shall exceed the maximum rate of interest permitted to be charged by Payee to Maker under applicable law, such interest rate shall be deemed to be reduced automatically to the maximum rate of interest permitted to be charged under applicable law, and that portion of each sum paid attributable to that portion of such interest rate that exceeds the maximum rate of interest permitted by applicable law shall be deemed a voluntary prepayment of principal hereunder.

Unless otherwise specified by Payee in a written notice delivered by Payee to Maker using the notice procedures set forth in the Contract, all payments to be made by Maker hereunder shall be made by wire transfer to Payee using the following instructions:

> Bank of America
> One Bryant Park
> New York, NY 10036 USA
> Phone (U.S.) 1-800-729-9473

2

Phone (Int'l) +1-570-330-1610
ABA Number ▬▬▬▬▬ Wires)
SWIFT: BOFAUS3N
Account Name: Power Rental Op Co LLC
Account Number: ▬▬▬▬

Maker may repay the indebtedness evidenced hereby in full or in part at any time without notice, penalty, prepayment fee, or payment of unearned interest.  All payments made hereunder shall be applied first to the payment of any costs or expenses due to Payee hereunder, second to accrued interest, and third to the payment of the principal amount outstanding under this Note.  No prepaid amount may be reborrowed.

Whenever any payment to be made hereunder shall be due on a day that is not a Business Day (as defined hereinafter), such payment shall be made on the next succeeding Business Day and such extension will be taken into account in calculating the amount of interest payable under this Note.  As used herein, *"Business Day"* means any day other than a Saturday, Sunday or other day on which commercial banks in New York, New York, Jacksonville, Florida or St. Thomas, United States Virgin Islands, are authorized or required by law to close.

Maker hereby waives demand for payment, presentment for payment, protest, notice of payment, notice of dishonor, notice of nonpayment, notice of acceleration of maturity and diligence in taking any action to collect sums owing hereunder.  If at any time any payment made by Maker under this Note is rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy or reorganization of Maker or otherwise, Maker's obligation to make such payment shall be reinstated as though such payment had not been made.

As used herein, the term *"Event of Default"* means any one or more of the following: (a) failure of Maker to pay, when due, any amounts due hereunder (time being of the essence) including, without limitation, any payment due upon the Maturity Date, within five business days' following written notice of such nonpayment by Payee; (b) the filing, by or against Maker, of any petition for relief under the United States Bankruptcy Code or any similar provision of state or foreign law; (c) the making of an assignment by Maker for the benefit of its creditors; (d) the insolvency of Maker; (e) the filing, by or against Maker, of any provision for relief under any reorganization, debtor relief or similar statute designed to provide relief for debtors with respect to creditors; (f) the failure by Maker to maintain, renew or replenish the Letter of Credit; or (g) the failure by Maker to perform any of its other obligations under this Note, within five business day's following written notice of such failure by Payee.  Maker hereby agrees with Payee that any Event of Default hereunder (other than as set forth in subparagraph (a) and (g) of this paragraph) shall constitute an immediate event of default by Maker under the Contract (and that no notice or cure period that may otherwise be applicable to events of default under the Contract shall be applicable upon the occurrence of an Event of Default hereunder, other than as set forth in subparagraph (a) and (g) of this paragraph).

Upon the occurrence of an Event of Default, all then outstanding principal and accrued interest hereunder shall, at the sole election of Payee, become immediately due and payable in full, and Payee may exercise any or all of its rights, powers or remedies under this Note, the Contract, applicable law or in equity; provided, however, that upon any Event of Default described in either

3

clause (b) or (d) of the definition thereof, all such amounts shall automatically become immediately due and payable in full. Interest shall accrue, and shall be payable on demand, on the outstanding principal balance of this Note from and after the date of any Event of Default hereunder, regardless of whether or not there has been an acceleration of the indebtedness evidenced hereby as set forth herein, at a rate equal to three percent (3%) per annum in excess of the interest rate otherwise applicable at the time of such default. If an Event of Default occurs, Maker shall promptly pay to Payee, upon demand, all reasonable costs and expenses incurred by Payee in connection with the enforcement of its rights and remedies under this Note including, without limitation, reasonable attorneys fees and court costs. No failure to exercise and no delay in exercising on the part of Payee, of any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law or in equity.

Maker hereby agrees that, in the event that any payment is not made when due hereunder, the amount of any such delinquent payment (including, without limitation, the entire amount of the principal hereof if accelerated, and any accrued but unpaid interest) shall be deemed to be a payment due from Maker to Payee under and pursuant to the Contract and, as a result, Payee shall be entitled to make demand under the Letter of Credit for the amount then due hereunder and to resort to any other collateral security that may be provided by Maker with respect to the Contract.

Maker hereby acknowledges and agrees that the Agreed Contract Arrearage is immediately due and payable in full and that, but for Payee's willingness to accept this Note in substitution for the Agreed Contract Arrearage and Maker's agreement to perform its obligations hereunder, Maker would be in default of its obligations under the Contract and, as a result, Payee would be entitled immediately to pursue all of its rights and remedies under the Contract, at law and in equity. With respect to the Agreed Contract Arrearage, Maker waives any defenses, right of set off or any other claim Maker has or may have against Payee.

Maker unconditionally and irrevocably agrees that the execution, delivery and performance by it of this Note constitute private and commercial acts. In furtherance of the foregoing, Maker hereby irrevocably and unconditionally agrees that, to the extent permitted by Applicable Law, (i) should any proceedings be brought against Maker or its assets (other than Maker's electric system and equipment, its electric distribution assets, and assets protected by diplomatic and consular privileges legislation analogous to the 1976 Sovereign Immunities Act of the United States (the *"Protected Assets"*)) in any jurisdiction in connection with this Note, no claim of immunity from such proceedings shall be claimed by or on behalf of Maker on behalf of itself or any of its assets (other than Protected Assets); (ii) it waives any right of immunity which it or any of its assets (other than Protected Assets) now has or may in the future have in any jurisdiction in connection with any such proceedings; and (iii) it consents generally in respect of the enforcement of any judgment against it in any such proceedings in any jurisdiction, to the giving of any relief or the issuance of any process in connection with such proceedings, including, without limitation, the making, enforcement or execution against or in respect of any of its assets (other than Protected Assets).

4

This Note, and any claim, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Note, shall be governed by the laws of the State of New York, without regard to its conflicts of law rules. Maker hereby irrevocably and unconditionally (i) agrees that any legal action, suit or proceeding arising out of or relating to this Note may be brought in the courts of the United States Virgin Islands located in St. Thomas and (ii) submits to the exclusive jurisdiction of any such court in any such action, suit or proceeding. Final judgment against Maker in any action, suit or proceeding shall be conclusive and may be enforced in any other jurisdiction by suit on the judgment. Nothing in this Note shall affect the right of Payee to (i) commence legal proceedings or otherwise sue Maker in any other court having jurisdiction over Maker or (ii) serve process upon Maker in any manner authorized by the laws of any such jurisdiction. Maker irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Note in any court referred to in this paragraph and the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

If any term or provision of this Note is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Note or invalidate or render unenforceable such term or provision in any other jurisdiction.

MAKER HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY RELATING TO THIS NOTE, WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY.

This Note and any amendments, waivers, consents or supplements hereto may be executed in counterparts, each of which shall constitute an original, but all taken together shall constitute a single instrument. This Note constitutes the entire agreement between the Parties with respect to the subject matter hereof and supersedes all previous agreements and understandings, oral or written, with respect thereto; provided, however, that nothing herein shall be deemed to modify the Contract except to the extent expressly stated herein. Delivery of an executed counterpart of a signature page to this Note by facsimile or in electronic (i.e., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Note.

No term of this Note may be waived, modified or amended except by an instrument in writing signed by both of the parties hereto. Any waiver of the terms hereof shall be effective only in the specific instance and for the specific purpose given. This Note may not be assigned or transferred by Payee to any person or entity without the prior written consent of Maker which shall not be unreasonably withheld or delayed. Maker may not assign or transfer this Note or any of its rights or obligations hereunder without the prior written consent of Payee, to be granted or withheld in its sole discretion. Subject to the foregoing provisions of this paragraph, this Note shall inure to the benefit of, and be binding upon, the parties hereto and their respective permitted successors and assigns.

The undersigned represent that they have the authority to bind their respective parties.

5

*[Signature Page Follows]*

IN WITNESS WHEREOF, Maker has executed this Note as of the Effective Date.

**VIRGIN ISLANDS WATER AND POWER AUTHORITY**
a municipal corporation existing under the
laws of the United States Virgin Islands

By:_____

Name: Lawrence J. Kupfer

Title: Executive Director/CEO

Agreed and accepted by Payee as of the Effective Date:

**POWER RENTAL OP CO LLC,**
a Florida limited liability company

By:_____

Name:

Title:

# EXHIBIT "B"

Contract# SC-21-12

## This Contract is offered as of the Effective Date by:

**GENERAL ELECTRIC INTERNATIONAL, INC.,** a branch of a Delaware corporation, licensed to conduct business in the US Virgin Islands (the "Seller");
and between **VIRGIN ISLANDS WATER AND POWER AUTHORITY,** a municipal corporation existing under the laws of the United States Virgin Islands having a principal place of business at 8189 Subbase, St. Thomas, US Virgin Islands 00802 (the "Buyer.")

The Buyer and the Seller are referred to herein individually as a "Party" and collectively as the "Parties."

## Recitals

**WHEREAS,** the Seller is engaged in the business of renting various kinds of power plant equipment and of providing services and balance of plant in support of the installation and use thereof; and

**WHEREAS,** the Buyer desires to rent from the Seller, and the Seller desires to rent to the Buyer one TM2500 Mobile Power Plant and the Water Treatment System, together with Services and Balance of Plant in connection with Buyer's Project located at the Randolph Harley Power Plant, 8189 Subbase, St. Thomas, US Virgin Islands (the "Site"), all subject to the terms set forth herein;

**NOW, THEREFORE,** in consideration of the mutual promises stated herein, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

**1.   Equipment Rental**
Buyer shall rent the Equipment and the Water Treatment System from Seller for the Rental Term.

### a.   TM2500
The TM2500 Mobile Power Plant consists of four trailers assembled to create one Unit ("Unit") as more fully described in Appendix A. The one Unit rented in this Contract consists of a new package with a refurbished engine and makes up the Equipment ("Equipment"). Seller shall, on behalf of Buyer, operate the Equipment for up to twenty-four hours per day of the Rental Term without incurring additional charges.

Seller considers the applicable sections of the US and ISO Codes and Standards in Appendix A to be the most relevant Standards for gas turbine equipment. Seller's designs and procedures are generally compliant with applicable sections of Appendix A.

Without Seller's prior written consent, Buyer shall not make any alterations, additions or improvements to the Equipment, its software, connections or configurations or its connection to the data stream, and will not add tags, links to local area networks, or other devices or systems or otherwise change the Equipment's setup, functioning, and configuration or connectivity if the setup was performed by Seller. In addition to other rights, Seller may elect, at its sole option, to have any alteration, addition or improvement to the Equipment which is made by Buyer, with or without Seller's consent, become the property of Seller, or to have Buyer remove the alteration, addition or improvement and restore the Equipment to its prior condition, all at Buyer's expense. Buyer shall not (a) attempt to access any data, displays, information, software, or other parts or functions of the Equipment not specifically made available to Buyer by Seller; or (b) paint the Equipment or alter, cover, obscure or remove from the Equipment any nameplate, logo or other identification label or marking, operating instructions or safety warnings or markings.

### b.   The Water Treatment System
The Water Treatment System consists of one Mobile RO Machine, four MBDI, one DI Water Storage Tank with transfer pump, field service, the hoses and PVC piping and labor to connect the system, the electrical wiring/conduit, and the required consumables as more fully described in Appendix L, Water Treatment System (the "Water Treatment System").

2



2.   **Services and Balance of Plant**

**I. Services**

Seller's Services scope of supply under this Contract is limited to the following (the "Services"), which Seller shall perform in accordance with the terms hereof:

A.   Installation of the Equipment includes the following activities ("Installation of the Equipment"):
     i.    Conduct an installation planning meeting with the Buyer
     ii.   Perform receiving and inspection of the Equipment
     iii.  Tie Equipment into the grounding system
     iv.  Setup, level, and align the main trailer and generator inlet and exhaust
     v.   Install the air filter module
     vi.  Install the exhaust silencer module
     vii.  Setup auxiliary trailer
     viii. Connect mechanical interconnections
     ix.  Connect electrical interconnections
     x.   Fill fluid reservoirs in accordance with Seller's specifications

B.   Commissioning of the Equipment, per Appendix N, Commissioning Checklist, including the following activities ("Commissioning of the Equipment"):
     i.    Conduct a commissioning planning meeting with the Buyer
     ii.   Perform static Equipment checks
     iii.  Perform Equipment system configurations, inspections, & commissioning with auxiliary power
     iv.  Test the fire suppression system including, but not limited to, the following verifications: a) mechanical test of dampers, b) discharge of $CO_2$ into all turbine compartments, c) verification of $CO_2$ initial and sustained discharge, d) gas turbine shut down via fuel stop valve closure, and e) shutdown the turbine compartment vent fans
     v.   Conduct high speed crank test
     vi.  Execute first fire of the gas turbine
     vii.  Conduct full speed no load generator checks
     viii. Seller and Buyer shall check phase rotation and Seller shall correct phase rotation if necessary
     ix.  Synchronize to the grid
     x.   Tune the fuel and water systems from minimal load to full load
     xi.  Perform test run
     xii.  Declare the Equipment commercially available

C.   Demobilization of the Equipment including the following activities ("Demobilization of the Equipment"):
     i.    Conduct a demobilization planning meeting with the Buyer
     ii.   Isolate Equipment from all non-Seller owned equipment; including, but not limited to, all fuel, water, and electrical connections
     iii.  Disconnect all the Equipment interconnections
     iv.  Disassemble all of the trailers and the ship-loose components
     v.   Prepare the Equipment for shipment
     vi.  Prepare parts and tool containers for shipment
     vii.  Remove all Seller-owned Equipment and Seller-owned material from the site
     viii. Conduct final Site assessment with Buyer

D.   full operational services for the Equipment for up to twenty-four hours per day, as more specifically described in Appendix C

E.   maintenance of the Equipment



F.  Performance testing of the Equipment including output, heat rate, emissions, and noise testing as more specifically described in Appendix F, Typical Test Specification, and Appendix O, Performance Testing

G.  provide information reasonably necessary to assist the Buyer in obtaining Buyer's permits

H.  round trip transportation of the Equipment, Water Treatment System, and tooling from Seller's point of origin to Buyer's Site and then back again.  One-way transportation of the Balance of Plant from Seller's point of origin to Buyer's Site.

## II. Balance of Plant

Seller's Balance of Plant scope of supply under this Contract is limited to the following (the "Balance of Plant"), which Seller shall perform in accordance with the terms hereof:

1.  *Balance of Plant Scope of Work*

Furnish engineering, equipment, materials, construction and testing to install the Unit on the Site.  The Unit will be connected to the Buyer's existing transformer T22.  Seller will provide power and control cable between the Unit and transformer T22.  Buyer will provide cable tray from T22 to the pipe rack adjacent to the Unit.  Near the existing fuel skid area, Buyer to provide a 4" flange in the existing diesel fuel supply line.  Seller will connect to the flange for a fuel supply source to the Unit fuel line.

a)  Engineering:

i)  Revise existing Buyer drawings related to transformer T22 and addition of the new Unit. Revisions will be hand mark-ups of existing Buyer drawings and the list of the drawings to be marked up will be mutually agreed by the Parties.

ii)  Protection/Trip/Close associated with the Unit addition.  Functionality will be consistent with Buyer's existing breaker 10 associated with generator 22 as described in the General Arrangement Drawing in Appendix H, General Arrangement Drawing and Single Line Diagram

b)  Lot design engineering and the following drawings:

i)  General arrangement

ii)  480V/277V single-line diagram

iii)  Provide design and foundation drawings for the Unit and the auxiliary transformer

iv)  Low voltage equipment arrangement plan

v)  Cable tray arrangement drawing

vi)  Piping and instrumentation drawing with bill of material

vii)  Grounding plan and details

c)  Balance of Plant Equipment and Materials

The following equipment and materials will be provided by Seller:

i)  One auxiliary step-down transformer, 13.8kV/480V, 110 kV BIL, 750KVA Delta/Wye.  Located in close proximity of Unit

ii)  One 480V, 1000 Amp, 65kA, outdoor distribution switchboard with main breaker and feeder breakers to power balance of plant low voltage loads.

iii)  Lot, 15 kV cable connecting:

(1)  Unit output to Buyer transformer T22.  Total length less than 500'.

(2)  Unit output to auxiliary transformer



        (3)  Lot 600V insulated power and control cables to interconnect auxiliary power, control and instrumentation.  Total length less than 1,000'.

    iv) Lot ground grid materials as follows:

        (1)  Bare conductor loop around the Unit with 4 grounding rods.  Unit grounding tails tied to ground loop

  v) Mechanical equipment as follows:

      1. One, end stage, 3 micron, duplex (2x100%), liquid fuel filter skid

      2. Lot, stainless steel and carbon steel fuel pipe from the Buyer's fuel interface flange to the Unit.  Buyer's fuel flange is no more than 100 feet from the Unit feed flange.

      3, One fuel metering unit, utilizing a Yokogawa RotaMass GT15 as specified by Buyer in supplied document as found in Appendix I, Fuel Meter Specification.  The fuel metering system will be monitored and or stored by Buyer's owned or supplied device.  Only local fuel monitoring is provided by Seller, however Seller will be provide metering control signal via shielded analog twisted pair to within 1,000 feet.

  d) Construction craft labor and materials as follows:
    (1)  Site supervision
    (2)  Craft labor
    (3)  Installation of ground grid
    (4)  Gravel and steel plates for Unit foundation
    (5)  Install foundations as designed for auxiliary transformer and Unit.

  e) Balance of Plant Testing

      1. Auxiliary transformer

      2. Visually inspect bushings, radiators and gauges for leaks.

      3. Inspect/operate transformer auxiliary devices and check for discrepancies.

      4. Check for proper tightness of accessible externally bolted electrical connections.

      5. Check equipment grounds for tightness.

      6.    Perform a turns ratio test in operating tap position.

      7.    Remove insulating liquid sample from the transformer, send to laboratory for the following analysis: dielectric breakdown, acid neutralization number, color (visual and sediment), interfacial tension and specific gravity.  Provide Buyer with the test report.

      8.    Verify trip/close/blocking/protection/control scheme and devices as designed.

      9.    Hi-pot of 15 kV cable and stress cones installed as part of this Contract via a "Go/No Go" test.

    Buyer will verify and witness the functional testing of the transformer 87/67 circuits.

  f) Labor to connect the Lot, 15 kV cable as described here:

      1.  Unit output to Buyer transformer T22

      2.  Unit output to Auxiliary Transformer



    3.  Lot 600V insulated power and control cables to interconnect auxiliary power, control and instrumentation.

g) 15kV Current Transformers

    1. Perform a Current Transformer polarity test.

h) Low Voltage Circuit Breakers

1.  The circuit breaker will be manually operated and inspected for proper open and close operation.

2.  The primary contact resistance of each phase will be measured with a ductor and recorded.

3.  Measure phase-to-phase and phase-to-ground insulation resistance.

4.  The circuit breakers equipped with solid state or microprocessor programmers will be tested with a programmer test set

(g) Fuel Monitoring Device

1.  Verify the device provides the proper proportional signal on the supplied signal cable.

(Note: Fuel supplied by Buyer is to meet the specification(s) in Appendix K and the fuel shall be at flow rate of 40 GPM at 35 PSIG (+/- 10%) or at a flow rate and pressure capable of continuously running the Unit. )

The Buyer will be responsible for services and balance of plant other than those performed by Seller as set forth in this Section 2 and the relevant appendices.

**3.      Buyer Responsibilities**

An outline of Buyer Responsibilities is available in Appendix B.

**4.      Contract Price**

In exchange for the Equipment and Water Treatment System rental and associated Balance of Plant and Services identified in Articles 1 and 2 above, Buyer will pay the Seller $14,673,702 plus transportation and mix bed exchanges in United States Dollars, further details of which are described in Section A of Appendix P, Confidential Information.

Seller's installation, commissioning, and decommissioning, Services are based on Seller's estimated schedule of installation lasting three consecutive days, commissioning lasting nine consecutive days and decommissioning lasting three consecutive days. Any non-Seller caused delay will be subject to additional charges on an hourly time and material basis per Seller's then-current standard Field Services Rate Schedule (Seller's Field Services Rate Schedule current as of the Effective Date is attached in Appendix G, Field Service Labor Rates) and will be agreed as per Article 15, Changes, Paragraph (a), Buyer-Initiated Changes.  Should Seller require additional installation, commissioning, decommissioning time due to delays caused by the Seller, Buyer will not be liable for this incremental services time.  The Service fees and the time for performance of such Services assume the accuracy of the information given to Seller with respect to Site conditions and are subject to adjustment to the extent such information is or becomes inaccurate, the Buyer has not complied with the obligations in Appendix B, Section 4, Site, utilities are not correctly located, provision of utilities is not timely, applicable licenses or permits are not obtained in a timely manner, or Buyer in any way delays completion of the Services.

If the Equipment is imported under a temporary import duty exemption and the Buyer causes the Equipment to remain in country past the temporary import duty exemption expiration, then Buyer will bear the costs of the additional duties and penalties.



6

5.      Transportation

Seller will provide transportation of the Equipment, Balance of Plant, the Water Treatment System, and Water Treatment System mixed beds between Seller's facility or other point of origin, the Site and back again.  Buyer shall pay Seller for (a) all fees and expenses including, but not limited to, those covering preparation of consular documents, freight, storage and warehouse-to-warehouse insurance (collectively, "Transportation Costs") plus (b) a shipping management fee in the amount of 15% of all Transportation Costs actually incurred.   At the time of shipment, Seller shall consign the Equipment, Balance of Plant, and the Water Treatment System to the Buyer. Buyer will provide free and clear access for delivery of the Equipment.

Should Seller ship any items in error due to Seller's error, Seller shall re-ship the replacement item(s) at Seller's expense.

Seller shall be given free access to the Site for the purpose of inspecting it or the Equipment.

Seller will utilize Seller's sourcing and logistics department to find a competitively priced transportation solution given the time and location constraints.  Seller will provide supporting documentation for verifying the actual transportation costs.

6.      Taxes and Duties

6.1     Seller shall be responsible for, and shall pay directly, any and all corporate and individual taxes that are measured by net income or profit imposed by any governmental authority of any country on Seller, its employees or subcontractors due to the execution of any agreement or the performance of or payment for work hereunder (the "Seller Taxes.")  If Buyer deducts or withholds Seller Taxes, Buyer shall, within one month, furnish to Seller accurate official receipts from the appropriate governmental authority for each deducted or withheld Seller Tax.  Buyer shall be responsible for, and shall pay directly when due and payable, any and all Project Taxes (defined in Section 6.2 below,) and all payments due and payable by Buyer to Seller hereunder shall be made in the full amount of the purchase price, free and clear of all deductions and withholding, for Project Taxes.  Except for Gross Receipts Tax which are addressed in Section 6.3, if Buyer deducts or withholds Project Taxes, Buyer shall pay additional amounts to Seller to cause the amounts actually received by Seller, net of deducted or withheld Project Taxes, to equal the full amount of the purchase price, and shall provide to Seller within one month, along with such payments, accurate official receipts from the appropriate governmental authority for deducted or withheld Project Taxes.  If Seller is required to pay Project Taxes, Buyer shall, promptly upon presentation of Seller's invoice for such Project Taxes, pay to Seller in U.S. dollars an amount equal to the U.S. dollar equivalent of such Project Taxes (calculated at the tax rate in effect at the time payment of such Project Taxes were made.)

6.2     "Project Taxes" means all taxes, duties, fees, or other charges of any nature (including, but not limited to, ad valorem, consumption, excise, franchise, gross receipts, import, license, property, sales, stamp, storage, transfer, turnover, use, or value-added taxes, and any and all items of withholding, deficiency, penalty, addition to tax, interest, or assessment related thereto), other than Seller Taxes, imposed by the government of the US Virgin Islands on Seller or its employees or subcontractors due to the execution of any agreement or the performance of or payment for rental of Equipment or Services hereunder. Equipment, Water Treatment System, and Balance of Plant delivered to a location outside the country of origin are presumed to be exempt from Project Taxes levied within the country of origin. When requested by Seller, Buyer agrees to furnish, without charge, evidence of tax or duty exemption acceptable to the taxing or customs authorities.  Furthermore, if Buyer arranges for export shipment, Buyer agrees to provide Seller, without charge, an export bill of lading.

6.3     Gross Receipts Tax.
        The Parties agree to the following:
        a. Supplies of goods and services are subject to the Virgin Islands Gross Receipt Tax (the "GRT").



    b. Seller's invoices shall include grossed-up pricing calculated at the then-current GRT amount (the prices in this Contract as of the Effective Date are calculated on a 4.5% GRT).

    c. Should the GRT percentage change from 4.5% during the Contract, the pricing in this Contract will be adjusted accordingly such that the net payments the Buyer will remit to the Seller, less the GRT, remain as they are at the time of the Effective Date.

    d. Buyer must withhold the GRT from the payments due to Seller

    e. Buyer must remit the withheld GRT to the taxing authorities by the respective due dates

    f. Buyer must provide Seller proof of their GRT withholding remittance within ten days of the date that Buyer remits the GRT to the taxing authorities.

    g. Should the Buyer fail to withhold or remit the GRT such that the Seller is assessed and/or penalized by the taxing authorities for any late-paid GRT, then Seller shall be entitled to recover the amounts of such assessments/penalties from the Buyer.

**7.      Rental Term**

The rental term commences on the Commercial Operation Date and continues for one year and 183 days thereafter (the "Rental Term") as estimated in the schedule attached in Appendix J, Estimated Schedule. Commercial Operation Date is defined as the date of Seller's issuance of the successfully completed Commissioning Checklist Certificate, an example of which is documented in Appendix N, Commissioning Checklist Certificate the "Commercial Operation Date").

Seller and Buyer confirm their intent that the rental of the Equipment and the Water Treatment System as designated by and pursuant to the Contract shall be a true lease and not a sale or financing transaction and that neither the execution nor the filing of any financing statement with respect to any of the Equipment or Water Treatment System or with respect to the Contract, or the recording hereof, shall in any manner imply otherwise.

**8.      Rental Extension**

Buyer may request an extension of the Rental Term in writing ninety days prior to the original Rental Term end date.  Seller will respond to (approve or deny) Buyer's Rental Term extension request within twenty days of receipt of Buyers written communication.  Upon Contract extension, the Contract terms and conditions may be adjusted by mutual agreement of the Parties via a change order.

**9.      Buyer Liquidated Damages For Non-Return of the Equipment**

If, at the end of the Rental Term, Buyer and Seller have not reached a written agreement extending the Rental Term and Service time or are not negotiating in good faith towards an extension, then the Buyer owes the Seller liquidated damages calculated according to the following table until the date that the Equipment is returned to the designated Seller location.

| Number of Days From Contract End Date | Liquidated Damages Amount ($USD) |
|---|---|
| 0-30 | The Daily Rental Rate, the Daily Water Treatment Plant Rental Rate, and the Daily Services Rate for each day or portion of each day. |
| 31 and higher | Two times the Daily Rental Rate, two times the Daily Water Treatment Rental Rate, and two times the Daily Services Rate for each day or  portion of a day after 31 days from the Rental Term expiration. |

The daily Equipment rental rate is:        1/15th of the Monthly Rental Rate (the "Daily Rental Rate.")
The daily Services operation rate is:  1/15th of the Monthly Services Rate (the "Daily Services Rate.")
The daily Water Treatment System rental rate is:  1/15th of the Monthly Water Treatment System Rental Rate (the "Daily Water Treatment System Rental Rate").



**10.**    **Contract Termination**

a. Buyer may terminate this Contract for Buyer's convenience provided that:
   A.  Buyer provides Seller 90 days advance written notice of termination; and
   B.  Buyer must pay to Seller the lesser of:
      1. The remaining sums due under the Contract not already paid by Buyer to Seller; or
      2. One third of the total Contract Price
      plus, in each case, the transportation costs plus 15% including export duties and fees necessary to
      return the Equipment back to the Seller's facility or other location designated by Seller (whichever is
      less expensive) and the Decommissioning costs.
   Such payment must be made by Buyer to Seller at least thirty (30) days prior to the designated termination
   date and any such termination shall be effective upon receipt of such payment by Seller.  Seller will invoice
   for payment within thirty (30) days after Buyer's Contract termination notice.

   **Special Termination for the Water Treatment Plant Rental:**  Buyer may not terminate the Water
   Treatment Plant rental for Buyer's convenience until after the first 180 days of Rental Term (the "Minimum
   Water Treatment Plant Rental Period").  After the Minimum Water Treatment Plant Rental Period, with a
   minimum of seven calendar days advanced written notice to Seller, Buyer may terminate the Water
   Treatment Plant rental and pay for any yet unpaid Water Treatment Plant rental fees that have been
   accrued, or any portions thereof.

b. The Buyer shall have the right to terminate this Contract for cause in the event that the Seller:
   (i) becomes insolvent, makes an assignment for the benefit of its creditors, has a receiver or trustee
   appointed for the benefit of its creditors, or files for protection from creditors under any bankruptcy or
   insolvency laws; or
   (ii) substantially breaches and fails to comply or perform its material obligations hereunder (but only with
   respect to a material obligation for which this Contract does not provide exclusive remedies), provided that:
      (A) the Buyer shall first have provided the Seller with written notice (return receipt requested) of the
      nature of such breach and of the Buyer's intention to terminate this Contract as a result of such
      breach, and
      (B) the Seller shall have failed within thirty (30) calendar days after receipt of such notice (or such
      extended period as is considered reasonable by the Parties) either:
         (1) to commence to cure such breach and diligently thereafter to pursue such cure, but in any
         event, the cure will take no longer than 60 days or such other time as may be reasonably
         agreed to by the Parties under the circumstances or
         (2) to provide reasonable written evidence, with supporting documentation, that no such
         breach has occurred which shall be provided from the Seller to the Buyer within fifteen (15)
         days from Buyer's written notice.  Buyer shall then have fifteen (15) days to respond to the
         Seller in writing to advise if Buyer is withdrawing its notice of breach or advise Seller that
         Buyer shall not withdraw its notice of breach including the reason behind such advice, in
         which case the Seller shall commence to cure the breach within the time period as stated in
         Article 10, Section b., (ii), B, (1).

c. If the Buyer terminates this Contract for cause as provided in Section10.b, the Buyer shall pay the Seller for
that portion of the Contract Price allocable to the Equipment Rental, Balance of Plant, Water Treatment System,
and/or Services performed prior to the effective date of the termination.  If the payments received by the Seller
as of the effective date of such termination are in excess of the Contract Price, the Seller shall return the excess
of such payments to the Buyer within thirty days of termination.  In addition, the Seller shall pay to Buyer an
amount equal to the difference between that portion of the Contract Price allocable to the terminated work
and such actual and reasonable amount paid by the Buyer to another vendor for equipment or services
comparable to those terminated.



d. Termination of the Contract shall not relieve either Party of any obligation arising out of work performed prior to termination.

e. The Seller shall have the right to terminate this Contract for cause in the event that the Buyer substantially breaches and fails to comply or perform its material obligations hereunder, including failure to make any payment when due or to fulfill any payment conditions, including any payment security, as set forth in this Contract, provided:

(A) that the Seller shall first have provided the Buyer with written notice (return receipt requested) of the nature of such failure and of the Seller's intention to terminate this Contract as a result of such failure, and

(B) either:

i. that the Buyer shall have failed within thirty (30) calendar days after receipt of such notice to correct such failure, or

ii. if failure is not related to payment, the Buyer shall either:

(1) to commence to cure such breach and diligently thereafter to pursue such cure, but in any event, the cure will take no longer than 60 days or such other time as may be reasonably agreed to by the Parties under the circumstances or

(2) provide reasonable written evidence, with supporting documentation, that no such breach has occurred which shall be provided from the Buyer to the Seller within fifteen (15) days from Seller's written notice. Seller shall then have fifteen (15) days to respond to the Buyer in writing to advise if Seller is withdrawing its notice of breach or advise Buyer that Seller shall not withdraw its notice of breach including the reason behind such advice, in which case the Buyer shall commence to cure the breach within the time period as stated in Article 10, Section e., B, ii, (1).

f. If Buyer is in possession of any Equipment at the time Seller suspends or terminates the Contract or portion thereof pursuant to the terms and conditions in this Contract, in addition to its other rights thereunder, Seller may also require Buyer at Buyer's expense to return promptly all or any portion of the Equipment to Seller; Seller, with consent of Buyer, may enter upon the premises where the Equipment is located and take immediate possession and remove some or all of it, all without liability to Buyer; or Seller may exercise any other right or remedy available to it under any applicable law. No right or remedy of Seller referred to in this Article is exclusive, but each is cumulative and in addition to any other right or remedy otherwise available to Seller at law or in equity.

g. Seller shall have the right to immediately reclaim and demobilize the Equipment back to point of origin if Buyer defaults on payment obligations or payment security obligations for more than 30 days. Such default will be deemed Buyer's termination for convenience and incur termination amounts described above in 10.a.B.

h. If Buyer fails to fulfill any condition of its payment obligations, Seller may suspend performance and delivery following the cure period described in Article 10, Section e, B, i. Any cost incurred by Seller in accordance with such suspension (including storage costs) shall be payable by Buyer upon submission of Seller's invoices. Performance of Seller's obligations shall be extended for a period equaling the period of Buyer's nonfulfillment of any portion of the payment terms of the Contract, whether or not Seller suspends performance, and such additional time as may be reasonably necessary in the circumstances. If Buyer does not correct such failure in the manner and time satisfactory to Seller as described in Article 10, Section e, B, i, then Seller may, at its option, terminate the transaction in respect to the portion of the Rental Term not completed and work not yet performed. Buyer shall pay Seller termination charges for Buyer's convenience in accordance with Article 10.a, Contract Termination in the event of such termination.

i. If Buyer becomes bankrupt or insolvent, or if any proceeding is brought against Buyer, voluntarily or involuntarily, under the bankruptcy laws or any insolvency laws, Seller shall be entitled to terminate this Contract. Buyer shall pay Seller its termination charges in the event of such termination in accordance with Article 10.a above.



11.     **Equipment Security**
Upon demobilization of the Equipment, Buyer must allow for Equipment exportation and/or shipment back to Seller's point of origin or designated location within thirty days after Equipment demobilization.  If Buyer has impeded the exportation of the Equipment for more than thirty days after the Equipment demobilization, Buyer will pay the Equipment Daily Rental Rate for each day following the rental term end date until the Equipment arrives at the Seller's point of origin or designated location.

12.     **Title Passage, Delivery, and Right to Access Equipment, Use of Water Treatment System**
a. The Equipment and Water Treatment System is, and shall at all times be and remain, solely and exclusively the property of Seller or its affiliates, and no right, title or interest in the Equipment shall pass to Buyer other than, conditioned upon Buyer's compliance with and fulfillment of the terms and conditions of the Contract, the right of Buyer to maintain, as lessee, possession and use as described in the Contract of the Equipment for the Rental Term, as defined herein.   The Equipment is, and shall at all times remain, personal property notwithstanding that the leased Equipment or any part thereof may now be, or hereafter become, in any manner affixed or attached to any other personal or real property.

b. Provided that Seller has not initiated the Equipment shipment, if any Equipment cannot be finally shipped to Buyer when ready due to any cause not attributable to Seller, upon notice to Buyer, Seller may ship such Equipment to storage.  If such Equipment is placed in storage, including storage at the facility where manufactured, the following conditions shall apply:  (i) any amounts otherwise payable to Seller upon delivery or shipment shall be payable upon presentation of Seller's invoices and certification as to cause for storage; (ii) all expenses incurred by Seller, such as for preparation for and placement into storage, handling, inspection, preservation, insurance, storage, removal charges and any taxes shall be payable by Buyer upon submission of Seller's invoices; and (ii) when conditions permit and upon payment of all amounts due hereunder, Seller shall resume delivery of the Equipment to the originally agreed point of delivery.

c. Title to Services shall pass to Buyer as performed.

d. Seller shall have access to the Site and the Equipment at any and all times.

e. Buyer's failure to meet local authorities regulations/laws (i.e. payment of taxes of any kind) nor pay related charges/fees shall not preclude Seller from the right to immediately reclaim and demobilize the Equipment back to point of origin.

f. Balance of Plant:
        i. Title to Balance of Plant shipped from the U.S. shall pass to Buyer immediately after each item departs from the territorial land, seas and overlying airspace of the U.S. For this purpose, the parties acknowledge that the territorial seas of the U.S. extend to twelve nautical miles from the baseline of the country determined in accordance with the 1982 United Nations Convention of the Law of the Sea. Title to Balance of Plant shipped from within the country where Balance of Plant will be installed shall pass to Buyer when Balance of Plant is made available for shipment from the manufacturer's factory or the storage facility utilized by Seller. Title to Balance of Plant shipped directly from a European Union ("EU") manufacturer or a EU storage facility outside the country where the Balance of Plant will be installed shall pass to Buyer the earlier of (i) the port of export immediately after the Balance of Plant has been cleared for export or (ii) immediately after each item departs from the territorial land, seas and overlying airspace of the EU sending country.  Title to Balance of Plant to be shipped from any other country shall pass to Buyer at the port of export immediately after the Balance of Plant has been cleared for export. Title to Services shall pass to Buyer as performed. Notwithstanding the foregoing, for any software provided by Seller hereunder, only the license to the software transfers as set forth herein, and title to leased equipment, including equipment of Seller which will be located at Site during all or some portion of the Contract term without Seller's personnel present, such as remote diagnostic equipment, shall remain at all times with Seller.



ii. Notwithstanding Article 12.f.i. above, in all events risk of loss shall transfer to Buyer upon delivery to the Site.

iii. If any Balance of Plant cannot be shipped to or received by Buyer when ready due to any cause not attributable to Seller, Seller will notify Buyer and then may ship Balance of Plant to a storage facility, including a facility within the place of manufacture, or to an agreed freight forwarder.  If Seller places Balance of Plant in storage or if Balance of Plant are detained at any port, the following conditions shall apply:  (i) title and all risk of loss or damage shall immediately pass to Buyer if they had not already passed and delivery shall be deemed to have occurred; (ii) any amounts otherwise payable to Seller upon delivery or shipment shall be payable upon presentation of Seller's invoices; (iii) all expenses and charges incurred by Seller, such as for preparation for and placement into storage, handling, inspection, preservation, insurance, storage, demurrage, removal and any taxes shall be payable by Buyer upon submission of Seller's invoices; and (iv) when conditions permit and upon payment of all amounts due hereunder, Seller shall resume delivery of Balance of Plant to the originally agreed point of delivery.

iv. Once delivered to the Site, Buyer shall bear the sole risk of loss for Buyer's equipment during the Contract term.  If repair services are to be performed on Buyer's equipment at Seller's facility, Buyer shall be responsible for transporting the equipment to and from Seller's facility and Buyer shall retain title at all times.  Buyer shall reimburse Seller at Seller's then current storage rate if the equipment remains at Seller's facility beyond 10 days after notification that services have been completed.

## g. No Title To Water

At no time shall Seller be deemed to have taken title to product water, feedwater, Nonstandard Substances, Hazardous Materials, or any other materials or substances processed at the Site or treated by Seller pursuant to this Contract.  Seller does not take responsibility for or provide waste characterization, disposal facility selection, disposal, or payment of sewage or landfill fees.  Buyer is responsible for all wastes and waste disposal from the plant.  Wastes may include, but are not limited to water system reject waste, used RO membranes, filters, CIP related wastes and wastewaters, spent media, cartridge filters, equipment and consumables, lube/oil contaminated debris/rags, other maintenance related wastes, lab analysis residuals, and office waste.  Buyer is required to obtain Seller's written approval prior to any changes in reject disposal or use, or waste disposal methods or configuration being made.

Other than described in Appendix L, Water Treatment System, Seller's does not plan to utilize any Nonstandard Substances or Hazardous Materials in treating the Influent Water under the terms of this Contract.  Should Seller use Nonstandard Substances or Hazardous Materials other than those described in Appendix L, Water Treatment System, to clean the Influent Water, Seller will be responsible for the proper storage and disposal of the Seller-provided Nonstandard Substances or Hazardous Materials.

"Nonstandard Substances" shall mean substances or materials which are not specifically identified in the Influent Water Quality Window of the Influent Water Quality table set forth herein or which were not or could not be reasonably anticipated by Seller as being a component of the influent feedwater.

For this Article 12.g., "Hazardous Materials" shall mean toxic substances, hazardous substances, pollutants, contaminants, regulated wastes, or hazardous wastes as such terms may be defined or classified in any statute or ordinance or regulations promulgated by any national, federal, state, provincial, or local governmental authority.

## h. Use of Water Treatment System

Although the Water Treatment System will be utilized at the Site by the Seller, Buyer acknowledges that Seller shall retain beneficial ownership of the Water Treatment System and any other Seller supplied parts, equipment, inventory, supplies and other assets utilized by Seller, or loaned or made available to Buyer at the Site.  Seller reserves the right to file a UCC-1 security form on all Seller-owned equipment and products and a mechanic's lien on any labor performed by Seller for the design, fabrication, installation, and maintenance of the system and hereby provides legal notice of its intention to do so if deemed necessary to ensure payment.



Buyer shall keep Seller's Water Treatment System free and clear of any liens. Upon expiration or termination of this Contract, Seller shall have the right to disconnect and remove the Water Treatment System, parts or assets installed or utilized by Seller pursuant to this Contract.

Buyer acknowledges that Seller's Water Treatment System is designed for specific applications and processes and therefore may not be relocated, modified, altered or changed in any way without the expressed, written consent of the Seller. To the extent caused by Buyer, Buyer is responsible for any loss or damage to Seller's equipment including but not limited to, theft, physical damage, operational impairment caused by lack of proper maintenance or operation outside manufacturer's or Seller's operating specifications, and damage due to exposure to liquids at a temperature higher than 110 degrees Fahrenheit or corrosive gases or liquids including, but not limited to acids or caustic chemicals. Buyer shall be solely responsible for any and all costs to test, decontaminate or dispose of and replace any of Seller's equipment or ion exchange resins contaminated by exposure to any process or application containing any Federal, DOT, or State listed hazardous waste or a characteristic hazardous waste. Upon request Buyer shall certify to Seller, by means of a completed and signed Resin Process Profile form, the conditions under which all ion exchange resins will be operated.

Buyer shall not remove the Water Treatment System from Buyer's Site and shall not sublease or lend the Water Treatment System or otherwise attempt to transfer or dispose of the Water Treatment System or any rights in or to the Water Treatment System. Before moving any part of the Water Treatment System, Buyer must notify and get Seller's permission, and in the event of any move, Buyer assumes all responsibility for damages caused to the Water Treatment System, or any other property.

## 13.    Payment Schedule/Payment Security

Payment Schedule/Payment Security details are contained in Section F of Appendix P, Confidential Information. Past due payments will be subject to interest at the rate of 1.5% per month. Disputed portions of an invoice shall not be cause for nonpayment or delay of payment of any undisputed portions of an invoice.

## 14.    Terms & Conditions

Rental of any Equipment, Water Treatment System or sale of any Services or Balance of Plant identified herein is expressly conditioned on the Buyer's assent to the terms and conditions contained or referred to herein (hereinafter "Terms and Conditions.") Any additional or different terms or conditions proposed by Buyer are expressly objected to and will not be binding upon Seller unless specifically assented to in writing by Seller's authorized representative. Any order for, or any statement of intent to purchase hereunder, or any direction to perform work or any assent to Seller's performance of work shall constitute assent to these Terms and Conditions.

The Equipment, Water Treatment System, Balance of Plant, and Services hereunder are not intended for application, and shall not be used, in connection with any nuclear facility or activity except as expressly provided in Article 35 (Prohibition on Nuclear Use).

## 15. Changes

(a)  *Buyer-Initiated Changes*. The Buyer shall have the right to request that the Seller consider changes to the Equipment, the Water Treatment System, the Services, or Balance of Plant, including modifications, alterations, additions, or non-Seller caused delays. If the Buyer wishes to request such a change, the Buyer shall notify the Seller in writing. Within forty-eight (48) hours after receipt of such notice (unless otherwise extended by mutual agreement), the Seller shall advise the Buyer of the feasibility of the requested change, and shall submit to the Buyer a draft Change Order, unless the matter requires further investigation and research in which case Seller will provide an estimate of the time frame in which Seller will be able to submit a detailed response to Buyer.

(b)  *Seller-Initiated Changes.* If the Seller wishes to propose a change, or if the Seller is entitled to a Change Order pursuant to the provisions of this Contract, the Seller shall submit to the Buyer a draft Change Order.



(c) *Contents of Draft Change Order*.  The draft Change Order shall include:  (i) a technical description of the proposed change in such detail as the Buyer may reasonably require,  (ii) a price adjustment (increase or decrease) in the Contract Price, if any, caused by the proposed change,  (iii) all potential effect(s), if any schedule or date for performance by the Seller hereunder and (iv) all potential effect(s), if any, on the Seller's ability to comply with any of its obligations hereunder.

(d) *Process for Concluding Change Order*.  The Buyer shall, within twenty-four (24) hours from the date of receipt of such information, either approve or disapprove the draft Change Order in writing or request additional time to consider the draft Change Order.  If the Buyer approves the Change Order, the Buyer and the Seller shall then sign the Change Order that shall operate as an amendment to this Contract.

(e) *Agreement Required*.  All changes under this contract shall be subject to mutual agreement, and no Change Order will be effective until signed by both Parties.

**16. Contract**

The following documents shall comprise the Contract, and shall together be referred to as the "Contract":

(a)     This Contract;
(b)     Appendix A, TM2500 Equipment and Codes and Standards;
(c)     Appendix B, Buyer Responsibilities;
(d)     Appendix C, Operational Responsibilities;
(e)     Appendix D, Not Used;
(f)     Appendix E, Performance Guarantee;
(g)     Appendix F, Typical Test Specification;
(h)     Appendix G, Field Service Labor Rates;
(i)     Appendix H, General Arrangement and Single Line Diagram;
(j)     Appendix I, Fuel Meter Specification;
(k)     Appendix J, Estimated Schedule;
(l)     Appendix K, Fuel and Water Specifications;
(m)     Appendix L, Water Treatment System;
(n)     Appendix M, High Wind Response Plan;
(o)     Appendix N, Commissioning Checklist;
(p)     Appendix O, Performance Testing; and
(q)     Appendix P, Confidential Information

Should any terms in the (a) Contract conflict with any terms in any of the other Appendices, the Contract terms shall take precedence.

The Contract represents the entire agreement between the Parties, and no modification, amendment, rescission, waiver or other change shall be binding on either Party unless assented to in writing by the Parties' authorized representatives.  Any oral or written representation, warranty, course of dealing or trade usage not contained or referenced in the Contract shall not be binding on either Party.  Each Party agrees that it has not relied on, or been induced by, any representations of the other Party not contained in this Contract.

The invalidity, in whole or in part, of any provision of the Contract shall not affect the validity of the remainder of the Contract.

The specifications and standards explicitly cited in the statement of work, drawings, or elsewhere in the Contract, are first tier specification and standards, and are applicable only to the extent specified in the Contract.  Second tier and lower documents referenced in those first tier documents are for guidance only, and are not contractually binding.  Seller shall only comply with the specifications specifically included in the Contract and shall have no obligation to comply with any additional specifications incorporated within those specifications or otherwise referenced.

The following Articles and Sections shall survive termination or cancellation of, and completion of work under, the Contract between Buyer and Seller: Article 6 (Taxes and Duties); Sections 19.3 and 19.5 of Article 19



(Compliance With Laws, Codes and Standards); Article 25 (Warranty), Article 27 (Limitation of Liability), Article 35 (Prohibition on Nuclear Use), Article 28 (Dispute Resolution, Governing Law), Article 29 (Confidentiality), Article 26 (Indemnification).

**17.    Effective Date**

The Effective Date of this Contract shall be the date when both Parties have signed it.  Seller will prepare for Equipment, Balance of Plant, and Water Treatment System shipment upon Seller's receipt of the down payment and the letter of credit.

**18.    Liens or Subletting**

Buyer shall keep the Equipment and Water Treatment System and its interest in the Contract free and clear of all liens, charges, security interests and encumbrances and shall indemnify Seller for all reasonable costs resulting from any breach of this obligation.  Buyer shall not assign, sell, pledge or hypothecate the Contract or any of its rights hereunder, in whole or in part, whether directly, indirectly or by operation of law, or sublease any Equipment, without the prior written consent of Seller which consent shall not be withheld unreasonably. No permitted assignment or sublease shall relieve Buyer of any of its obligations under the Contract.

**19.    Compliance with Laws, Codes and Standards**

19.1  The price is based on Seller's design, manufacture, testing and delivery of the Equipment and performance of the Services pursuant to (i) its design criteria, manufacturing processes and procedures and quality assurance program, (ii) those portions of industry specifications, codes and standards in effect as of the date of Seller's proposal to Buyer which Seller has deemed applicable to the Equipment and Services, (iii) the national laws and rules of the United States of America in effect on the date of Seller's proposal to Buyer and (iv) any mutually agreed upon specification.

19.2  The price will be equitably adjusted to reflect additional costs incurred by Seller resulting from changes required to comply with applicable regulatory, legal or industrial requirements in the location where the Equipment will be installed and the Services performed.  Buyer shall advise Seller of requirements affecting the Equipment and Services resulting from the applicability of any laws, rules or regulations in the location where the Equipment will be installed and the Services performed. Reasonable adjustments will be made to the delivery date, performance evaluation criteria and Service performance dates as may be appropriate to comply with the foregoing.

19.3  All transactions hereunder shall at all times be subject to and conditioned upon compliance with all applicable export control laws and regulations of the U.S. Government and any amendments thereof. Buyer and Seller hereby agree that Buyer or Seller shall not, except as said laws and regulations may expressly permit, make any disposition by way of transshipment, re-export, diversion or otherwise, of U.S. origin goods or technical data (including computer software,) or the direct product thereof, furnished by GE hereunder, other than in and to the ultimate country of destination specified on Buyer's order and/or declared as the country of ultimate destination on Seller's invoice.

19.4  Notwithstanding any other provisions herein, and excluding the Seller's Virgin Islands business license, Buyer shall be responsible for timely obtaining any required authorization, such as a work permit or any other governmental authorization, even though any such authorization may be applied for by Seller. Buyer and Seller shall provide each other reasonable assistance in obtaining required authorizations. Seller shall not be liable if any authorization is delayed, denied, revoked, restricted or not renewed and Buyer shall not be relieved thereby of its obligations to pay Seller for the Equipment, Water Treatment System rental, Balance of Plant, or Services.  Unless stated otherwise in Appendix C, Operational Responsibilities, Buyer shall comply with all codes, laws, rules and regulations applicable to the performance of the Contract, including ensuring that the Equipment selected by Buyer is and remains in compliance therewith.



19.5   Seller acknowledges that, in connection with the performance of the Contract, the import and customs laws and regulations of the country in which the Site is located apply to the furnishing and shipment of the Equipment.

19.6   Seller shall not comply with any law, regulation or requirement which would subject Seller to criminal or civil penalties or loss of tax benefits under any federal, state or local law or regulation of the U.S.A., and the execution of the Contract does not constitute the furnishing of, or an agreement to furnish, any information which would subject Seller to any of the above mentioned penalties or loss of tax benefits.

19.7   Notwithstanding anything to contrary in this Contract or Seller's proposal, Buyer acknowledges and agrees that (i) the Equipment is required to meet an emergency and temporary requirement in the Virgin Islands, (ii) the Equipment was designed and constructed to withstand wind speeds of up to 100 MPH, (iii) there is not sufficient time, nor does Buyer desire to have Seller to redesign and retrofit the Equipment to withstand winds exceeding 100 MPH and (iv) Seller has provided Buyer with an emergency anticipated high wind response plan that will provide reasonable protection of the Equipment in the event of winds in excess of 100 MPH as described in Appendix M, High Wind Response Plan. Buyer agrees to indemnify Seller and hold Seller harmless from and against any claims, penalties, or fines asserted against Seller due to the Equipment not being designed to withstand wind speeds in excess of 100 MPH.

## 20.   Seller's Insurance

<u>Commercial General Liability</u>.  The Seller shall furnish and maintain Commercial General Liability insurance for third party bodily injury and property damage with limits of not less than $5,000,000 per occurrence and in the aggregate annually.   Such policy shall include contingent Automobile Liability coverage.

<u>Automobile Liability</u>.  The Seller shall furnish and maintain automobile liability insurance with limits of not less than $5,000,000 combined single limit per occurrence for owned automobiles.

<u>Worker's Compensation</u>.  The Seller will comply with all federal and state workers compensation or similar laws.

<u>All Risks Property</u>.  Seller shall maintain "All Risks" property insurance for Seller's owned equipment.  Buyer shall be responsible for any loss or damage to Seller's property, except to the extent the loss/damage is caused by Seller's actions, provided however, such amount shall not exceed the lesser of:  (1) the actual cost to repair/replace or; (2) $250,000 for general losses; or $5,000,000 per occurrence for each flood, earthquake and hurricane.  Seller waives its right of action for any damage to Seller's owned equipment and Seller's insurer shall waive its rights of subrogation against Buyer for losses in excess of the specified amounts.

<u>Certificates of Insurance</u>.  On or before the Kickoff Meeting, the Seller shall furnish the Buyer with certificates of insurance evidencing that insurance has been provided to meet the above requirements. Buyer's acceptance of Seller's evidence of insurance shall not be deemed a waiver or modification of Seller's insurance, indemnity, or other obligations, under the Contract.

<u>Deductibles</u>.  Except as otherwise provided, Seller shall be responsible for any and all deductibles with regard to the insurance required of and provided by Seller.

## 21.   Not Used

## 22.   Buyer Insurance

Buyer shall obtain, at its expense, and shall at all times during which Equipment is at the Site or otherwise in Buyer's possession or control, maintain the following insurance:

<u>Commercial General Liability and Automobile Liability</u> insurance for third party bodily injury and property damage with limits of not less than $5,000,000 per occurrence and in the aggregate annually.  Such policy shall include coverage for owned, non-owned and hired automobiles.

<u>Worker's Compensation</u>.  The Buyer will comply with all federal and state worker's compensation or similar laws.



16

<u>All Risks Property Insurance</u>. Buyer shall maintain "All Risks" property insurance on its existing property, including any Balance of Plant provided by Seller under this Contract. Buyer shall be responsible for any loss/damage unless loss/damage results from actions of Seller, provided however, Seller's responsibility for such loss/damage shall not exceed the lesser of: (1) actual cost to repair/replace or; (2) $250,000 per occurrence and $1,000,000 in the aggregate and shall be subject to Article 27, Limitation of Liability. Buyer waives it right of action for any damage to Buyer's existing property including any Balance of Plant provided by Seller under this Contract and Buyer's insurer shall waive its rights of subrogation against Seller for losses in excess of the specified amounts

<u>Deductibles</u>. Except as otherwise provided, Buyer shall be responsible for any and all deductibles with regard to the insurance required of and provided by Buyer.

<u>Certificates of Insurance</u>. Buyer will provide Seller with evidence of Buyer's insurance on or Before the Kickoff Meeting. Seller's acceptance of Buyer's evidence of insurance shall not be deemed a waiver or modification of Buyer's insurance, indemnity, or other obligations, under the Contract.

**23.    Not Used**

**24.    Excusable Delays**

**24.1 "Uncontrollable Circumstance"** means any act, event or condition, that is not caused by the negligence or lack of reasonable due diligence of the Party relying thereon as justification for any failure of performance hereunder, that is beyond the reasonable control of such party, and that has a material adverse effect on the performance of either Party's obligations under this Contract, including:

> (a) act of God, hurricane, tornado, lightning, earthquake, fire, explosion, flood, act of public enemy, threats or acts of terrorism, war, blockade, insurrection, riot or civil disturbance, sabotage, or the exercise of the power of eminent domain, condemnation or other taking by or on behalf of any public, quasi-public or private entity; and
> (b) change in Law;

provided, that the following acts or events shall not be considered an Uncontrollable Circumstance:

> i equipment breakdown (or inability to use equipment) caused by its design, construction, operation, maintenance or
> ii inability to meet regulatory standards existing at the time of execution of this Contract.

**24.2    *Effect of Uncontrollable Circumstance*.** Neither Party shall be liable to the other Party for failure to perform any obligation hereunder, when such failure is the result of the occurrence of an Uncontrollable Circumstance after the Effective Date; provided, however, that neither Party shall be excused from any obligation to pay amounts due under this Contract by reason of an Uncontrollable Circumstance. Upon becoming aware of the occurrence of an Uncontrollable Circumstance, or that any such event is reasonably expected to occur, the affected Party shall immediately notify the other Party of such event, or such pending event, as the case may be. The suspension of performance shall be of no greater scope and of no longer duration than is required by the Uncontrollable Circumstance. The non-performing Party shall proceed with reasonable diligence to remedy its inability to perform and shall provide weekly progress reports to the other Party describing actions taken to end the Uncontrollable Circumstance. When the non-performing Party is able to resume performance of its obligations under this Contract, the non-performing Party shall give the other Party written notice to that effect. Except as otherwise expressly provided for in this Contract, the existence of an Uncontrollable Circumstance shall not relieve the Parties of their obligations under this Contract (including, but not limited to, payment obligations) to the extent that performance of such obligations is not precluded by such Uncontrollable Circumstance.

**24.3    *Changes Due to Uncontrollable Circumstance*.** Immediately following the initial notice of the Uncontrollable Circumstance by either Party pursuant to, the notifying Party shall provide the other Party with a written preliminary evaluation of the extent of the adverse effect on the performance of such other Party's obligations caused by the Uncontrollable Circumstance or on the operation and maintenance of the Equipment. Upon completion of the notifying Party's final analysis of such adverse impact, including



completion of engineering estimates, if necessary, and of any necessary modifications or repairs to the Equipment, the notifying Party shall provide the other Party with a final written report of the overall impact on the Equipment.

**24.4  *Termination Due to Uncontrollable Circumstance.*** If delay excused by this Article extends for more than one hundred twenty (120) days and the parties have not agreed upon a revised basis for continuing the work at the end of the delay, including adjustment of the price, then either party (except where delay is caused by Buyer, in which event only Seller,) upon thirty (30) days written notice, may terminate the order with respect to the unexecuted portion of the work, whereupon Buyer shall promptly pay Seller for demobilization charges and return transportation charges back to Seller's Equipment storage location.

**25.  Warranty**

**A. Equipment and Services Warranty**

25.1  Seller warrants to Buyer that the Equipment:  (a) upon commencement of the Rental Term will be operable, and (b) when properly installed, operated, and maintained in accordance with Seller's and manufacturer's recommendations and the terms of the Contract, will remain operable; and that the Services will be performed in a competent and diligent manner in accordance with any mutually agreed specifications.   Seller provides no warranty for incidental materials and consumables utilized in the performance of the Services and only the warranty given by the manufacturer, if any, shall apply.

25.2  If any failure to meet the foregoing Equipment and Services warranty appears within the Rental Term, Buyer shall promptly notify Seller and make the Equipment available promptly for correction.  Seller shall thereupon correct any defect by re-performing the defective Services.

25.3  The foregoing warranties for Equipment and Services shall apply to defects that appear within the Rental Term.

25.4  The reperformance of Services by Seller pursuant to Section 25.2 shall not extend the duration of the Warranty Period.  Seller shall not be responsible for removal or replacement of systems, structures or other portions of Buyer's facility. The condition of any tests shall be mutually agreed upon and Seller shall be notified of and may be represented at all tests that may be made.

25.5  Seller does not warrant the Services or Equipment (i) against normal wear and tear including that due to environment or operation, including excessive operation at peak capability outside of the recommendations in Seller's Operations and Maintenance manuals, type of fuel, detrimental air inlet conditions or erosion, corrosion or material deposits from fluids or (ii) which have been involved in an accident.   The warranties and remedies set forth herein are further conditioned upon

> (i) if not provided by the Seller, the proper storage, installation, operation, and maintenance of the Equipment and conformance with the operation instruction manuals (including revisions thereto) provided by Seller and/or its subcontractors, as applicable and
> (ii) if not provided by the Seller, the repair or modification pursuant to Seller's instructions or approval.
> Seller does not warrant any equipment or services of others designated by Buyer where such equipment or services are not normally supplied by Seller.

25.6  The preceding Sections of this Article 25 set forth the exclusive remedies for all claims based on failure of or defect in the Equipment and Services provided under the Contract, whether the failure or defect arises before or during the Rental Term and whether a claim, however instituted, is based on contract, indemnity, warranty, tort (including negligence), strict liability or otherwise. The foregoing warranties are exclusive and are in lieu of all other warranties and guarantees whether written, oral, implied or statutory.  NO IMPLIED STATUTORY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE SHALL APPLY.



**B. Balance of Plant Warranty**

Seller warrants to Buyer that (i) the Balance of Plant shall be shipped free from defects in material, workmanship and title. Unless otherwise stated in the Contract, the warranty period for Balance of Plant shall be 18 months from the Commercial Operation Date or 18 months from delivery, whichever occurs first, except that software are warranted for 90 days from delivery.

If Balance of Plant does not meet the above warranties, Buyer shall promptly notify Seller in writing within the warranty period. Seller shall thereupon (i) at Seller's option, repair or replace the defective portion of the Balance of Plant. If in Seller's reasonable judgment the portion of the Balance of Plant cannot be repaired or replaced, the Parties will negotiate an action plan which may include Seller refunding or crediting monies paid by Buyer for that portion of Balance of Plant that does not meet the above warranties. Any repair or replacement performed by Seller hereunder shall not extend the applicable warranty period. The parties shall mutually agree on the specifications of any test to determine the presence of a defect.

Buyer shall bear the costs of access (including removal and replacement of systems, structures or other parts of Buyer's facility), de-installation, decontamination, re-installation and transportation of Balance of Plant to Seller and back to Buyer.

These warranties and remedies are conditioned upon (a) if not provided by the Seller, the proper storage, installation, operation, and maintenance of the Balance of Plant and conformance with the proper operation instruction manuals provided by Seller or its suppliers or subcontractors, (b) Buyer, or Seller during the Rental Term, keeping proper records of operation and maintenance during the warranty period and providing Seller access to those records, and (c) modification or repair of the Balance of Plant only as authorized by Seller. Seller does not warrant the Balance of Plant or any repaired or replacement parts against normal wear and tear or damage caused by misuse, accident, or use against the advice of Seller. Any modification or repair of any of the Balance of Plant not authorized by Seller shall render the warranty null and void.

This Article provides the exclusive remedies for all claims based on failure of or defect in the Balance of Plant, whether the failure or defect arises before or during the applicable warranty period and whether a claim, however described, is based on contract, warranty, indemnity, tort/extra contractual liability (including negligence), strict liability or otherwise. The warranties provided in this Article 25, Section B are exclusive and are in lieu of all other warranties and guarantees whether written, oral, implied or statutory. NO IMPLIED STATUTORY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE APPLIES.

**C. Water Treatment System Warranty**

WATER QUALITY WARRANTY

Effluent Water quality shall meet or exceed the specifications in the Product Quality table as described in Appendix L, Water Treatment System. Any Effluent Water not meeting these specifications shall, at Seller's option, be replaced or reprocessed at no additional cost to Buyer, unless the failure is caused by the acts or omissions of Buyer, including but not limited to Buyer's failure to provide the required Influent Water. Increased costs due to acts or omissions of Buyer will follow the change order process described in Article 15, Changes.

Seller warrants only that the Water Treatment System is capable of processing the Influent Water, described in the Influent Water Quality table to meet the specifications for Effluent Water in the Product Quality table. Seller further warrants that Services will be performed in a good and workmanlike manner and will comply in all material respects with the requirements set forth in this Contract. Buyer shall notify Seller of any warranty claim within thirty (30) days of the claimed item's delivery, and Buyer's sole remedy shall be to have deficient services corrected or re-performed and to have defective products repaired or replaced.

Effluent Water processed for Buyer is not intended for, or suitable for, human consumption.

19




SELLER EXPRESSLY DISCLAIMS LIABILITY FOR INCIDENTAL AND/OR CONSEQUENTIAL DAMAGES INCLUDING, WITHOUT LIMITATION, LOST PROFITS RELATED TO BREACH OF WARRANTY, COSTS OF ACCESS TO THE WATER TREATMENT SYSTEM FOR REPAIR/REPLACEMENT, AND DECONTAMINATION.  EXCEPT AS EXPRESSLY SET FORTH IN THIS PARAGRAPH, SELLER MAKES NO WARRANTIES, EXPRESSED OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, WARRANTIES OF MERCHANTABILITY OR OF FITNESS OF USE OR FOR THE PURPOSE INTENDED.

| | |
|---|---|
| Effluent Water | shall mean the treated water delivered from the Water Treatment System to the storage tank or point of use, resulting from the treatment of Influent Water under the terms and conditions of this Contract. |
| Influent Water | shall mean Buyer's influent water or fluids to be provided by Buyer at the inlet of the Water Treatment System, and subject to treatment under the terms and conditions of this Contract. |

**26.    Indemnification**

26.1    <u>General Indemnity.</u>  Seller hereby agrees to indemnify and hold harmless Buyer from the cost of (i) repairing or, in the case of destruction, replacing physically damaged tangible property of third parties or (ii) injury to persons, including death, to the extent resulting directly from the negligence of Seller or its officers, servants, agents, employees, and/or assigns while engaged in activities under this Contract. Buyer shall likewise indemnify and hold harmless Seller from the cost of (i) repairing or, in the case of destruction, replacing physically damaged tangible property of third parties or (ii) injury to persons, including death, to the extent resulting directly from the negligence of Buyer, its officers, servants, agents, employees, and or assigns, while engaged in activities relating to this Contract. In no case, however, shall Seller or Buyer have any obligation under the foregoing unless Seller or Buyer is liable to the third party claimant under the law otherwise normally applicable.   In the event such damage or injury is caused by the joint or concurrent negligence of Seller and Buyer, the loss shall be borne by each party in proportion to its negligence.

26.2    The indemnities provided for in Article 26.1 shall only apply if the party demanding to be indemnified gives the other party prompt notice of any such claim and all necessary information and assistance so that the other party, at its option, may defend or settle such claim and the party demanding to be indemnified does not take any adverse position in connection with such claim.  For purposes of Article 26.1, "third parties" shall not include: (i) the Buyer; (ii) the subsidiaries, parents, affiliates, agents, successors or assigns of the Buyer, or (iii) any party (A) with any equity interest in the foregoing entities, or (B) with a security interest of any nature in any such entity's assets or property, or (C) which claims or seeks to claim any of the rights, powers or privileges of the Buyer under this Contract or claims or seeks to claim as a third party beneficiary of the Buyer under this Contract.

26.3    a. The Parties acknowledge that no specific data regarding subsoil condition and pre-existing contamination is available at the Effective Date of this Contract.  Seller shall not be responsible for any remediation costs, fines and penalties arising out or relating to any contamination of the Site caused by the release of any hazardous material, present at, or under, the Site or, released at the site, which contamination or release occurred prior to Seller's access to the site, whether or not discovered before or after the Effective Date of the Contract, and Buyer shall indemnify and hold Seller harmless from any such remediation costs, fines, and penalties.

b.  Nor will Seller be responsible for any remediation costs, fines or penalties arising out of or relating to any contamination of the Site caused by the release of any hazardous material at any time caused by the Buyer or any third party  and the Buyer shall indemnify and hold harmless Seller from any such, fines, penalties and remediation costs.

c.  Seller will indemnify and hold Buyer harmless from any remediation costs, fines and penalties, and costs of remediation, to the extent resulting from any hazardous materials that are actually released at the Site by the negligence or willful misconduct of the Seller while performing the Contract, provided that



(i) the Seller is the sole cause of release;
(ii) Immediately after a release of hazardous material from Seller's operation has occurred, either, the Seller shall immediately notify the Buyer's project manager or control room shift supervisor and/or the Buyer shall immediately notify the Seller's project manager or site leader, depending on which Party is aware of the release at the time it occurs;
(iii) within 24 hours after the release notification, the Buyer , with the assistance and concurrence of Seller, shall produce a written report assessing the release.  Seller's delay in providing Buyer with required release details shall be grounds for extending the 24 hour period on a one-for-one hour basis.

At the conclusion of the cleanup of any hazardous material release meeting the indemnity requirements outlined in the preceding paragraph, the Buyer shall present the Seller with an invoice outlining the  scope of work and the remediation cost for clean up  the hazardous material released by Seller at the site, whereupon the Seller shall within thirty (30) days of presentation of the invoice remit payment to the Buyer, failing which Buyer may deduct such payment from  any payment owed the Seller.

Any contamination found at the site is presumed to be preexisting unless Buyer can show that it was released at the Site by the negligent or willful misconduct of Seller.

All liability of Seller for release of hazardous materials or contamination of the Site or otherwise directly or indirectly related to the soil, subsoil or groundwater at or near the Site shall terminate upon the expiration or termination of this Contract and Buyer shall indemnify and hold Seller harmless against all such claims, provided, however that Seller shall remain responsible for incremental costs of remediation of hazardous materials in accordance with preceding paragraph for remediation of hazardous materials to the extent released at Site by negligence or willful misconduct of Seller during the performance of the Contract and reported by Seller unless any contamination resulting from such materials has been remediated upon expiration or termination of the Contract.

It is agreed that the Buyer will retain responsibility for reporting any release to the local governing body as required by law.

## 27    Limitation of Liability

27.1    a. The total liability of Seller, on all claims of any kind, whether in contract, warranty, indemnity, tort (including negligence), strict liability, or otherwise, arising out of or related to the Contract or its performance or breach, or from use of any Equipment, Water Treatment System, Balance of Plant, or Services shall not exceed the price allocable to the rental of Equipment or Water Treatment System, or sale of the Balance of Plant or Services giving rise to the claim.  All liability of Seller on all claims of any kind between the Parties shall terminate upon expiration of the Rental Term or early termination of the Contract, provided that Buyer may enforce a claim of such liability accruing during the Rental Term by an action timely commenced in accordance with the applicable statute of limitations and/or statute of repose, but in no event greater than three years after the expiration of the Rental Term.

b. With the exception of payments to be made pursuant to this Contract, Buyer's liability to Seller pursuant to this Contract, whether based on contract, warranty or tort, including intentional acts, errors or omissions, negligence, indemnity, strict liability, or otherwise, or any other claim or cause of action shall not in the aggregate exceed the Contract Price as stated herein and in no event shall Buyer be liable to Seller for consequential, special, incidental, speculative, punitive, or exemplary damages.

27.2    In no event, whether as a result of breach of contract, warranty, indemnity, tort (including negligence), strict liability, or otherwise, shall Seller or its subcontractors or suppliers be liable for loss of profit or revenues, loss of use of the Equipment, Water Treatment System, Balance of Plant, and Services or any associated equipment, facilities or vessels, cost of capital, cost of substitute Equipment, Water Treatment



System, and Services or any associated equipment, facilities, services or replacement power, downtime costs, damage to associated equipment or facilities, claims for damages or costs related to the clean-up, removal, release or threatened release, remediation or disposal of or any response to any hazardous materials (except as described in Article 26.3), or nuclear materials, or any special, consequential, incidental, indirect, speculative, punitive or exemplary damages, or claims of Buyer's customers for any of the foregoing damages, and Buyer shall indemnify Seller against all such claims of Buyer's customers.

27.3   If Seller furnishes Buyer with advice or assistance concerning any Equipment, Water, Treatment System, Balance of Plant, Services, systems or work which is not required pursuant to this Contract or any mutually agreed written specification, the furnishing of such advice or assistance will not subject Seller to any liability, whether in contract, warranty, indemnity, tort (including negligence), strict liability or otherwise.

27.4   Except as provided by Article 22, Buyer waives rights of recovery against Seller, whether Buyer's claim is brought under breach of contract, warranty, indemnity, tort (including negligence), strict liability, or otherwise, for loss or damage to the property of Buyer.

27.5   In no event shall Seller be liable for any loss or damage whatsoever arising from its failure to discover or repair latent defects or defects inherent in the design of goods serviced (unless such discovery or repair is normally discoverable by tests expressly specified in the scope of work under the Contract) or caused by the use of goods by the Buyer against the advice of Seller. Except as provided in this paragraph, the provisions in this Contract are for the benefit of the Parties hereto and not for any other third party.

27.6   For the purposes of this Article 27, Article 35 (Prohibition on Nuclear Use, the term "Seller" shall mean Seller, its affiliates, subcontractors and suppliers of any tier, and their respective agents and employees, whether individually or collectively.

27.7   The provisions of this Article 27, Article 35 (Prohibition on Nuclear Use) shall prevail over any conflicting or inconsistent provisions contained in any of the documents comprising the Contract between Buyer and Seller, except to the extent that such provisions further restrict Seller's liability.

28.   **Dispute Resolution, Governing Law.**

*a) Referral to Senior Management.*

Any and all controversies, disputes or differences between the Parties to this Contract, if not amicably settled by the Parties within thirty (30) Days following written notice of dispute, shall be referred to senior management of the Parties for resolution in accordance with the Notices provisions of Article 43, Notices.  In the event the dispute has not been resolved within forty-five (45) Days following referral to senior management, or such longer period as the Parties may mutually agree, then either Party may, subject to limitations and exclusions of liability and remedies herein, upon ten (10) days notice to the other Party, pursue their remedies at law.

*b) Venue.*

Any legal action or proceeding with respect to this Contract shall be brought in the United States District Court for the Southern District of New York or, if such court lacks jurisdiction, in the Supreme Court of the State of New York in New York County.  Each of the Parties hereby accepts and consents to, generally and unconditionally, the jurisdiction of the aforesaid courts and applicable appellate courts for any appeal thereof. Each Party irrevocably consents to the service of process out of any of the aforementioned courts in any such action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to such Party at the address first set forth in this Contract.  Each Party hereby irrevocably waives any objection which it may now or hereafter have to the laying of venue of any of the aforesaid actions or proceedings arising out of or in connection with this Contract brought in the courts referred to above and hereby further irrevocably waives and agrees not to plead or claim in any such court that any such action or proceeding brought in any such court has been brought in an inconvenient forum.

22



*d) Governing Law.*
This Contract, including but not limited to, the validity, performance and all matters relating to the interpretation and effect of this Contract and all further documents executed pursuant to it, shall be construed and interpreted in accordance with the laws of the State of New York, excluding its conflict of law rules, provided that any provision of such law invalidating any provision of this Contract or modifying the intent of the Parties as expressed in the terms of this Contract shall not apply.

**29.  Confidentiality**

29.1  In connection with this transaction, Seller and Buyer (as to information disclosed, the "Disclosing Party") may each provide the other party (as to information received, the "Receiving Party") with Confidential Information. Buyer shall not provide any Confidential Information to Seller without Seller's prior written consent to receive it. "Confidential Information" as used in this Contract shall mean all Equipment rental and Services and Balance of Plant pricing, and all information related to the business or products of the Disclosing Party that is not generally known to the public, or to the competitors of the Disclosing Party, provided that the obligations of this Article shall not apply as to any portion of the Confidential Information which: (i) is or becomes generally available to the public other than as a result of disclosure by the Receiving Party, its representatives or its affiliates, or (ii) is or becomes available to the Receiving Party or its representatives or affiliates on a non-confidential basis from a source other than the Disclosing Party when such source is not, to the best of the Receiving Party's knowledge, subject to a confidentiality obligation to the Disclosing Party, or (iii) has been or is subsequently independently developed by the Receiving Party, its representatives or affiliates, without reference to the Confidential Information, or (iv) is necessarily disclosed in connection with permitted uses of the Equipment.

29.2  The Receiving Party agrees, except as otherwise required by law: (i) to use the Confidential Information only in connection with this transaction and permitted uses of the Equipment and Services, and (ii) to take reasonable measures to prevent disclosure of the Confidential Information, except to its employees to the extent necessary to facilitate this transaction and permitted uses of the Equipment, Balance of Plant, and Services.

29.3  Neither Party shall disclose Confidential Information, unless required to do so by law.  If either party or any of their respective affiliates or representatives is requested or required (by interrogatories, subpoena, or similar legal process) to disclose any Confidential Information, such party agrees to provide the Disclosing Party with prompt notice of each such request, to the extent practicable, so that the Disclosing Party may seek an appropriate protective order or waive compliance by the Receiving Party with the provisions of this Article 29, or both.

29.4  Nothing in the Contract shall be construed (i) to allow export or re-export of technical information in violation of Section 19.3, or (ii) to limit or abridge the protection of trade secrets under applicable trade secrets law, or (iii) as granting (by implication, estoppel or otherwise) any licenses or rights under any patents, copyrights, mask works or other legally protectable intellectual property rights (present or future) of either party (although the Parties may provide for such a license in an express written agreement), or (iv) subject to Section 25.4., as precluding Buyer from using or furnishing to others information and data necessary to effect any contract or arrangement under which there is to be performed for Buyer, by others (excluding competitors of Seller), non-infringing modification, overhaul, or maintenance work on the Equipment, Balance of Plant, and Services, subject to the same limitations set forth above, which shall be confirmed in a written agreement with the party to whom further disclosure is made.

**30.  Health and Safety Matters.**

30.1  Seller is responsible for implementing an Environmental Health and Safety plan over the portion of the Site for which Seller has direct control and for those activities of which Seller has direct control.  Buyer



will take all necessary precautions, at all times, for the safety of Seller personnel at Site. This includes, but is not limited to, instruction of Buyer's safety practices, proper and safe handling of hazardous substances and protection of Seller's personnel from exposure thereto, energization / de-energization of all power systems (electrical, mechanical and hydraulic) using a safe and effective lock-out tag procedure, and conducting periodic safety meetings during construction and start-up.

Buyer may request the removal of Seller's personnel if Seller's personnel fail to comply with the Buyer's safety practices and procedures at the Site.

Each Party will provide a safety plan in accordance with local laws and regulations outlining the procedures for the safety of the personnel on Site. Each Party will undertake their respective EHS plans when operating in the portion of the Site where the respective plan is in place.

30.2    Seller may, from time to time, conduct safety audits to insure safe conditions exist and make recommendations to Buyer concerning same. Neither the conduct or non-conduct of safety audits nor the making of any recommendation by Seller shall relieve Buyer of the responsibility to provide a safe place to work. If Seller's personnel require emergency medical attention, Buyer shall assist with making contact and coordinating the logistics to have local EMT and medical and hospital emergency providers response to provide medical assistance to Seller's personnel for the duration of such needs.

30.3    If, in Seller's opinion, the safe execution of Services at the Site is, or is apt to be, imperiled by catastrophic occurrences, or such other situations in which Seller reasonably determines that the safety of Seller's personnel is in jeopardy, Seller may remove some or all of its personnel from the Site and/or supervise performances of all or any part of its Services and/or evacuate its personnel and Buyer shall assist in said evacuation with making contact with local shelters or with travel arrangements, any of which shall be considered to be an Uncontrollable Circumstance.

30.4    In general, Seller personnel will have at least one day of rest in any seven (7) consecutive days. However, with Seller's written consent and where the nature of the assignment requires, Seller personnel may work seven (7) days a week for a maximum of thirty (30) days. Unless prior written agreement is obtained from Seller's headquarters, Seller personnel shall not work more than one hundred and forty (140) hours in any two (2) consecutive weeks or sixteen (16) hours in any one day.

30.5    The operation of Buyer's equipment at the Site is the responsibility of the Buyer. If Buyer requires or permits Seller's personnel to operate the Buyer's equipment at the Site, Buyer shall indemnify and save Seller, its employees and agents, harmless from expense and liability (including reasonable attorneys' fees) incurred by or imposed upon Seller, its employees and agents, based upon injury to persons (including death) or damage to property resulting from operation of Buyer's equipment at the Site by Seller personnel.

30.6    The Seller shall be responsible for complying with all applicable rules, regulations and guidelines issued by the U.S. Environmental Protection Agency (EPA), V.I. Department of Planning and Natural Resources (DPNR), and any other Federal, State or local regulatory agencies with regard to the discharge or spilling or oil, petroleum products, or other prohibited contaminants during the performance of the work at the Site pursuant to this Contract. Seller shall also become familiar with and adhere to the policies and practices of the Buyer regarding the discharge or spilling of oil, petroleum products and other prohibited contaminants in the performance in the scope of the work.

In the event of Seller's realization of a Seller caused release of hazardous material or other prohibited contaminants during the work at the Site, Seller shall immediately notify the Buyer's project manager or the control room shift supervisor and comply with Seller's release response plan.



**31.    Differing Site Conditions; Hazardous Materials**

31.1    Seller shall promptly and, if feasible, before such conditions are disturbed, notify Buyer in writing of: (i) subsurface or latent physical conditions at the Site differing materially from those indicated in the Contract, or (ii) unknown physical conditions at the Site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inherent in the work of the character provided for in the Contract. Buyer shall promptly investigate the conditions. If it is determined that such conditions do materially differ and cause an increase in Seller's cost of, or the time required for, performance of any part of the work under the Contract, an equitable adjustment in price and time of performance shall be made and the Contract modified in accordance with the provisions in Article 15, Changes.

31.2    If, at the Site, Seller encounters toxic substances, hazardous substances or hazardous wastes (as such terms may be defined in any statute or ordinance or regulations promulgated by any federal, state or local governmental authority of the United States or the country of the Site) (collectively, the "Hazardous Materials" which require special handling and/or disposal, Buyer shall immediately take whatever precautions are required to legally eliminate such hazardous conditions so that the work under the Contract may safely proceed.  If any such Hazardous Materials cause an increase in Seller's cost of or the time required for performance of any part of the work, an equitable adjustment shall be made in the price and schedule in accordance with the provisions of Article 15, Changes.

Buyer agrees to properly dispose of all Hazardous Materials produced or generated in the course of Seller's work at the Site.  Buyer shall indemnify Seller for any and all claims, damages, losses, causes of action, demands, judgments and expenses arising out of or relating to (i) the presence of any Hazardous Materials which are present on the Site prior to the commencement of Seller's work or (ii) Hazardous Materials improperly handled or disposed of by Buyer or (iii) Hazardous Materials brought on to the Site or produced thereon by parties other than Seller.

Buyer will provide a suitable location at the Site to dispose of excavation spoils.

**32.    Software License**

32.1    "Software" means a computer program or compilation of data that is fixed in any tangible medium of expression, or any storage medium from which the program may be perceived, reproduced or otherwise communicated, either directly or with the aid of a machine or device, and shall include without limitation any of Seller's proprietary operating Software, provided for the ordinary operation of the Equipment, any optional Software to enhance the operation of the Equipment, as well as any upgrades or revisions of this material the Seller provides in fulfillment of a specific written commitment or otherwise. Nothing herein shall be deemed to create an obligation on the part of Seller to provide any upgrade or revision to any Software other than pursuant to a written obligation to do.

32.2    Buyer is granted a limited license for any Software delivered by Seller, whether as part of any Equipment or separately. Buyer is not granted a license for any other Software. This license allows Buyer to:

32.3    Use the Software only on the Equipment on which it is installed at the time of delivery or, if Software is supplied separately, in connection with equipment supplied by Seller. Buyer must obtain a supplementary license from Seller (which Seller may or may not grant in its sole discretion) before using the Software in connection with any other equipment or for any other purpose.

32.4    Buyer may not distribute copies of the Software to others or electronically transfer the Software from one computer to another over a network. The Software contains trade secrets. In order to protect them Buyer may not decompile, reverse engineer, disassemble, or otherwise reduce the Software to a human-perceivable form. BUYER MAY NOT MODIFY, ADAPT, TRANSLATE, RENT, LEASE, LOAN, RESELL FOR PROFIT, DISTRIBUTE, NETWORK, OR CREATE DERIVATIVE WORKS BASED UPON THE SOFTWARE OR ANY PART



THEREOF.

32.5   All Software is protected by the copyright laws of the United States and by applicable international treaties. No rights under copyrights are transferred to Buyer, except as specifically provided above.

32.6   All Software provided by Seller remains Seller's property. If Buyer receives Software that renders Software that Buyer then has redundant, Buyer must return the redundant Software to Seller or certify in writing that Buyer has erased all copies of it.

## 33.   Assignment

Seller may assign or novate its rights and obligations regarding the Contract, in part or in whole, to one or more of its subsidiaries or affiliates without the consent of Buyer.  Upon the effective date of such assignment or novation, all of the rights and obligations of Seller under the Contract shall vest solely in Seller's assignees and novatees. However, Seller guarantees the performance of its assignees or novatees after the assignment or novation takes effect.  Buyer agrees to execute such documents as may be necessary to effect the assignment or novation. The delegation or assignment by Buyer of any or all of its duties or rights under the Contract without Seller's prior written consent shall be void.  Buyer shall notify Seller immediately upon any change in its ownership or control.  If Buyer fails to so notify Seller or, if Seller objects to the change in ownership or control, Seller shall have the unilateral right to terminate the Contract.  In lieu of termination, Seller may require Buyer to provide adequate assurance of performance of the Contract, and/or institute special controls, including but not limited to, special controls regarding the protection of the Confidential Information of Seller.

## 34.   Publicity

Buyer agrees to allow Seller to photograph and video tape the Equipment and the performance of Services at the Site and to use these materials as well as project details in public print ads, trade journals, technical papers, brochures, web pages and other publications.

## 35.   Prohibition On Nuclear Use

The Equipment rented and Services sold hereunder are not intended for application (and shall not be used) in connection with any nuclear installation or activity and Buyer warrants that it shall not use the Equipment and Services for such purposes, or permit others to use or permit others to use the Equipment or Services for any such purposes.  If, in breach of the foregoing, any such use occurs, Seller shall have no liability for any nuclear or other damage, injury or contamination, and Buyer shall indemnify Seller, its Affiliates and suppliers of every type and tier against any such liability, whether arising as a result of breach of contract, warranty, indemnity, tort (including negligence), strict liability or otherwise.

## 36.   Importation and Exportation

In connection with any export and import of the Equipment and/or Balance of Plant, whether in delivering the Equipment and/or Balance of Plant to the Delivery Point or in returning the Equipment to Seller after the Rental Term, Buyer shall be responsible for:
   (i)   paying all costs, fees, expenses and import/export duties;

and Seller shall be responsible for:
   (i)   obtaining all required licenses, permits, consents and authorizations; and
   (ii)   clearing customs.

## 37.   Permits

   (a)   Permits.  The Buyer shall be responsible for obtaining all environmental and use permits, all other licenses, exemptions, permits, and approvals, local building and construction permits, and easements necessary for the construction and operation of the facility, and shall be responsible for any additional costs arising from and any delay or failure to obtain such permits.



(b) Permitting Support. The Seller shall assist the Buyer in its endeavors relating to the permitting of the Site and cooperate by providing information and support during any hearings in the process of obtaining the permits. In undertaking such assistance, the Seller shall not be obligated to incur out-of-pocket costs and expenses without reimbursement from the Buyer.

## 38. Performance Guarantees

### I. Output, Heat Rate, Emissions

A. When tested in accordance with and subject to the conditions specified in Appendix E, Performance Guarantee, and the Seller's Site-specific performance test measurement specification to be provided during the course of project execution (see Appendix F for a typical specification provided as reference), the Seller guarantees that the Unit will achieve the output and heat rate Performance Guarantees, emissions levels, and noise levels set forth in the signature block on the Stamped Guarantee Sheet attached hereto as Appendix E (the "Performance Guarantees"). If the performance of the Unit fails to achieve the output or heat rate Performance Guarantees after the final performance test provided for in Section II below, the Seller shall pay to the Buyer as liquidated damages, and not as a penalty, a sum calculated in accordance with the table below for each Unit that fails to achieve the output or heat rate Performance Guarantees:

| Criterion | Test Measurement Point | Liquidated Damages |
|---|---|---|
| Output | At generator terminals | $250 for each kW below the applicable Performance Guarantee |
| Heat Rate | At turbine fuel meter | $250 for each Btu/kWh (LHV) above the applicable Performance Guarantee |
| NOx Emissions | At turbine exhaust flange | Liquidated damages not applicable. In lieu of any damages, Seller has a one-time duty to adjust and repair the Unit until the Performance Guarantee for NOx is met. (Must Meet Remedy). |
| Noise | 90 DB(A) ARITHMETIC AVERAGE SOUND PRESSURE LEVEL (dB REF 20 MICROPASCALS, RMS) OF LOCATIONS AROUND THE PACKAGE (VERTICAL DISTANCE OF 5FT. (1.5M) ABOVE PACKAGE BASE AT A HORIZONTAL DISTANCE OF 3FT. (1M) FROM THE EXTERIOR PLANE OF EQUIPMENT AS TESTED IN A FREE-FIELD CONDITION OVER A HARD REFLECTING GROUND PLANE, OPERATING AT BASE LOAD) | Liquidated damages not applicable. In lieu of any damages, Seller has a one-time duty to adjust and repair the Unit until the Performance Guarantee for Noise is met. (Must Meet Remedy). |

Liquidated damages will be calculated and applied as a credit on the invoice following a sixty day calculation period from the acceptance of the final performance test(s).

The Seller's aggregate liability hereunder for liquidated damages for failure to achieve the output Performance Guarantee shall not exceed five percent (5%) of the Equipment Rental price. The Seller's aggregate liability hereunder for liquidated damages for failure to achieve the heat rate Performance Guarantee shall not exceed five percent (5%) of the Equipment Rental price. The liquidated damages for failure to achieve the Performance Guarantees and the corrective action to be taken by the Seller for deficiencies in performance shall be the Buyer's exclusive remedies for and the Seller's sole obligations arising out of such deficiencies.





Notwithstanding the foregoing, the Seller shall have no liability to the Buyer for liquidated damages for failure to achieve the Performance Guarantees with respect to any Unit unless the Buyer suffers economic harm as a result of the failure of such Unit to achieve the Performance Guarantees.

B.  In addition to the Performance Guarantees for output and heat rate, when tested in accordance with the Seller's Site-specific performance test measurement specification and subject to the conditions set forth in Appendix E, Performance Guarantee, the Seller guarantees that the Unit will meet the Minimum Performance Guarantee.  If when first so tested, any Unit fails to meet the minimum Performance Guarantee, in lieu of liquidated damages, the Seller shall have a one-time duty to adjust and repair the Unit until the Minimum Performance Guarantee is met ("Must Meet Remedy").

"Minimum Performance Guarantees" shall mean at least ninety-five percent (95%) of the Performance Guarantee for output and no more than one hundred and five percent (105%) of the Performance Guarantee for heat rate.

"Performance Guarantees" shall mean the guaranteed values identified in the signature box on the Stamped Guarantee Sheet attached hereto as Appendix F.

**II. Performance Guarantee Testing**

*Performance Tests.*

The performance tests shall be arranged and conducted by the Seller or its designee at Seller's cost except as specifically otherwise stated below in paragraph (D).

A.  *Performance Testing.*

The tests for output and heat rate shall be performed using the Seller's Site-specific performance test measurement specification to be provided during the course of project execution (see Appendix F for typical specification provided as reference) and subject to conditions set forth in Appendix E, and shall be conducted immediately following the start-up period once the Seller has declared the Equipment commercially available and within the first 200 fired hours.  If the output and heat rate tests are not conducted within the first 200 fired hours, degradation shall be applied in accordance with Seller's degradation curve to be provided to Buyer at the time of the performance testing.

B.  *Emissions Testing.*

Seller or its designee shall conduct the emissions tests at the engine exhaust.  Seller shall provide Buyer a copy of the test report.

C.  *Noise Testing.*

Seller or it designee shall conduct the noise tests during full load operation in accordance with the stamped guarantee in Appendix E, Performance Guarantee.

D.  *Cure Period.*

If when first tested, any Unit does not meet the heat rate or output Performance Guarantees, the Seller shall be afforded thirty (30) days or such other time as can be reasonable agreed between the Parties Unimpeded Access Days of access to the Unit to undertake corrective action.  The Unit will be re-tested when the Seller so requests, but in any event at the end of this cure period.

E.  *Cost of Tests and Re-Tests.*

The Seller shall perform the initial performance tests at its cost.  The Buyer shall be notified of, and shall be represented at all such tests.  If a re-test is required and to the extent the Seller was the cause of such re-test, the actual cost of the retest will be borne by the Seller.  The actual cost of the re-test shall mean (i) cost of special test personnel or special operating personnel provided by the Buyer, (ii)



cost of special instrumentation and equipment (including rental cost) and including required calibration of the instrumentation, and (iii) the Seller's personnel cost, but in no event whatsoever will the Seller be responsible for the cost of fuel or any other such cost typically borne by the Buyer.

**F.   Degradation.**

In conducting the initial performance test or re-tests, the performance of the Unit shall not be adjusted for degradation until such Unit has operated in excess of two hundred (200) hours. The Seller's degradation curve shall be used to determine the adjustment for Unit output and Unit heat rate.

**G.   Not Used**

**H.   Delayed Tests.**

If for reasons not attributable to the Seller, the performance tests are not started within sixty (60) Days of the Seller's written notice to Buyer that the Unit is ready for use by Buyer, the tests shall be deemed waived and each Unit shall be deemed to have achieved the Performance Guarantees.

**III. Reliability**

Sixty days after the Equipment has achieved commercial operation, and subject to compliance with Buyer Responsibilities, Seller fuel specification and fuel availability, the Equipment shall be available for dispatch by Buyer during the Rental Term. Seller guarantees an average minimum reliability of 90% for the Equipment during the Rental Term calculated on two time periods:
    a. in the first year of the Rental Term and
    b. in the final 183 days of the Rental Term (the "Reliability Guarantee"). Should Buyer not elect for Seller to dispatch during a four week period, Seller shall have the right to run the Unit for up to sixty (60) minutes every four (4) weeks during the Rental Term, at the Buyer's expense. Additionally, Seller will have the right to perform standard Planned Maintenance tasks as required by normal GE gas turbine operating requirements to allow for safe and efficient operation of the Equipment without impact on the Reliability Liquidated Damage or Bonus. When possible, Seller will perform maintenance events during the part of the day(s) when the Buyer requests the Equipment not to operate. Planned Maintenance is defined as periodic inspection, testing, cleaning, repair, and/or replacement of components of the Equipment, as specified in the GE TM2500 Operations and Maintenance Manuals, Service/Product Bulletins, and vendor documentation as reasonably necessary in light of deterioration due to normal wear and tear on the Equipment and in accordance with Seller's recommendations and prudent industry practices ("Planned Maintenance.")

Reliability shall be measured as follows:

Period Calculation
RG – Reliability Guarantee stated as a percentage of Contract Hours
CH - Contract Hours
    Contract Hours shall mean the number of hours in the measurement period less the hours in the first 60 days of the first measurement period (the "Contract Hours")

GH - Guarantee Hours
PM – Planned Maintenance Hours plus High Wind Outage Hours (HW)
HW – Total hours of an outage to (i) remove and store 2nd story components of the Equipment prior to exposure to anticipated winds in excess of 100MPH plus (ii) reassemble and start the Equipment following the high wind event.
UH hours = the total number of machine hours that the machine is actually declared unavailable to run by Seller as measured by Seller's machine logs excluding hours determined to be Planned Maintenance. The UH hours shall begin 60 (sixty) minutes after Seller receives dispatch notification and the Seller deems it necessary to shut the equipment down and perform unplanned maintenance.

UH hours do not include the following (this is not an exclusive list):



29

a. Outage hours caused by events outside Seller's control including but not limited to: power grid instability, dispatching instructions, lack of fuel or water that meets the Seller's specifications, or to the extent of the Buyer's acts or omissions.

b. Any Buyer related or caused delay.

c. Choice of timing of Buyer scheduled maintenance events.

d. Outage hours to perform commercially available conversions, modifications and upgrades and all other work as mutually agreed upon by the Parties.

e. Outage hours caused by pre-existing conditions external to Seller's Equipment and the Balance of Plant.

<u>Example For The First Year:</u>
RG = 90% (per Contract)
PM = 300 Planned Maintenance Hours + 100 High Wind Hours = 400 Hours
CH = (1 Unit*(366 Days)*24 Hours) – (60 Days * 24 Hours)= 7,344 Hours
GH = (CH – PM) * RG
UH = 700 Hours
Result: GH = (7,344 Hours – 400 Hours) *0.90 = 6,250 hours during the first year of the Rental Term.

Reliability =        [1 - UH/GH]*100
                     As in the example:  [1 – 700 Hours/6,250 Hours]*100 = 88.8%

<u>Example For Final 183 Days:</u>
RG = 90% (per Contract)
PM = 100 Planned Maintenance Hours + 50 High Wind Hours = 150 Hours
CH = (1 Unit*(183 Days)*24 Hours) – (0 Days * 24 Hours)= 4,392 Hours
GH = (CH – PM) * RG
UH = 350 Hours
Result: GH = (4,392 Hours – 150 Hours) *0.90 = 3,818 hours during the Rental Term.

Reliability =        [1 - UH/GH]*100
                     As in the example:  [1 – 350 Hours/3,818 Hours]*100 = 90.8%

It is the responsibility of the Buyer to comply fully with Seller's fuel and water input specifications.  The Buyer will be responsible for maintaining fuel compliance for the duration of the Rental Term.

If a decreased Reliability has been caused by the use of a fuel not in compliance with the Seller's specification, Seller shall not be responsible for the lower Reliability.

In case that the Reliability is lower than 90% and to the extent that the Buyer suffers actual damages, including, but not limited to, loss of Buyer revenue due to outage or utilizing a separate Buyer-unit in place of the Equipment, as a result of such lower Reliability, the following liquidated damages will apply:

$250 USD per hour per Unit

In case the Reliability is higher than 92% per Unit, when dispatched, the following bonus will apply:

$250 USD per hour per Unit.

Liquidated damages apply, provided such liquidated damages are not the result, in whole or in part, of an act or omission of the Buyer (including but not limited to those responsibilities of the Buyer identified in the Contract), or of an Excusable Delay.

Liquidated damages and bonuses will be calculated on an average basis over the Rental Term starting 60 days after the Commercial Operation Date. The liquidated damages and bonuses will be trued up following a 60-day calculation/agreement period. Seller will keep monthly logs of reliability, reconcile them on a monthly basis and reconcile them at the end of the Rental Term for liquidated damages and/or bonus calculation purposes.

**Liquidated Damages**

The total liquidated damages payable under this Section III shall be capped and not exceed five percent (5%) of the Equipment rental portion of the Contract.

The payment of liquidated damages for failure to achieve the Reliability Guarantee shall be the Buyer's exclusive remedies for and the Seller's sole obligations arising out of such deficiencies.

Notwithstanding the foregoing, the Seller shall have no liability to the Buyer for liquidated damages for failure to achieve the Reliability Guarantee with respect to the Equipment unless the Buyer suffers economic harm including, but not limited to, loss of Buyer revenue due to outage or utilizing a separate Buyer-unit in place of the Equipment as a result of the failure of such Equipment to achieve the Reliability Guarantee.

The Parties agree that the amount of liquidated damages set forth above are reasonable in light of the anticipated harm caused by the breach of duty related thereto and the difficulties of proof of loss and inconvenience or nonfeasibility of obtaining any adequate remedy and the Parties are stopped from contesting the validity or enforceability of such liquidated damages.

**Bonus**

The total accrued bonus under this Section III shall be capped and not exceed five percent (5%) of the Equipment rental portion of the Contract.

Notwithstanding the foregoing, the Buyer shall have no liability to the Seller for bonus for Seller exceeding 92% reliability with respect to the Equipment unless the Buyer enjoys economic benefit as a result of the performance of such Equipment past 92% reliability. However, even if Buyer does not enjoy economic benefit as a result of Seller's performance of the Equipment past 92% reliability, Seller may apply any actual or accrued bonus to offset or partially offset any Seller liquidated damages due to Buyer.

**IV. Aggregate limitation on Liquidated Damages**

The Seller's overall aggregate liability hereunder for all forms of liquidated damages provided for in this Contract shall not exceed ten percent (10%) of the price of the Equipment rental. The Parties agree that the amount of liquidated damages set forth above are reasonable in light of the anticipated harm caused by the breach of duty related thereto and the difficulties of proof of loss and inconvenience or nonfeasibility of obtaining any adequate remedy and the Parties are stopped from contesting the validity or enforceability of such liquidated damages.

**39. Project Manager**

*a. Kickoff Meeting.*

Unless otherwise agreed, the Seller will schedule a Kickoff Meeting within thirty (30) Days of the Effective Date (the "Kickoff Meeting").

*b. Project Manager.*

No later than the date of the Kickoff Meeting, the Parties will appoint a respective individual person as its respective project manager. Each Party's project manager will be authorized to act on the respective Parties' behalf in matters connected with this Contract or the Project.



**40. Business License**

Seller must comply with all Virgin Islands' laws with respect to licensing which must be obtained in connection with its business operation(s). All necessary and applicable license(s) shall be obtained by the Seller and copies presented to the contracting officer concurrent with its execution of the Contract. Failure by Seller to present its license(s) at the time of execution of the Contract by the Seller may be grounds to consider the Contract void, or for Buyer to terminate the Contract.

**41.  Right to Audit**

1.  The Buyer reserves the right to request price justification information on all of Seller's scope of work that is based on pass-through costs marked up (i.e. transportation) or any incremental costs above and beyond the original Contract Price (i.e. change orders) (the "Audit Records").

2.  The Seller shall provide the Buyer with copies of records in computer-readable format as well as a hard copy.

3.  Should there be incremental charges above and beyond the original Contract Price (i.e. transportation or additional service work), the Buyer reserves the right to request supporting evidence necessary to substantiate Seller's invoices.

4.  The Buyer reserves the right to audit any records necessary to evaluate and verify contractor compliance with Contract requirements.

5.  The Seller's Audit Records shall be subject to audit throughout the Rental Term and for a period of two year after final payment.

6.  In the event that the Buyer needs to conduct audit at the Seller's facilities, the Seller shall provide adequate work space and access to photocopy machines.

7.  The Buyer shall recoup the cost of the audit if the audit detects over charges greater than 0.5 % of the total Contract billings.

**42. Remote Diagnostic Services**

The Buyer will permit Seller to operate a data retrieval system on the Equipment to collect, transmit, diagnose, and store plant operating data, and will permit Seller to remotely access and conduct troubleshooting and adjustment of Unit control systems. The purpose of these remote services is to monitor the Equipment during the Rental Term. Upon completion of the Rental Term, remote diagnostic services will be terminated.

Buyer will provide on-site support, if requested by Seller, a high-speed connection to the internet and IT support in the configuration of the Virtual Private Network (VPN) as required for installation and operation of Seller's remote diagnostic system and services during the installation, commissioning, and the Rental Term.

**43. Notices**

Any notice pursuant to this Contract shall be sent via certified mail as follows:

If to Buyer:
Executive Director
Virgin Islands Water and Power Authority
PO Box 1450
St. Thomas, Virgin Islands  00804

And



General Counsel
Virgin Islands Water and Power Authority
PO Box 1450
St. Thomas, Virgin Islands  00804

If to Seller:

General Manager
PowerXpand
GE Aeroderivative Services
General Electric International, Inc.
1333 West Loop South, 8th Floor
Houston, TX  77027



The reminder of this page left intentionally blank



Contract# SC-21-12

**IN WITNESS WHEREOF** the Parties have caused this document to be executed by their authorized representatives as of the Effective Date.

Seller

Coppard Electric International Inc

By: _____
(Signature)

Brian Boute'
(Printed Name)

GM Power Xpand
(Title)

2/15/2012
(Date)

Buyer

Virgin Islands Water and Power Authority

By: _____
(Signature)

Hugo Hodge Sr.
(Printed Name)

Executive Director/CEO
(Title)

3/15/12
(Date)

Approved for Legal Sufficiency:

_____

Lorelei Farrington
General Counsel
VI WAPA

34

# COMPOSITE EXHIBIT "C"





aprenergy.com
info@aprenergy.com

## Contract Change Order

| Project Name: Virgin Islands Water and Power Authority | Change Order No.: 1 |
|---|---|
| Contract/P.O. No.: 719463 | Subject: Rental Period Extension |

**Reason for Change:** Buyer has requested Seller to extend rental period for an additional six (6) days and twelve (12) months (through November of 2014) in accordance with Article 8 of the Contract.

**Description of Change:**

- **Article 2, Section I, Subsection D** – Buyer agrees to provide one (1) operator during all times that the Unit is scheduled for dispatch.

- **Article 4 Contract Price** – The contract price will be increased by $ 7,828,746.94 ("Rental Extension Increase"). This price includes the Scope of Supply as described in Contract 719463 and any subsequent change orders to same for the Revised Rental Term.

- **Article 7 Rental Term** – The Rental Term shall be extended by 6 days and 12 months; start date is November 25, 2013, end date is November 30, 2014 ("Revised Rental Term").

- **Article 8 Rental Extension** – The terms of this Article shall apply to the Revised Rental Term.

- **Appendix P, Section F, Subsection b.** – Within 15 days of the effective date of this Change Order, Buyer shall modify the Standby Letter of Credit such that the value of the LOC shall equal 75% of the Rental Extension Increase and the Standby Letter of Credit and any tenor shall expire no earlier than 90 days beyond the revised Rental Term.

- **Appendix P, Section F, Subsection g.** – Effective on November 1, 2013, this subsection will be deleted in its entirety and replaced with the following:

  Monthly rental rates for the extended Rental Term will be in accordance with the following schedule. Monthly rental rates exclude any Gross Receipts Tax impact. The monthly rental rate, beginning December 2013, also includes a pro-rated estimate of the end of term transportation from the Site to Seller's facility. The total estimate of this pro-rated transportation is $240,000 ("Estimated End of Term Transportation Costs"). The actual transportation costs will be reconciled to the Estimated End of Term Transportation Cost, and any costs above the estimate will be billed to the Buyer. Conversely, any amount collected via the pro-rated Estimated End of Term Transportation Costs that exceeds the actual transportation costs will be returned to Buyer.



APR ENERGY

aprenergy.com
info@aprenergy.com



| Line | Scope | November 2013 18 | | December 2013 19 | January 2014 20 | February 2014 21 | March 2014 22 |
|------|-------|------------------|---|------------------|-----------------|------------------|---------------|
| 1 | Equipment Rental | 344,444 | | 365,864 | 365,864 | 365,864 | 365,864 |
| 2 | Equipment Rental Annual Increase | 7,348 | | | | | |
| 3 | Water Treatment System Rental (First 180 Days) | 6,060 | | | 6,302 | 6,302 | 6,302 |
| 4 | Water Treatment System Rental (Final Year) | | | | | | |
| 5 | Water Treatment System Annual Increase | | | | | | |
| 6 | Equipment Operational Services | 237,278 | | 248,743 | 248,743 | 248,743 | 248,743 |
| 7 | Equipment Operational Services Annual Increase | 1,898 | | | | | |
| 8 | Installation and Commissioning Services | | | | | | |
| 9 | Performance Testing Services | 10,556 | | | | | |
| 10 | Decommissioning Services | 5,000 | | | | | |
| 11 | Balance of Plant | - | | | | | |
| 12 | Subtotal Contact Price | | | | | | |
| 13 | | | | | | | |
| 14 | Mixed Bed Exchange (per Exchange) | - | | | | | |
| 15 | Estimated Transport In | - | | | | | |
| 16 | Estimated Transport Out | | | 20,000 | 20,000 | 20,000 | 20,000 |
| 17 | Total | 612,584 | | 640,910 | 640,910 | 640,910 | 640,910 |

| April 2014 23 | May 2014 24 | June 2014 25 | July 2014 26 | August 2014 27 | September 2014 28 | October 2014 29 | November 2014 30 |
|---------------|-------------|--------------|--------------|----------------|-------------------|-----------------|------------------|
| 365,864 | 365,864 | 365,864 | 365,864 | 365,864 | 365,864 | 365,864 | 365,864 |
| | | | | | | | |
| 6,302 | 6,302 | 6,302 | 6,302 | 6,302 | 6,302 | 6,302 | 6,302 |
| | | | | | | | |
| | | | | | | | |
| 248,743 | 248,743 | 248,743 | 248,743 | 248,743 | 248,743 | 248,743 | 248,743 |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 |
| 640,910 | 640,910 | 640,910 | 640,910 | 640,910 | 640,910 | 640,910 | 640,910 |

Note: The November 2013 monthly invoice includes $137,831.41 for the six days of the Revised Rental Term contemplated under this change order.

Contract Elements Affected: Article 4 Contract Price, Article 7 Rental Term, and Appendix P Confidential Information.

Reason for Change: Buyer has requested Seller to extend rental period for an additional six (6) days and twelve (12) months (through November of 2014) in accordance with Article 8 of the Contract.



aprenergy.com
info@aprenergy.com



**Description of Change:**

- **Article 2, Section I, Subsection D** – Buyer agrees to provide one (1) operator during all times that the Unit is scheduled for dispatch.
- **Article 4 Contract Price** – The contract price will be increased by $ 7,828,746.94 ("Rental Extension Increase"). This price includes the Scope of Supply as described in Contract 719463 and any subsequent change orders to same for the Revised Rental Term.
- **Article 7 Rental Term** – The Rental Term shall be extended by 6 days and 12 months; start date is November 25, 2013, end date is November 30, 2014 ("Revised Rental Term").
- **Article 8 Rental Extension** – The terms of this Article shall apply to the Revised Rental Term.
- **Appendix P, Section F, Subsection b.** – Within 15 days of the effective date of this Change Order, Buyer shall modify the Standby Letter of Credit such that the value of the LOC shall equal 75% of the Rental Extension Increase and the Standby Letter of Credit and any tenor shall expire no earlier than 90 days beyond the revised Rental Term.
- **Appendix P, Section F, Subsection g.** – Effective on November 1, 2013, this subsection will be deleted in its entirety and replaced with the following:

Monthly rental rates for the extended Rental Term will be in accordance with the following schedule. Monthly rental rates exclude any Gross Receipts Tax impact. The monthly rental rate, beginning December 2013, also includes a pro-rated estimate of the end of term transportation from the Site to Seller's facility. The total estimate of this pro-rated transportation is $240,000 ("Estimated End of Term Transportation Costs"). The actual transportation costs will be reconciled to the Estimated End of Term Transportation Cost, and any costs above the estimate will be billed to the Buyer. Conversely, any amount collected via the pro-rated Estimated End of Term Transportation Costs that exceeds the actual transportation costs will be returned to Buyer.

| Line | Scope | November 2013 18 | December 2013 19 | January 2014 20 | February 2014 21 | March 2014 22 |
|------|-------|------------------|------------------|-----------------|------------------|---------------|
| 1 | Equipment Rental | 344,444 | 365,864 | 365,864 | 365,864 | 365,864 |
| 2 | Equipment Rental Annual Increase | 7,348 | | | | |
| 3 | Water Treatment System Rental (First 180 Days) | 6,060 | 6,302 | 6,302 | 6,302 | 6,302 |
| 4 | Water Treatment System Rental (Final Year) | | | | | |
| 5 | Water Treatment System Annual Increase | | | | | |
| 6 | Equipment Operational Services | 237,278 | 248,743 | 248,743 | 248,743 | 248,743 |
| 7 | Equipment Operational Services Annual Increas | 1,898 | | | | |
| 8 | Installation and Commissioning Services | | | | | |
| 9 | Performance Testing Services | 10,556 | | | | |
| 10 | Decommissioning Services | 5,000 | | | | |
| 11 | Balance of Plant | - | | | | |
| 12 | Subtotal Contact Price | | | | | |
| 13 | | | | | | |
| 14 | Mixed Bed Exchange (per Exchange) | - | | | | |
| 15 | Estimated Transport In | - | | | | |
| 16 | Estimated Transport Out | | 20,000 | 20,000 | 20,000 | 20,000 |
| 17 | Total | 612,584 | 640,910 | 640,910 | 640,910 | 640,910 |

S8L



apronergy.com
Info@aprenergy.com



| April 2014 | May 2014 | June 2014 | July 2014 | August 2014 | September 2014 | October 2014 | November 2014 |
|---|---|---|---|---|---|---|---|
| 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 365,864 | 365,864 | 365,864 | 365,864 | 365,864 | 365,864 | 365,864 | 365,864 |
| 6,302 | 6,302 | 6,302 | 6,302 | 6,302 | 6,302 | 6,302 | 6,302 |
| 248,743 | 248,743 | 248,743 | 248,743 | 248,743 | 248,743 | 248,743 | 248,743 |
| 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 |
| 640,910 | 640,910 | 640,910 | 640,910 | 640,910 | 640,910 | 640,910 | 640,910 |

Note: The November 2013 monthly invoice includes $137,831.41 for the six days of the Revised Rental Term contemplated under this change order.

Contract Elements Affected: Article 4 Contract Price, Article 7 Rental Term, and Appendix P Confidential Information.

Price: The price for this Change Order is $7,828,746.94.

Schedule Impact:
Not Applicable.

Delivery and Title Transfer Terms:
Delivery Terms and Title Transfer Terms are not impacted by this Change Order.

Payment Terms:
Payment Terms remain in accordance with Appendix P, Subsection F of the Contract.

Change Order Validity:  Seller's proposal valid through October 31, 2013.

Terms and Conditions:
Terms and Conditions remain in accordance with Contract Number 719463, dated February 15, 2012 except as modified herein.



aprenergy.com
info@aprenergy.com



| Power Rental Op Co LLC Authorization | Customer Authorization | |
|---|---|---|
| Name    Steven S. List | Name | |
| Title    Secretary | Title | |
| Signature   Steven S. List | Signature | |
| Date    11\|8\|2013 | Date | |


ENERGY.

*EXECUTION VERSION*

## Contract Change Order And Addendum

| Project Name: Virgin Islands Water and Power Authority | Change Order No.: 2 |
|---|---|
| Contract/PO. No.: SC-21-12 dated 15 Feb 2012  719463 | Subject: Rental Period Extension/Equipment Purchase Option |

**Reason for Change:** Buyer has requested that Seller extend the Rental Term for an additional twenty-four (24) months (through November 30, 2016) in accordance with Article 8 of the Contract. The capitalized terms used in this Change Order, unless otherwise defined in this Change Order, have the same meanings ascribed to them in the Contract.

**Description of Change:**

- **Article 4 Contract Price** – The Contract Price will be increased by thirteen million two hundred thousand dollars, currency of the United States (US$13,200,000) ("Rental Extension Increase"). The Contract Price, as increased by the Rental Extension Increase amount, includes the scope of supply as described in the Contract for the Revised Rental Term.

- **Article 7 Rental Term** – The Rental Term of the Contract will be extended, without any further action by any Party, until November 30, 2016, as described in Section 8 of the Contract. The period from December 1, 2014 to November 30, 2016 shall be referred to as the "Revised Rental Term."

- **Article 8 Rental Extension** – Except as modified by this Change Order, the terms and conditions of the Contract (as properly amended by previous properly executed amendment(s) or change order(s)) shall apply during the period from the Effective Date until November 30, 2016 and during the Revised Rental Term.

- **Appendix P, Monthly Rate** – The total monthly rate payable by Buyer to Seller during the Revised Rental Term shall be five hundred fifty thousand dollars, currency of the United States (US$550,000) and shall be paid in accordance with the Contract.

- **Appendix P, Section F, Subsection b.** – Within fifteen (15) calendar days of the execution of this Change Order, Buyer shall modify the Standby Letter of Credit such that the value of the Standby Letter of Credit shall equal seventy-five percent (75%) of the Rental Extension Increase and the Standby Letter of Credit and any tenor shall expire no earlier than ninety (90) days beyond the Revised Rental Term. Except as modified by the foregoing, the requirements for the Standby Letter of Credit shall remain as set forth in the Contract.

- **Subject to Buyer's fulfillment of its obligations under the Contract as amended hereby and mutual agreement of any addition terms which may apply to the transaction, Buyer and Seller agree that Buyer has the option to purchase the existing installed Unit, which includes the Unit, the Equipment and Balance of Plant as defined in the Contract between General Electrical International, Inc. and Virgin Islands Water and Power Authority, dated February 15, 2012, and excludes spares, consumable, and tools, at the end of the Revised Rental Term (the "Purchase Option").**

- **Buyer must notify Seller, in writing, ninety (90) days prior to the expiration of the Revised Rental Term, of Buyer's intent to exercise the Purchase Option. Upon receipt of Buyer notice to exercise the Purchase Option, the Buyer and Seller agree to negotiate in good faith to endeavor to agree on mutually agreeable terms, including purchase price, which the Buyer and Seller agree will reflect reasonable market value at the time of purchase, as well as any additional terms applicable to the sale and purchase of the installed Unit (the "Terms of Purchase"). The Buyer shall be solely responsible for any additional costs**

Seller Initial and Date: _GA_
11/30/14

Buyer Initial and Date: _HH_

ENERGY.

**EXECUTION VERSION**

## Contract Change Order And Addendum

| Project Name: Virgin Islands Water and Power Authority | Change Order No.: 2 |
|---|---|
| Contract/PO. No.: SC-21-12 dated 15 Feb 2012<br>719463 | Subject: Rental Period Extension/Equipment Purchase Option |

| associated with the installed Unit at the time of purchase. |
|---|
| • In the event that Buyer and Seller are unable to agree upon mutually acceptable Terms of Purchase within at least thirty (30) calendar days prior to the expiration of the Revised Rental Term, or Buyer fails to notify Seller within the time and in the manner prescribed herein of its desire to exercise the Purchase Option, then the Purchase Option shall expire and be of no force or effect, and Buyer shall be obligated to re-deliver the installed Unit and the Equipment to Seller in accordance with the terms of the Contract.  For avoidance of doubt, the Parties acknowledge that the purchase of the installed Unit will not affect the Buyer's obligation to pay any termination charges when due under the terms of the Contract |

| Contract Elements Affected: Article 4 Contract Price, Article 7 Rental Term, and Appendix P Confidential Information. |
|---|

| Price: The Rental Extension Increase for this Change Order is thirteen million two hundred thousand dollars, currency of the United States (US$13,200,000) and the Contract Price shall be increased by such amount. |
|---|

| Schedule Impact:<br>Not Applicable. |
|---|
| Delivery and Title Transfer Terms:<br>Delivery Terms and Title Transfer Terms are not impacted by this Change Order. |
| Payment Terms:<br>Payment Terms remain in accordance with Appendix P, Subsection F of the Contract. |
| Change Order Validity:  Upon execution of this Change Order by both Parties, this Change Order shall operate as an amendment to the Contract pursuant to Section 15(d) thereof.  Except as expressly amended by the terms of this Change Order, the Contract (as amended by any previous amendment(s) or change order(s) properly executed by the Parties) shall continue to be unchanged and shall remain in full force and effect. Nothing in this Change Order shall be deemed to release any Party for any of its obligations arising under the Contract prior to the execution of this Change Order. |
| Terms and Conditions:<br>All terms and conditions set forth in the Contract dated February 15, 2012 (as amended by previous properly executed amendment(s) or change order(s)), except as expressly modified herein, shall remain in full force and effect and govern the relationship of the Parties. Without limiting any rights or obligations of the Parties set forth in the Contract, by executing this Change Order the Buyer hereby agrees to be bound by the obligations and duties set forth in the Contract Addendum below. The Contract, as modified by this Change Order and any fully executed prior amendment(s) or change order(s), embodies the entire agreement between the Parties with respect to the subject matter of the Contract and this Change Order, and supersedes any prior or contemporaneous agreements, representations and undertakings between |

Seller Initial and Date: _CHA_
11/30/14

Buyer Initial and Date: _AH_

ENERGY.

*EXECUTION VERSION*

## Contract Change Order And Addendum

| Project Name: Virgin Islands Water and Power Authority | Change Order No.: 2 |
|---|---|
| Contract/PO. No.: SC-21-12 dated 15 Feb 2012 719463 | Subject: Rental Period Extension/Equipment Purchase Option |

the Parties with respect to such subject matter. For the convenience of the Parties, this Change Order may be executed in any number of separate counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts will together constitute the same agreement. Executed signature pages to this Change Order may be delivered by facsimile and such facsimiles will be deemed as sufficient as if actual signature pages had been delivered. The headings or clause titles used herein are included for convenience only and may not be used in construing or interpreting this Change Order or the Contract Addendum.

## Contract Addendum

Buyer and Seller entered into that certain Power Purchase Agreement, dated as of February 15, 2012 (the "**Original Agreement**"); and,

On November 12, 2013, Buyer and Seller executed a Contract Change Order which extended the term of the of the Original Agreement for an addition 12 month period ending November 30, 2014 (the "**First Contract Change Order**"); and,

Buyer and Seller have agreed herein to extend the term of the of the Original Agreement and beyond the First Extension period for an additional term of 24 month period ending November 30, 2016 (the "**Second Contract Change Order**"); and,

Buyer and Seller desire to incorporate the following additional terms, conditions and covenants into the Original Agreement as follows:

Definition The phrase "Environmental Laws" shall mean any applicable statute, law, rule, regulation, ordinance, code, binding and enforceable policy or guideline now or hereafter in effect and as amended, or any judicial or administrative interpretation thereof, to the extent binding on the Buyer or the Seller or any of their successors or assigns, relating to the environment, the effect of the environment on health, or hazardous materials.

Environmental-Related Requirements

A.      Buyer shall promptly notify Seller in writing of any notice Buyer receives during the Revised Rental Term regarding any of the following which arise or occur during the Revised Rental Term: (i) any and all enforcement or other regulatory actions threatened, instituted or completed by any governmental authority with respect to the Unit; and (ii) all claims made or threatened by any third party against the Buyer which specifically relate to the Buyer's leasing and/or the ownership or operation of the Unit;

B.      Seller may request and Buyer shall promptly provide copies of the following materials which relate to the  Buyer's leasing and/or the ownership or operation of the Unit as from the Effective Date of the Original Agreement: (i) material correspondence, notices of violation, summons, orders, or

Seller Initial and Date: _____   11/30/14           Buyer Initial and Date: _H.H._____

ENERGY.

*EXECUTION VERSION*

## Contract Change Order And Addendum

| | |
|---|---|
| **Project Name:** Virgin Islands Water and Power Authority | **Change Order No.:** 2 |
| **Contract/PO. No.:** SC-21-12 dated 15 Feb 2012 719463 | **Subject:** Rental Period Extension/Equipment Purchase Option |

complaints; (ii) reports of environmental investigations, including any emission reports or monitoring data; (iii) licenses, certificates and permits; and (iv) copies of any reports, documents, or other correspondence to or with any governmental authority.

C.       In responding to a request made by Seller pursuant to Paragraph (B) above, Buyer is not required to provide materials which Buyer deems are protected by the American Bar Association's Model Rules of Professional Conduct.

D.       Within 30 days from the date this Second Contract Change Order is executed by all Parties, Seller shall implement and maintain a monitoring plan for (i) recording the Unit's operating load, actual water-to-fuel ratio, and the applicable minimum required water-to-fuel ratio (provided to Seller by Buyer) established under the Unit's environmental permit, at least every 15 minutes, (ii) as part of the monitoring plan Seller shall confirm each hour whether the hourly average minimum has been met, and, if not, determine and record the cause and the corrective action taken.  In order to enable Buyer to timely report each exceedance and overall compliance with the water-to-fuel injection requirements, Seller shall provide Buyer with notification of (a) each hourly deviation within one hour of the occurrence, (b) the cause and corrective action taken within 12 hours of each occurrence, and (c) a monthly summary of the compliance monitoring within 15 days of the close of each month.

E.       Buyer shall provide, upon Seller's request, information regarding fuel quality as utilized by the Unit.

F.       In the event that Buyer is requested to install a continuous emissions system on the Unit, then Seller shall provide Buyer with reasonable rights of access to the Unit so that Buyer may evaluate the feasibility of installing the requested continuous emissions monitor.

G.       Buyer's obligations under the Original Agreement and this Second Contract Change Order shall continue in accordance with the Contract regardless of whether a governmental authority prohibits the operation of the Unit through no material fault of the Seller.

H.       Buyer hereby covenants and agrees to indemnify, defend, and hold harmless the Seller and its respective officers, directors, employees and agents, successors and assigns (collectively, "Seller Indemnified Parties") against and from any and all damages, claims, judgments, losses, penalties, fines, direct or indirect liabilities (including strict liability), reasonable attorneys' fees and disbursements and consultants' fees, (collectively, "Losses") arising from or out of the following actions or inactions by Buyer with respect to the St. Thomas Facility: (i) failure to comply with Environmental Laws; or (ii) failure to comply with its obligations to Seller under the Original Agreement or any Contract Change Order that result in the Seller's failure to comply with Environmental Laws. Without limiting the generality of the foregoing, Buyer shall not be obligated to indemnify any Seller Indemnified Parties for Losses which result from Seller's failure to comply with (a) Environmental Laws with respect to Unit 25 at the St. Thomas Facility or (b) its obligations to Buyer under the Original Agreement or under any Contract Change Order.

Seller Initial and Date: GA     Buyer Initial and Date: BH
11/30/14

ENERGY.

*EXECUTION VERSION*

## Contract Change Order And Addendum

| Project Name: Virgin Islands Water and Power Authority | Change Order No.: 2 |
|---|---|
| Contract/PO. No.: SC-21-12 dated 15 Feb 2012        719463 | Subject: Rental Period Extension/Equipment Purchase Option |

The Buyer's indemnification obligations set forth herein shall survive the termination of the Contract and are not subject to the Limitations of Liability set forth in Paragraph 27 of the Contract.

----------------- Signature Page to Follow -----------------

Seller Initial and Date: _____ 11/30/14

Buyer Initial and Date: _____

ENERGY

*EXECUTION VERSION*

## Contract Change Order And Addendum

| Project Name: Virgin Islands Water and Power Authority | Change Order No.: 2 |
|---|---|
| Contract/PO. No.: SC-21-12 dated 15 Feb 2012 <br> 719463 | Subject: Rental Period Extension/Equipment Purchase Option |

| Power Rental Op Co LLC Authorization | | Virgin Islands Water and Power Authority Authorization | |
|---|---|---|---|
| Name | Phillip Burres Herold | Name | Hugo Hodge Jr. |
| Title | Regional Director | Title | Executive Director |
| Signature | | Signature | |
| Date | 11/30 | Date | 12/9/10 |

APPROVED AS TO LEGAL SUFFICIENCY:

11/28/14

LORELEI FARRINGTON, ESQ.                Date
General Counsel, VIWAPA

Seller Initial and Date: _____          Buyer Initial and Date: HH _____



## Contract Third Contract Change Order and Exhibits

| Project Name: Virgin Islands Water and Power Authority | Contract Change Order No. 3 ("Third Contract Change Order") |
|---|---|
| Contract/PO. No.: SC-21-12 dated 15 Feb 2012/719463 | Subject: Addition of TM2500+ for generation on LPG and #2 Diesel |
| Effective Date: [11/30/2016] | Extension of Rental Term for Existing Equipment |

**Reason for Changes:**

The Seller will add an additional TM2500+ LPG (Propane) Mobile Power Plant ( Additional Unit & Additional Equipment) to the Site to supply additional capacity. The Buyer has requested additional capacity to enhance system reliability and stability, potentially reduce fuel costs through use of LPG, and reduce emissions through the use of LPG in lieu of diesel. The Rental Term for the Additional Unit and Additional Equipment will be twelve (12) months following the commissioning of the Additional Unit and the Additional Equipment, which will be scheduled to occur within sixty (60) days after completion of the the Conditions Precedent of this Third Contract Change Order.

The Rental Term, as set forth in Article 7 of the Contract and further modified by the Second Change Order, for the Existing Unit and the Existing Equipment (as defined below) will be extended for an additional six (6) months (from November 30, 2016 until May 31, 2017) (the "Second Extension") and Buyer and Seller both hereby waive the ninety (90) day notice requirement to further extend the Rental Term prescribed by Article 8 of the Contact.

Seller, in order to integrate the Additional Unit and Additional Equipment with the existing exhaust stack for Buyer's Unit No. 22, shall undertake the removal of the Buyer's Unit 22 to a designated laydown area within the Buyer's Randolph Harley Power Station. Furthermore, Seller shall carry out the structural works on the exhaust stack's support to enable this integration. The stack and its support shall remain the property and responsibility of Buyer, and as such any required modifications to the stack shall be conducted with the approval and oversight of the Buyer's designated personnel.

In order to meet the Buyer's requirements for the Additional Unit and Additional Equipment to operate on LPG, Seller shall also supply a vaporization skid capable of converting LPG provided by the Buyer into a gaseous form required for operation of the Additional Unit and Additional Equipment. Additionally, Seller, at its own cost shall finance the construction of a pipeline running from Vitol's bulk fuel storage to Seller's vaporization skid. The ownership of this pipeline shall transfer to Buyer immediately upon commercial operation.

Seller Initial and Date: _____ 11/30/16          Buyer Initial and Date: _____



## <u>Contract Third Contract Change Order and Exhibits</u>

| Project Name: Virgin Islands Water and Power Authority | Contract Change Order No. 3 ("Third Contract Change Order") |
|---|---|
| Contract/PO. No.: SC-21-12 dated 15 Feb 2012/719463 | **Subject:** Addition of TM2500+ for generation on LPG and #2 Diesel |
| Effective Date: [11/30/2016] | Extension of Rental Term for Existing Equipment |

**Defined Terms:** Capitalized terms used in this Third Contract Change Order, if not defined in this Third Contract Change Order, have the meanings given to them in the Contract, as amended.

**Description of Changes:**

**Article 1 Equipment Rental** – The Equipment described in Section 1(a) of the Contract is hereby modified to add the additional Equipment (the "Additional Equipment") and the additional unit (the "Additional Unit") more fully described in Exhibit A to this Third Contract Change Order.

The term "Equipment" is amended to mean the existing Equipment (the "Existing Equipment") under the Contract, and the term "Unit" is amended to mean the existing Unit under the Contract (the "Existing Unit").

Other than as expressly modified by this Third Contract Change Order, all terms and conditions of the Contract that relate to the Equipment and the Unit under the Contract shall apply to the Additional Equipment and the Additional Unit, except as otherwise expressly provided by this Third Contract Change Order.

**Article 2 Services and Balance of Plant** – The Seller will provide the Services described in Article 2 of the Contract with respect to the Additional Equipment and the Additional Unit, except as otherwise set forth in Exhibit A to this Third Contract Change Order.

The Seller will have the operational responsibilities set forth on Appendix C of the Contract with respect to the Additional Equipment, except as otherwise set forth in Exhibit A to this Third Contract Change Order.

The Seller will provide the Balance of Plant Scope of Work and Balance of Plant Equipment and Materials described in Article 2 of the Contract with respect to the Additional Equipment and the Additional Unit, except as otherwise set forth in Exhibit A to this Third Contract Change Order.

The Seller will provide the required electrical and control systems interconnectivity, project management, installation and daily management and operation of the Additional Unit in

Seller Initial and Date: _____ 11/30/16          Buyer Initial and Date: _____



## Contract Third Contract Change Order and Exhibits

| Project Name: Virgin Islands Water and Power Authority | Contract Change Order No. 3 ("Third Contract Change Order") |
|---|---|
| Contract/PO. No.: SC-21-12 dated 15 Feb 2012/719463 | **Subject:** Addition of TM2500+ for generation on LPG and #2 Diesel |
| **Effective Date:** [11/30/2016] | Extension of Rental Term for Existing Equipment |

conjunction with the Existing Unit on the Site.

**Article 2 Balance of Plant** – The Balance of the Plant to be provided by the Seller shall be amended to include the additional LPG (Propane) fuel system, customized exhaust transition and structural steel modifications to the exhaust stack more fully described in Exhibit A to this Third Contract Change Order.

**Article 3 Buyer's Responsibilities** – The Buyer will be responsible for the items listed in Appendix B to the Contract and Exhibit A to this Third Contract Change Order with respect to the Additional Equipment and the Additional Unit.

**Article 4 Contract Price** – As consideration for the Existing Equipment and the Existing Unit, and the Services related to the Existing Equipment and the Existing Unit, the Buyer shall pay to the Seller an amount equal to three hundred and forty thousand United States Dollars (US$340,000) per month (the "Existing Unit Payments").

As consideration for the Additional Equipment and the Additional Unit, and the additional Services related to the Additional Equipment and the Additional Unit, the Buyer shall pay to the Seller an amount equal to six hundred and seventy thousand United States Dollars (US$670,000) per month (the "Additional Unit Payments").

Additionally, the Buyer shall pay a variable fired hour payment ("Variable Payments") for Additional Unit hours operated using diesel fuel at a rate of one hundred and fifty United States Dollars ($150) per fired hour.

The portion of the total Contract Price, applicable for the Existing Unit, shall be two million, forty thousand, United Stated Dollars (US$2,040,000) to reflect the the six (6) month term of the Second Extension.

The portion of the total Contract Price, applicable for the Additional Unit, shall be eight million, forty thousand, United States Dollars (US$8,040,000) to reflect the initial twelve (12) month term, excluding any applicable Variable Payments.

In any month, in the event Seller is unable to utilize LPG, and Buyer needs the Additional Unit to meet generation demand, Buyer agrees to allow for the operation of the Additional Unit on diesel fuel for up to fifty (50) hours a month until the ability to utilize LPG is restored.

Seller Initial and Date: _____ 11/30/16        Buyer Initial and Date: _____



## Contract Third Contract Change Order and Exhibits

| Project Name: Virgin Islands Water and Power Authority | Contract Change Order No. 3 ("Third Contract Change Order") |
|---|---|
| Contract/PO. No.: SC-21-12 dated 15 Feb 2012/719463 | Subject: Addition of TM2500+ for generation on LPG and #2 Diesel |
| Effective Date: [11/30/2016] | Extension of Rental Term for Existing Equipment |

Should the need to operate on diesel fuel exist beyond the fifty (50) hours allowance, due to reasons solely attributable to the Seller, the Seller agrees to a reduction of the subsequent invoice at an equivalent value of one hundred and fifty United States Dollars ($150) per hour, for every hour the Additional Units operates on diesel fuel, beyond the fifty (50) hour allowance.

**Article 7 Rental Term** – The Rental Term for the Existing Unit and the Existing Equipment (as defined below) will be extended for an additional six (6) months (from November 30, 2016 until May 31, 2017) (the "Second Extension Term").

After the Second Extension Term for the Existing Unit, the Seller agrees to allow the Buyer, upon forty five (45) days written notice, to further extend the Rental Term for the Existing Unit on a month to month basis on the same terms. For each additional month thereafter, Seller agrees to an advanced thirty (30) days written notice.

The Rental Term for the Additional Unit and Additional Equipment will be twelve (12) months following the commissioning of the Additional Unit and the Additional Equipment (the "Additional Unit Term"), which will be scheduled to occur within sixty (60) days after completion of the the Conditions Precedent of this Third Contract Change Order.

Notwithstanding Article 8 of the Contract, the notice period for extension of term for the Additional Unit shall be sixty (60) days advanced written notice to further extend the Rental Term for the Additional Unit on a month to month basis on the same terms. For each additional month thereafter, Seller agrees to provide to Buyer advance thirty (30) days written notice

**Article 10 Contract Termination** – The Buyer may terminate the Contract for Buyer's convenience provided that the Buyer provides ninety (90) days advanced written notice and Buyer must pay to the Seller all remaining sums due under the Contract (as modified by this Third Contract Change Order) not already paid by the Buyer to the Seller in accordance with Article 10 of the Contract.

**Article 22 Buyer's Insurance** – Buyer's insurance requirements remain in accordance with the Contract, ensuring sufficient coverage for the Additional Unit and Additional Equipment, as applicable.

Seller Initial and Date: _____ 11/30/16          Buyer Initial and Date: _____



## Contract Third Contract Change Order and Exhibits

| Project Name: Virgin Islands Water and Power Authority | Contract Change Order No. 3 ("Third Contract Change Order") |
|---|---|
| Contract/PO. No.: SC-21-12 dated 15 Feb 2012/719463 | Subject: Addition of TM2500+ for generation on LPG and #2 Diesel |
| Effective Date: [11/30/2016] | Extension of Rental Term for Existing Equipment |

**Article 30 Health & Safety** - Add a new section 30.7 as follows - Seller shall provide for its employees entering the Seller's facility to wear and/or use at all times, required PPE's which includes but is not limited to fire retardant (FR) clothing, hard hat, ear plugs, safety glasses, gloves and a respirator when deemed necessary. While not necessary, Seller's employees can request a Potable Gas Detection Monitor ("GDM") from the Buyer' Project Manager. The Project Manager, will make a determination on the need for same. The Buyer will ensure that the GDM is charged, calibrated and bump tested. The issuer of the GDM will also advise the Seller's employee of the responsibilities associated with the use of the GDM. The GDM must be returned daily at the conclusion of the business day.

**Article 38 Performance Guarantees** – Performance Guarantees included in Appendix E of the Contract for the Existing Unit are included for the Additional Unit in Exhibit A of this Third Contract Change Order

**Appendix P, Monthly Rate** – The total monthly rate payable by Buyer to Seller during the Second Extension Term for the rental of the Existing Unit and Existing Equipment and related Services during the Second Extension Term shall be equal to of three hundred and forty thousand United States Dollars (US$340,000).

The total monthly rate payable by Buyer to Seller during the Additional Unit Term for the rental of the Additional Unit and Additional Equipment and related Services during the Additional Unit Term shall be equal to six hundred and seventy thousand United States Dollars (US$670,000).

The foregoing amounts be paid in U.S. Dollars in accordance with the terms of the Contract and will exclude Gross Receipt Tax (GRT), which will be added to the specified pricing at the time of invoice.

**Variable Rate** – The Variable Rate payable by Buyer to Seller during the Additional Unit Term for the rental of the Additional Unit and Additional Equipment and related Services during the Additional Unit Term shall be equal to one hundred and fifty United States Dollars (US$150) per fired hour. This Variable Rate shall be calculated and charged on a monthly basis, for all operating hours operating on diesel fuel, in excess of fifty (50) hours per month.

Seller Initial and Date: _____ 11/30/16          Buyer Initial and Date: _____



## Contract Third Contract Change Order and Exhibits

| | |
|---|---|
| **Project Name:** Virgin Islands Water and Power Authority | **Contract Change Order No. 3** ("Third Contract Change Order") |
| **Contract/PO. No.:** SC-21-12 dated 15 Feb 2012/719463 | **Subject:** Addition of TM2500+ for generation on LPG and #2 Diesel |
| **Effective Date:** [11/30/2016] | Extension of Rental Term for Existing Equipment |

**Article 44 Drug / Alcohol Policy** - Any Seller Employee/Contractor who is under the influence of any drug or alcohol, or who possesses and/or consumes any drug or alcohol while on the job, has the potential for interfering with their own as well as their coworkers' safe and efficient job performance, and this is strictly prohibited. Using, selling, possessing, distributing or being under the influence of illegal drugs and alcohol are strictly prohibited on the Site, including any company provided housing or related facilities (prescription drugs must show a current prescription from a physician to be allowed on Site).The Buyer may require the temporary removal of any employee of the Seller who is suspected to be under the influence of alcohol or illegal drugs. The violating employee will not be allowed to return to the Buyer's facility unless the employee has been tested and has successfully passed alcohol or drug testing as permitted by applicable Virgin Islands law. Overconsumption of alcohol or use of alcohol where prohibited will not be permitted.

Illegal conduct or other conduct directly in conflict with the Employees/Contractors ethical and moral standards will not be tolerated – this includes lewd and lascivious acts including hiring prostitutes or bringing any other illegal or immoral individuals on site.

**Appendix P, Section F, Subsection b.** – Within fifteen (15) calendar days of the execution of this Third Contract Change Order, the Buyer shall instruct the issuing bank to make the following revisions to the letter of credit; 1) update the expiry date to [30th April 2018], 2) in all instances change the beneficiary from APR Energy to Power Rental Op Co LLC, 3) add the following language to Field 72 of the letter of credit:

Advising bank to forward SBLC to the Beneficiary as follows:
Power Rental Op Co LLC
c/o APR Energy, Attn: Treasury
3600 Port Jacksonville Parkway
Jacksonville, FL 32226 USA
Phone: +1 904-404-4503
Fax: +1 954-374-7049
Email: treasury(at)aprenergy.com

**Schedule Impact:** The Seller shall use commercially reasonable efforts to deliver and install the Additional Unit and Additional Equipment in accordance with the timeline for delivery and installation set forth in Exhibit A to this Third Contract Change Order.

Seller Initial and Date: _____ 11/30/16        Buyer Initial and Date: _____



## Contract Third Contract Change Order and Exhibits

| Project Name: Virgin Islands Water and Power Authority | Contract Change Order No. 3 ("Third Contract Change Order") |
|---|---|
| Contract/PO. No.: SC-21-12 dated 15 Feb 2012/719463 | Subject: |
| | Addition of TM2500+ for generation on LPG and #2 Diesel |
| Effective Date: [11/30/2016] | Extension of Rental Term for Existing Equipment |

**Change Order Validity:** Upon execution of this Third Contract Change Order by both Parties, this Third Contract Change Order shall operate as an amendment to the Contract pursuant to Section 15(d) thereof. Except as expressly amended by the terms of this Third Contract Change Order, the Contract (as amended by any previous amendment(s) or Change Order(s) properly executed by the Parties) shall continue to be unchanged and shall remain in full force and effect. Nothing in this Third Contract Change Order shall be deemed to release any Party for any of its obligations arising under the Contract prior to the execution of this Third Contract Change Order.

**Conditions Precedent:**

The obligations of the Parties under this Third Contract Change Order are subject to the prior fulfillment of the following conditions:

1) Confirmation of the approval of this Third Contract Change Order by the board of directors of the Buyer.

2) Modification to the Letter of Credit described above.

3) Confirmation from the Buyer verifying approval to construct and operate the Additional Unit.

4) Confirmation from the Buyer that the Seller's proposed exhaust stack modifications are acceptable and the Seller is authorized to make such modifications. Provided however that Seller will ensure that the engineering design for the stack structural steel modifications comply with all applicable codes and standards.

5) Buyer and Seller must complete a final engineering review and approval of the LPG fuel system design. Provided however that Seller will ensure that the engineering design and the fuel system design complies with all applicable codes and standards.

Seller Initial and Date: _____ 11/30/16          Buyer Initial and Date: _____



## Contract Third Contract Change Order and Exhibits

| Project Name: Virgin Islands Water and Power Authority | Contract Change Order No. 3 ("Third Contract Change Order") |
|---|---|
| Contract/PO. No.: SC-21-12 dated 15 Feb 2012/719463 | Subject: |
|  | Addition of TM2500+ for generation on LPG and #2 Diesel |
| Effective Date: [11/30/2016] | Extension of Rental Term for Existing Equipment |

6)  Buyer shall be up to date on payments due to Seller under the Contract.

7)  The Parties shall review and mutually agree the Buyer's LPG Commissioning Protocol, as included in draft format in Exhibit B of this Third Contract Change Order at least thirty days prior to COD.

**Terms and Conditions:**

All terms and conditions set forth in the Contract dated February 15, 2012 (as amended by previous properly executed amendment(s) or Change Order(s)), except as expressly modified herein, shall remain in full force and effect and govern the relationship of the Parties.

The Contract, as modified by this Third Contract Change Order and any fully executed prior amendment(s) or Change Order(s), embodies the entire agreement between the Parties with respect to the subject matter of the Contract and this Third Contract Change Order, and supersedes any prior or contemporaneous agreements, representations and undertakings between the Parties with respect to such subject matter.

For the convenience of the Parties, this Third Contract Change Order may be executed in any number of separate counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts will together constitute the same agreement. Executed signature pages to this Third Contract Change Order may be delivered by facsimile and such facsimiles will be deemed as sufficient as if actual signature pages had been delivered.

[Signature Page Follows On Next Page]

Seller Initial and Date: _____ 11/30/16       Buyer Initial and Date: _____



## Contract Third Contract Change Order and Exhibits

| Project Name: Virgin Islands Water and Power Authority | Contract Change Order No. 3 ("Third Contract Change Order") |
|---|---|
| Contract/PO. No.: SC-21-12 dated 15 Feb 2012/719463<br><br>Effective Date: [11/30/2016] | Subject:<br>Addition of TM2500+ for generation on LPG and #2 Diesel<br>Extension of Rental Term for Existing Equipment |

| Power Rental Op Co LLC | | Virgin Islands Water and Power Authority | |
|---|---|---|---|
| Name | JOHN CAMPION | Name | |
| Title | CHIEF EXECUTIVE OFFICER | Title | |
| Signature | | Signature | |
| Date | 11/30/16 | Date | |

Seller Initial and Date: _____ 11/30/16          Buyer Initial and Date: _____



## Contract Fourth Contract Change Order and Exhibits

| Project Name: Virgin Islands Water and Power Authority | Contract Change Order No. 4 ("Fourth Contract Change Order") |
|---|---|
| Contract/PO. No.: SC-21-12 dated 15 Feb 2012/719463<br><br>Change Order Date: April 22, 2017 | Subject:<br>APR Units #1 & #2 Rental Term Modification<br>Addition of a Second TM2500+ for generation on LPG and #2 Diesel (APR Unit #3) |

**Reason for Changes:**

The Seller will add a second TM2500+ LPG (Propane) Mobile Power Plant (APR Unit #3 & Equipment #3), in addition to the Additional Unit & Additional Equipment added pursuant to the Third Contract Change Order, to the Site to supply additional capacity pursuant to this Fourth Contract Change Order. The Buyer has requested additional capacity to enhance system reliability and stability, potentially reduce fuel costs through use of LPG, and reduce emissions through the use of LPG in lieu of diesel. The Rental Term for the APR Unit #3 and the Equipment #3 will be eighteen (18) months following the commissioning of the APR Unit #3 and the Equipment #3 , which will be targeted to occur by November 1, 2017, subject to adjustment pursuant to the terms of the Contract (as amended).

The Rental Term, as set forth in Article 7 of the Contract (as extended by prior Change Orders) is further modified as described in this Fourth Contract Change Order for each Unit and Equipment.

The Rental Term applicable to APR Unit #2 & Equipment #2 (as defined below) will be extended for an additional twelve (12) months for a total of twenty four (24) months following the commissioning on LPG. Such Rental Term will include additional weeks from commissioning on diesel to commission on LPG, subject to the terms set forth in this Fourth Contract Change Order. Buyer and Seller both hereby waive the ninety (90) day notice requirement to further extend the Rental Term prescribed by Article 8 of the Contract. The Rental Term applicable to APR Unit #1 & Equipment #1 (as defined below) will be extended for an additional six (6) months (from June 1 2017 until November 30, 2017) and Buyer and Seller both hereby waive the ninety (90) day notice requirement to further extend the Rental Term prescribed by Article 8 of the Contact.

Seller, in order to integrate the APR Unit #3 and Equipment #3 with the existing exhaust stack for Buyer's Unit No. 18/21, shall undertake the removal of the Buyer's Unit 18 to a designated laydown area within the Buyer's Randolph Harley Power Station. Furthermore, Seller shall install an elbow transition piece coupling the APR Unit exhaust stack to the Buyer's Unit No. 18/21 exhaust diverter. The stack and its support shall remain the property and responsibility of Buyer, and as such any required modifications to the stack shall be conducted with the approval and oversight of the Buyer's designated personnel.

In order to meet the Buyer's requirements for the APR Unit #3 and Equipment #3 to operate on

1

Buyer Initials:

Seller Initials:



## Contract Fourth Contract Change Order and Exhibits

| Project Name: Virgin Islands Water and Power Authority | Contract Change Order No. 4 ("Fourth Contract Change Order") |
|---|---|
| Contract/PO. No.: SC-21-12 dated 15 Feb 2012/719463<br><br>Change Order Date: April 22, 2017 | Subject:<br>APR Units #1 & #2 Rental Term Modification<br>Addition of a Second TM2500+ for generation on LPG and #2 Diesel (APR Unit #3) |

LPG, Seller shall use the  Seller's already installed vaporization skid capable of converting LPG provided by the Buyer into a gaseous form required for operation of the APR Unit #3 and Equipment #3.

2

Buyer Initials:

Seller Initials:



## Contract Fourth Contract Change Order and Exhibits

| Project Name:  Virgin Islands Water and Power Authority | Contract Change Order No. 4<br>("Fourth Contract Change Order") |
|---|---|
| Contract/PO. No.: SC-21-12 dated 15 Feb 2012/719463<br><br>Change Order Date: April 22, 2017 | Subject:<br>APR Units #1 & #2 Rental Term Modification<br>Addition of a Second TM2500+ for generation on LPG and #2 Diesel (APR Unit #3) |

**Defined Terms:** Capitalized terms used in this Fourth Contract Change Order, if not defined in this Fourth Contract Change Order, have the meanings given to them in the Contract, as amended.

**Description of Changes:**

**Article 1 Equipment Rental** – The Equipment described in Section 1(a) of the Contract is hereby modified to add the additional third Equipment (the "Equipment #3 ") and the additional third Unit (the "APR Unit #3") more fully described in Exhibit A to this Fourth Contract Change Order.

The term "Additional Equipment" is amended to mean the second equipment (the "Equipment #2") under the change order No.3, and the term "Additional Unit" is amended to mean the second Unit under the change order No. 3 (the "APR Unit #2").

The term "Existing Equipment" is amended to mean the first existing Equipment (the "Equipment #1 Existing Equipment") under the Contract, and the term "Existing Unit" is amended to mean the existing first Unit under the Contract (the "APR Unit #1 Existing Unit").

Other than as expressly modified by this Fourth Contract Change Order, all terms and conditions of the Contract as previously amended that relate to the Equipment and the Unit under the Contract shall apply to the installation, commissioning and operation of Equipment #3 and the APR Unit #3, except as otherwise expressly provided by this Fourth Contract Change Order.

**Article 2 Services and Balance of Plant** – The Seller will provide the Services described in Article 2 of the Contract with respect to the Equipment #3 and  the APR Unit #3, except as otherwise set forth in Exhibit A to this Fourth Contract Change Order.

The Seller will have the operational responsibilities set forth on Appendix C of the Contract with respect to the Equipment #3, except as otherwise set forth in Exhibit A to this Fourth Contract Change Order.

The Seller will provide the Balance of Plant Scope of Work and Balance of Plant Equipment

3

Buyer Initials:

Seller Initials:



## Contract Fourth Contract Change Order and Exhibits

| Project Name: Virgin Islands Water and Power Authority | Contract Change Order No. 4 ("Fourth Contract Change Order") |
|---|---|
| Contract/PO. No.: SC-21-12 dated 15 Feb 2012/719463<br><br>Change Order Date: April 22, 2017 | Subject:<br>APR Units #1 & #2 Rental Term Modification<br>Addition of a Second TM2500+ for generation on LPG and #2 Diesel (APR Unit #3) |

and Materials described in Article 2 of the Contract with respect to the Equipment #3 and the APR Unit #3, except as otherwise set forth in Exhibit A to this Fourth Contract Change Order.

The Seller will provide the required electrical and control systems interconnectivity, project management, installation and daily management and operation of the APR Unit #3 in conjunction with the APR Unit #1 and APR Unit #2 on the Site.

**Article 2 Balance of Plant –** The Balance of the Plant to be provided by the Seller shall be amended to include usage of the existing Unit #2 LPG (Propane) fuel system, customized exhaust elbow transition piece to the Buyer's Unit No. 18/21 exhaust diverter more fully described in Exhibit A to this Fourth Contract Change Order.

**Article 3 Buyer's Responsibilities –** The Buyer will be responsible for the items listed in Appendix B to the Contract and Exhibit A to this Fourth Contract Change Order with respect to the Equipment #3 and the APR Unit #3.

**Article 4 Contract Price –** Notwithstanding anything to the contrary in the Contract or prior Change Order, the Contract Price shall be as set forth in this Article 4 of this Fourth Contract Change Order, which shall be subject to adjustment pursuant to the same terms of the Contract applicable to the original Contract Price set forth therein.

As consideration for the Equipment #1 and the APR Unit #1 , and the Services related to the Equipment #1 and the APR Unit #1, the Buyer shall pay to the Seller an amount equal to two hundred fifty thousand United States Dollars (US$250,000) per month (the " Unit #1 Payments"). The Contract Price includes fifty (50) operating hours per month. Buyer may carry over any unused hours to the subsequent month. However, the Buyer may not retroactively apply any unused hours nor shall the Buyer be entitled to receive any value for the unapplied portion of any unused hours, which shall be forfeited at the end of the Rental Term. In addition to the foregoing monthly fixed charge, the Buyer shall pay a variable fired hour payment for APR Unit #1 hours operated using diesel fuel at a rate of one hundred and fifty United States Dollars ($150) per fired hour for the additional operating hours.

4

Buyer Initials:

Seller Initials:



## Contract Fourth Contract Change Order and Exhibits

| Project Name:  Virgin Islands Water and Power Authority | Contract Change Order No. 4 ("Fourth Contract Change Order") |
|---|---|
| Contract/PO. No.: SC-21-12 dated 15 Feb 2012/719463<br><br>Change Order Date: April 22, 2017 | Subject:<br>APR Units #1 & #2 Rental Term Modification<br>Addition of a Second TM2500+ for generation on LPG and #2 Diesel (APR Unit #3) |

As consideration for the Equipment #2 and the APR Unit #2, and the additional Services related to the Equipment #2 and the APR Unit #2, the Buyer shall pay to the Seller an amount equal to four hundred and seventy five thousand United States Dollars (US$475,000) per month (or prorated accordingly based on number of days operation on Diesel for any partial month) from commissioning on diesel to commissioning on LPG. The foregoing monthly price includes 350 operating hours per month. Buyer may carry over any unused hours to the subsequent month. However, the Buyer may not retroactively apply any unused hours nor shall the Buyer be entitled to receive any value or credit for the unapplied portion of any unused hours, which shall be forfeited at the end of the diesel operation portion of the Rental Term. In addition to the foregoing monthly fixed charge, the Buyer shall pay a variable fired hour payment for APR Unit #2 hours operated using diesel fuel at a rate of one hundred and fifty United States Dollars ($150) per fired hour for the additional operating hours.

As further consideration for the Equipment #2 and the APR Unit #2, and the additional Services related to the Equipment #2 and the APR Unit #2, the Buyer shall pay to the Seller an amount equal to six hundred thirty thousand United States Dollars (US$630,000) per month from LPG commissioning. The foregoing monthly price does not include operating hours per month. In addition to the foregoing monthly fixed charge, the Buyer shall pay a variable fired hour payment for APR Unit #2 hours operated using diesel fuel at a rate of one hundred and fifty United States Dollars ($150) per fired hour ~~for the additional operating hours.~~

As consideration for the Equipment #3 and  the APR Unit #3, and the additional Services related to the Equipment #3 and the APR Unit #3, the Buyer shall pay to the Seller an amount equal to six hundred thousand United States Dollars (US$600,000) per month (the " Unit #3 Payments"). The foregoing monthly price does not include operating hours per month. Additionally, the Buyer shall pay a variable fired hour payment ("Variable Payments") for APR Unit #3 hours operated using diesel fuel at a rate of one hundred and fifty United States Dollars ($150) per fired hour.

Without prejudice to Article 4, Article 15 and Appendix B of the Contract, the portion of the total Contract Price, applicable for the APR Unit #1, the Equipment #1 and related Services,

Buyer Initials:

Seller Initials:



## Contract Fourth Contract Change Order and Exhibits

| Project Name: Virgin Islands Water and Power Authority | Contract Change Order No. 4 ("Fourth Contract Change Order") |
|---|---|
| Contract/PO. No.: SC-21-12 dated 15 Feb 2012/719463<br><br>Change Order Date: April 22, 2017 | Subject:<br>APR Units #1 & #2 Rental Term Modification<br>Addition of a Second TM2500+ for generation on LPG and #2 Diesel (APR Unit #3) |

shall be one million, five hundred thousand United States Dollars (US$1,500,000) to reflect the initial six (6) month term, excluding any applicable Variable Payments.

Following satisfaction of all Conditions Precedent set for herein, the Buyer may elect for the Seller to proceed with commissioning of APR Unit #2 and the Equipment #2 on diesel by providing the Seller adequate formal notice of such election to allow for the diesel commissioning. Notwithstanding anything to the contrary: (i) the Buyer shall provide no less than one (1) days' notice to the Seller to discontinue diesel operation of the APR Unit #2 and the Equipment #2 and proceed with LPG commissioning; and ii) the Seller shall require no less than 10 days to perform final LPG commissioning (iii) the Seller shall be permitted to shut down any of the Units or Equipment as needed at its discretion to perform such LPG commissioning and shall not be subject to liquidated damage or penalty of any kind as a result of such outage or downtime. The portion of the total Contract Price, applicable for the APR Unit #2, the Equipment #2, and related Services, as from the date of execution of this Fourth Contract Change Order by the Parties, shall be calculated and payable to Seller based on the pricing set forth in this Article 4. An additional portion of the total Contract Price, applicable for the APR Unit #2, the Equipment #2 and related Services, shall be fifteen million, one hundred twenty thousand United States Dollars (US$15,120,000) to reflect the twenty four (24) month LPG, excluding any applicable Variable Payments.

The portion of the total Contract Price, applicable for the APR Unit #3, the Equipment #3 and related Services, shall be ten million, eight hundred thousand United States Dollars (US$10,800,000) to reflect the initial eighteen (18) month term, excluding any applicable Variable Payments.

Following successful commissioning on LPG, in any month, in the event Seller is unable to utilize LPG, and Buyer needs the APR Unit #3 to meet generation demand, Buyer agrees to allow for the operation of the APR Unit #3 on diesel fuel for up to fifty (50) hours a month until the ability to utilize LPG is restored. Should the need to operate on diesel fuel exist beyond the fifty (50) hours allowance, due to reasons solely attributable to the Seller, the Seller agrees to a reduction of the subsequent invoice at an equivalent value of one

6

Buyer Initials:

Seller Initials:



## Contract Fourth Contract Change Order and Exhibits

| Project Name: Virgin Islands Water and Power Authority | Contract Change Order No. 4 ("Fourth Contract Change Order") |
|---|---|
| Contract/PO. No.: SC-21-12 dated 15 Feb 2012/719463<br><br>Change Order Date: April 22, 2017 | Subject:<br>APR Units #1 & #2 Rental Term Modification<br>Addition of a Second TM2500+ for generation on LPG and #2 Diesel (APR Unit #3) |

hundred and fifty United States Dollars ($150) per hour, for every hour the APR Unit #3 operates on diesel fuel, beyond the fifty (50) hour allowance.

The APR Unit#3 is required to start on diesel fuel and then switch to LPG for continuous operation. Also, the APR Unit #3 will start on diesel fuel during a black out event, and it will switch to LPG once the LPG fuel handling system is operational. Notwithstanding the foregoing paragraph, the time on diesel fuel required for the APR Unit #3 normal start up and black out event will: (i) not count against the fifty (50) hour allowance nor be subject to the USD $150 per hour reduction (or any other) liquidated damage; and (ii) be invoiced as at the applicable monthly rate and variable rate pursuant to this Fourth Contract Change Order. This approach also continues to apply to APR Unit #2 in accordance with the Third Change Order.

**Article 7 Rental Term** – The Rental Term for the APR Unit #1 and the Equipment #1 (as defined below) will be extended for an additional six (6) months (from June 1, 2017 until November 30, 2017) (the " Third Extension Term").

After the Third Extension Term for the Existing Unit, the Seller agrees to allow the Buyer, upon forty five (45) days written notice, to further extend the Rental Term for the APR Unit #1 on a month to month basis on the same terms. For each additional month thereafter, Seller agrees to an advanced thirty (30) days written notice.

The Rental Term for the APR Unit #2 and the Equipment #2 (as defined below) will be extended from the time of commissioning of APR Unit #2 and the Equipment #2 on diesel and shall run concurrently for an additional twenty four (24) months from the successful commissioning of the APR #2 and the Equipment #2 on LPG, subject to adjustment pursuant to the terms of the of the Contract (amended).

Following expiration of the Rental Term for the APR Unit #2 and the Equipment #2, the Seller agrees to allow the Buyer, upon forty five (45) days written notice, to further extend the Rental Term for the APR Unit #2 on a month to month basis on the same terms with prior consent of the Seller, not to be unreasonably withheld, delayed or conditioned. For each additional month thereafter, Seller agrees to an advanced thirty (30) days written notice on the same terms.

7

Buyer Initials:

Seller Initials:



## <u>Contract Fourth Contract Change Order and Exhibits</u>

| Project Name: Virgin Islands Water and Power Authority | Contract Change Order No. 4 ("Fourth Contract Change Order") |
|---|---|
| Contract/PO. No.: SC-21-12 dated 15 Feb 2012/719463<br><br>Change Order Date: April 22, 2017 | Subject:<br>APR Units #1 & #2 Rental Term Modification<br>Addition of a Second TM2500+ for generation on LPG and #2 Diesel (APR Unit #3) |

The Rental Term for the APR Unit #3 and the Equipment #3 will be eighteen(18) months following the commissioning of the APR Unit #3 and the Equipment #3 (the "APR Unit #3 Term"), which will be scheduled to occur by November 1, 2017, subject to adjustment pursuant to the terms of the Contract (as amended)..

Notwithstanding Article 8 of the Contract, the notice period for extension of term for the APR Unit #3 shall be sixty (60) days advanced written notice to further extend the Rental Term for the APR Unit #3 on a month to month basis on the same terms. For each additional month thereafter, Seller agrees to provide to Buyer advance thirty (30) days written notice

**Article 10 Contract Termination –** The Buyer may terminate the Contract for Buyer's convenience provided that the Buyer provides ninety (90) days advanced written notice and Buyer must pay to the Seller all remaining sums due under the Contract (as modified by this Fourth Contract Change Order) not already paid by the Buyer to the Seller in accordance with Article 10 of the Contract.

**Article 22 Buyer's Insurance –** Buyer's insurance requirements remain in accordance with the Contract, ensuring sufficient coverage for the APR Unit #3 and the Equipment #3, as applicable.

**Article 30 Health & Safety -** Add a new section 30.7 as follows - Seller shall provide for its employees entering the Seller's facility to wear and/or use at all times, required PPE's which includes but is not limited to fire retardant (FR) clothing, hard hat, ear plugs, safety glasses, gloves and a respirator when deemed necessary. While not necessary, Seller's employees can request a Potable Gas Detection Monitor ("GDM") from the Buyer' Project Manager. The Project Manager, will make a determination on the need for same. The Buyer will ensure that the GDM is charged, calibrated and bump tested. The issuer of the GDM will also advise the Seller's employee of the responsibilities associated with the use of the GDM. The GDM must be returned daily at the conclusion of the business day.

**Article 38 Performance Guarantees –** Performance Guarantees included in Appendix E of the Contract apply to the APR Unit #1 and Equipment #1. The Performance Guarantees for APR Unit #2, Equipment #2, APR Unit #3 and Equipment #3 are as set forth in Exhibit A to this Fourth Contract Change Order

8

Buyer Initials:

Seller Initials:



## Contract Fourth Contract Change Order and Exhibits

| Project Name:  Virgin Islands Water and Power Authority | Contract Change Order No. 4<br>("Fourth Contract Change Order") |
|---|---|
| Contract/PO. No.: SC-21-12 dated 15 Feb 2012/719463<br><br>Change Order Date: April 22, 2017 | Subject:<br>APR Units #1 & #2 Rental Term Modification<br>Addition of a Second TM2500+ for generation on LPG and #2 Diesel (APR Unit #3) |

**Appendix P, Monthly Rate** – The total monthly rate payable by Buyer to Seller during the Third Extension Term for the rental of the APR Unit #1 and the Equipment #1 and related Services during the Third Extension Term shall be equal to two hundred fifty  thousand United States Dollars (US$250,000).

The total monthly rate payable by Buyer to Seller during the APR Unit #2 Term for the rental of the APR Unit #2 and the Equipment #2 and related Services during the APR Unit #2 Term shall be equal to four hundred and seventy five thousand United States Dollars (US$475,000) for the Diesel Rental Term, and six hundred and thirty thousand United States Dollars (US$630,000) for the LPG Rental Term.

The fixed monthly rate payable by Buyer to Seller during the APR Unit #3 Term for the rental of the APR Unit #3 and the Equipment #3 and related Services during the APR Unit #3 Term shall be equal to six hundred thousand United States Dollars (US$600,000).

The foregoing amounts be paid in U.S. Dollars in accordance with the terms of the Contract and will exclude Gross Receipt Tax (GRT), which will be added to the specified pricing at the time of invoice.

**Variable Rate** – The Variable Rate payable by Buyer to Seller during the APR Unit #3 Rental Term for the rental of the APR Unit #3 and the Equipment #3 and related Services during the APR Unit #3 Rental Term shall be equal to one hundred and fifty United States Dollars (US$150) per fired hour. This Variable Rate shall be calculated and charged on a monthly basis, for all operating hours operating on diesel fuel, for APR Unit #1 and the Equipment #1 in excess of fifty (50) hours per month, and for APR Unit #2 and the Equipment #2 during the weeks from commission on diesel to commissioning on LPG in excess of three hundred fifty (350) hours per month.

**Article 44 Drug / Alcohol Policy** - Any Seller Employee/Contractor who is under the influence of any drug or alcohol, or who possesses and/or consumes any drug or alcohol while on the job, has the potential for interfering with their own as well as their coworkers' safe and efficient job performance, and this is strictly prohibited. Using, selling, possessing, distributing or being under the influence of illegal drugs and alcohol are strictly prohibited on the Site, including any company provided housing or related facilities (prescription drugs must show a current prescription from a physician to be allowed on Site).The Buyer may

9

Buyer Initials:

Seller Initials:



## Contract Fourth Contract Change Order and Exhibits

| Project Name: Virgin Islands Water and Power Authority | Contract Change Order No. 4 ("Fourth Contract Change Order") |
|---|---|
| Contract/PO. No.: SC-21-12 dated 15 Feb 2012/719463<br><br>Change Order Date: April 22, 2017 | Subject:<br>APR Units #1 & #2 Rental Term Modification<br>Addition of a Second TM2500+ for generation on LPG and #2 Diesel (APR Unit #3) |

require the temporary removal of any employee of the Seller who is suspected to be under the influence of alcohol or illegal drugs. The violating employee will not be allowed to return to the Buyer's facility unless the employee has been tested and has successfully passed alcohol or drug testing as permitted by applicable law. Overconsumption of alcohol or use of alcohol where prohibited will not be permitted.

Illegal conduct or other conduct directly in conflict with the Employees/Contractors ethical and moral standards will not be tolerated – this includes lewd and lascivious acts including hiring prostitutes or bringing any other illegal or immoral individuals on site.

**Appendix P, Section F, Subsection b.** – Within sixty (60) calendar days of the execution of this Fourth Contract Change Order, the Buyer shall instruct the issuing bank to update the expiry date of the existing irrevocable letter of credit [Wells Fargo – Advice Number: AS0500855U] to August 31, 2019.

**Schedule Impact:** The Seller shall use commercially reasonable efforts to deliver and install the APR Unit #3 and the Equipment #3 in accordance with the timeline for delivery and installation set forth in Exhibit A to this Fourth Contract Change Order.

**Change Order Validity:** Upon execution of this Fourth Contract Change Order by both Parties, this Fourth Contract Change Order shall operate as an amendment to the Contract pursuant to Section 15(d) thereof. Except as expressly amended by the terms of this Fourth Contract Change Order, the Contract (as amended by any previous amendment(s) or Change Order(s) properly executed by the Parties) shall continue to be unchanged and shall remain in full force and effect. Nothing in this Fourth Contract Change Order shall be deemed to release any Party for any of its obligations arising under the Contract prior to the execution of this Fourth Contract Change Order.

**Conditions Precedent:**

The obligations of the Parties under this Fourth Contract Change Order are subject to the prior fulfillment of the following conditions:

10

Buyer Initials:

Seller Initials:



## Contract Fourth Contract Change Order and Exhibits

| | |
|---|---|
| **Project Name:** Virgin Islands Water and Power Authority | **Contract Change Order No. 4** ("Fourth Contract Change Order") |
| **Contract/PO. No.:** SC-21-12 dated 15 Feb 2012/719463<br><br>**Change Order Date:** April 22, 2017 | **Subject:**<br>APR Units #1 & #2 Rental Term Modification<br>Addition of a Second TM2500+ for generation on LPG and #2 Diesel (APR Unit #3) |

1) Confirmation of the approval of this Fourth Contract Change Order the board of directors of the Buyer.

2) Modification to the Letter of Credit described above.

3) Confirmation from the Buyer verifying approval to construct and operate the APR Unit #3.

4) Confirmation from the Buyer that the Seller's proposed exhaust stack elbow transition piece is acceptable and the Seller is authorized to make such modifications.

5) Buyer and Seller must complete a final engineering review and approval of the LPG fuel system design.

6) Buyer shall be up to date on payments due to Seller under the Contract.

In addition to the foregoing, the Parties will endeavor in good faith to negotiate an arrangement prior to the final commissioning of APR Unit #3 and the Equipment #3 for certain qualified workers to receive necessary training, as determined by Seller, to perform work related to the Seller's plant. For the avoidance of doubt, Seller shall not be obliged to provide any training nor permit any such workers of Buyer to perform any activities related to Seller's plant unless and until mutually acceptable terms have been agreed between the Parties in writing, which will supplement the Contract including this Fourth Contract Change Order.

**Terms and Conditions:**

All terms and conditions set forth in the Contract dated February 15, 2012 (as amended by previous properly executed amendment(s) or Change Order(s)), except as expressly modified herein, shall remain in full force and effect and govern the relationship of the Parties.

11

Buyer Initials:

Seller Initials:



## Contract Fourth Contract Change Order and Exhibits

| Project Name: Virgin Islands Water and Power Authority | Contract Change Order No. 4 ("Fourth Contract Change Order") |
|---|---|
| Contract/PO. No.: SC-21-12 dated 15 Feb 2012/719463

Change Order Date: April 22, 2017 | Subject: APR Units #1 & #2 Rental Term Modification

Addition of a Second TM2500+ for generation on LPG and #2 Diesel (APR Unit #3) |

The Contract, as modified by this Fourth Contract Change Order (and supplemented by Seller Proposal) and any fully executed prior amendment(s) or Change Order(s), embodies the entire agreement between the Parties with respect to the subject matter of the Contract and this Fourth Contract Change Order, and supersedes any prior or contemporaneous agreements, representations and undertakings between the Parties with respect to such subject matter.

For the convenience of the Parties, this Fourth Contract Change Order may be executed in any number of separate counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts will together constitute the same agreement. Executed signature pages to this Fourth Contract Change Order may be delivered by facsimile and such facsimiles will be deemed as sufficient as if actual signature pages had been delivered.

[Signature Page Follows On Next Page]

12

Buyer Initials:

Seller Initials:



## Contract Fourth Contract Change Order and Exhibits

| | |
|---|---|
| **Project Name:** Virgin Islands Water and Power Authority | **Contract Change Order No. 4** ("Fourth Contract Change Order") |
| **Contract/PO. No.:** SC-21-12 dated 15 Feb 2012/719463<br><br>**Change Order Date:** April 22, 2017 | **Subject:**<br>APR Units #1 & #2 Rental Term Modification<br>Addition of a Second TM2500+ for generation on LPG and #2 Diesel (APR Unit #3) |

| Power Rental Op Co LLC | | Virgin Islands Water and Power Authority | |
|---|---|---|---|
| Name | JOHN CAMPION | Name | Julio A. Rhymer, Sr. |
| Title | CHAIRMAN | Title | Executive Director (CEO) |
| Signature | | Signature | |
| Date | APRIL 22, 2017 | Date | April 22, 2016 |

13

Buyer Initials:

Seller Initials:



## Contract Fifth Contract Change Order and Exhibits

**Project Name:** Virgin Islands Water and
Power Authority

**Contract Change Order No. 5**
("Fifth Contract Change Order")

**Contract/PO. No.:** SC-21-12 dated 15 Feb
2012/719463

**Subject:**
APR Unit #1 Rental Term Modification

**Change Order Date:** November 30th, 2017

**Reason for Changes:**

Buyer and Seller both hereby waive the forty five (45) day notice requirement to further extend the Rental Term prescribed by the Forth Contract Change Order.

The Rental Term, as set forth in Article 7 of the Contract (as extended by prior Change Orders) applicable to APR Unit #1 & Equipment #1 (as defined below) will be extended for an additional four (4) months from December 1st, 2017 to April 30th, 2018, as described in this Fifth Contract Change Order

Buyer Initials:

Seller Initials:



## <u>Contract Fifth Contract Change Order and Exhibits</u>

| | |
|---|---|
| **Project Name:** Virgin Islands Water and Power Authority | **Contract Change Order No. 5** ("Fifth Contract Change Order") |
| **Contract/PO. No.:** SC-21-12 dated 15 Feb 2012/719463 | **Subject:** APR Unit #1 Rental Term Modification |
| **Change Order Date:** November 30ᵗʰ, 2017 | |

**Defined Terms:** Capitalized terms used in this Fifth Contract Change Order, if not defined in this Fifth Contract Change Order, have the meanings given to them in the Contract, as amended.

**Description of Changes:**

**Article 4 Contract Price** – Notwithstanding anything to the contrary in the Contract or prior Change Order, the Contract Price shall be as set forth in this Article 4 of this Fifth Contract Change Order, which shall be subject to adjustment pursuant to the same terms of the Contract applicable to the original Contract Price set forth therein.

As consideration for the Equipment #1 and the APR Unit #1, and the Services related to the Equipment #1 and the APR Unit #1, the Buyer shall pay to the Seller an amount equal to three hundred and thirty five thousand United States Dollars (US$335,000) per month (the " Unit #1 Payments").

The 50 operating hour limit for APR Unit #1 as defined in Fourth Contract Change Order is removed and the Contract Price now includes for unlimited operation of APR Unit #1.

The additional variable fired hour payment for APR Unit #1 hours operated using diesel fuel at a rate of one hundred and fifty United States Dollars ($150) per fired hour for the additional operating hours, is also removed.

Without prejudice to Article 4, Article 15 and Appendix B of the Contract, the portion of the total Contract Price, applicable for the APR Unit #1, the Equipment #1 and related Services, shall be one million, three hundred and forty thousand United States Dollars (US$1,340,000) to reflect the four (4) month extension term.

**Article 7 Rental Term** – The Rental Term for the APR Unit #1 and the Equipment #1 (as defined below) will be extended for an additional four (4) months (from December 1ˢᵗ, 2017 until April 30ᵗʰ, 2018) (the " Fourth Extension Term").

After the Fourth Extension Term for the Existing Unit, the Seller agrees to allow the Buyer, upon forty five (45) days written notice, to further extend the Rental Term for the APR Unit #1 on a month to month basis on the same terms. For each additional month thereafter, Seller agrees to an advanced thirty (30) days written notice.

2

Buyer Initials:

Seller Initials:



## Contract Fifth Contract Change Order and Exhibits

| | |
|---|---|
| **Project Name:** Virgin Islands Water and Power Authority | **Contract Change Order No. 5** ("Fifth Contract Change Order") |
| **Contract/PO. No.: SC-21-12 dated 15 Feb 2012/719463** | **Subject:** APR Unit #1 Rental Term Modification |
| **Change Order Date:** November 30th, 2017 | |

**Appendix P, Monthly Rate** – The total monthly rate payable by Buyer to Seller during the Forth Extension Term for the rental of the APR Unit #1 and the Equipment #1 and related Services during the Forth Extension Term shall be equal to three hundred and thirty five thousand United States Dollars (US$335,000).

The foregoing amounts be paid in U.S. Dollars in accordance with the terms of the Contract and will exclude Gross Receipt Tax (GRT), which will be added to the specified pricing at the time of invoice.

**Variable Rate** - The Variable Rate shall no longer apply to APR Unit #1 and the Equipment #1.

**Change Order Validity:** Upon execution of this Fifth Contract Change Order by both Parties, this Fourth Contract Change Order shall operate as an amendment to the Contract pursuant to Section 15(d) thereof. Except as expressly amended by the terms of this Fifth Contract Change Order, the Contract (as amended by any previous amendment(s) or Change Order(s) properly executed by the Parties) shall continue to be unchanged and shall remain in full force and effect. Nothing in this Fifth Contract Change Order shall be deemed to release any Party for any of its obligations arising under the Contract prior to the execution of this Fifth Contract Change Order.

**Terms and Conditions:**

All terms and conditions set forth in the Contract dated February 15, 2012 (as amended by previous properly executed amendment(s) or Change Order(s)), except as expressly modified herein, shall remain in full force and effect and govern the relationship of the Parties.

The Contract, as modified by this Fifth Contract Change Order and any fully executed prior amendment(s) or Change Order(s), embodies the entire agreement between the Parties with respect to the subject matter of the Contract and this Fifth Contract Change Order, and supersedes any prior or contemporaneous agreements, representations and

Buyer Initials

Seller Initials



## Contract Fifth Contract Change Order and Exhibits

| | |
|---|---|
| **Project Name:** Virgin Islands Water and Power Authority | **Contract Change Order No. 5** ("Fifth Contract Change Order") |
| **Contract/PO. No.:** SC-21-12 dated 15 Feb 2012/719463 | **Subject:** APR Unit #1 Rental Term Modification |
| **Change Order Date:** November 30th, 2017 | |

undertakings between the Parties with respect to such subject matter.

For the convenience of the Parties, this Fifth Contract Change Order may be executed in any number of separate counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts will together constitute the same agreement Executed signature pages to this Fifth Contract Change Order may be delivered by facsimile and such facsimiles will be deemed as sufficient as if actual signature pages had been delivered.

[Signature Page Follows On Next Page]

Buyer Initials.

Seller Initials·



## <u>Contract Fifth Contract Change Order and Exhibits</u>

**Project Name:** Virgin Islands Water and Power Authority

**Contract/PO. No.:** SC-21-12 dated 15 Feb 2012/719463

**Change Order Date:** November 30th, 2017

**Contract Change Order No. 5** ("Fifth Contract Change Order")

**Subject:**

APR Unit #1 Rental Term Modification

| Power Rental Op Co LLC | Virgin Islands Water and Power Authority |
|---|---|
| Name | Name   Julio A. Rhymer, Sr. |
| Title | Title   Executive Director(CEO) |
| Signature | Signature |
| Date | Date   11/30/2017 |



## Contract Sixth Contract Change Order and Exhibits

| Project Name: Virgin Islands Water and Power Authority | Contract Change Order No. 6 ("Sixth Contract Change Order") |
|---|---|
| Contract/PO. No.: SC-21-12 dated 15 Feb 2012/719463<br><br>Change Order Date: March 6ᵗʰ 2018 | Subject:<br>APR Unit #1 Rental Term modification &<br>APR Unit #3 Mobilization scope modification |

**Reason for Changes:**

To clarify that the Rental Term, as set forth in Article 7 of the Contract (as extended by prior Change Orders) applicable to APR Unit #1 & Equipment #1 (as defined below) will be extended for an additional four (4) months from December 1ˢᵗ, 2017 to April 1ˢᵗ, 2018, as described in this Sixth Contract Change Order, not April 30ᵗʰ, 2018 as described in the Fifth Contract Change Order. Also, to define Seller's preservation scope of works for Buyers Unit #18 and revise Balance of Plant scope of works to enable a revised electrical interconnection location for APR Unit #3.

Buyer Initials: _____

Seller Initials: _____



## Contract Sixth Contract Change Order and Exhibits

| Project Name: Virgin Islands Water and Power Authority | Contract Change Order No. 6 ("Sixth Contract Change Order") |
|---|---|
| Contract/PO. No.: SC-21-12 dated 15 Feb 2012/719463<br><br>Change Order Date: March 6th 2018 | Subject:<br>APR Unit #1 Rental Term modification &<br>APR Unit #3 Mobilization scope modification |

**Defined Terms:** Capitalized terms used in this Sixth Contract Change Order, if not defined in this Sixth Contract Change Order, have the meanings given to them in the Contract, as amended.

**Description of Changes:**

**Article 2 Services and Balance of Plant –** The Seller will provide the Services described in Article 2 of the Contract and in accordance with the Forth Contract Change Order with respect to the Equipment #3 and the APR Unit #3, except as otherwise set forth in Exhibit A to this Sixth Contract Change Order.

The Seller will provide the Balance of Plant Scope of Work and Balance of Plant Equipment and Materials described in Article 2 of the Contract and in accordance with the Forth Contract Change Order with respect to the Equipment #3 and the APR Unit #3, except as otherwise set forth in Exhibit A to this Sixth Contract Change Order.

**Article 2 Balance of Plant –** The Balance of the Plant to be provided by the Seller shall be amended to include interconnection to the same transformer as APR Unit #1, more fully described in Exhibit A to this Sixth Contract Change Order.

**Article 4 Contract Price –** Notwithstanding anything to the contrary in the Contract or prior Change Order, the Contract Price shall be as set forth in this Article 4 of this Sixth Contract Change Order, which shall be subject to adjustment pursuant to the same terms of the Contract applicable to the original Contract Price set forth therein.

As consideration for the Equipment #2 and the APR Unit #2, the variable fired hour payment for APR Unit #2 hours operated using diesel fuel at a rate of one hundred and fifty United States Dollars ($150) per fired hour for the additional operating hours, shall be waived from December 1st 2017, until APR Unit #2 is commissioned on LPG.

As consideration for the additional preservation works for the Buyer's Unit #18, as defined in Exhibit A of this Contract Change Order, the the Contract Price shall be increased by ninety one thousand, eight hundred and fifty United States Dollars ($91,850). Such amount shall be invoiced immediately upon completion of the Unit #18 preservation works, with payment of such amount due thirty (30) days thereafter.

2                                                                 Buyer Initials:

                                                                   Seller Initials:



## Contract Sixth Contract Change Order and Exhibits

| Project Name: Virgin Islands Water and Power Authority | Contract Change Order No. 6 ("Sixth Contract Change Order") |
|---|---|
| Contract/PO. No.: SC-21-12 dated 15 Feb 2012/719463 | Subject: APR Unit #1 Rental Term modification & APR Unit #3 Mobilization scope modification |
| Change Order Date: March 6th 2018 | |

As consideration for the additional interconnection scope of works, as defined in Exhibit A of this Contract Change Order, the Contract Price shall be increased by one hundred and forty four thousand, six hundred United States Dollars ($144,600). Such amount shall be invoiced immediately upon completion of the electrical interconnection works, with payment of such amount due thirty (30) days thereafter.

**Article 7 Rental Term** – The Rental Term for the APR Unit #1 and the Equipment #1 will be extended for an additional four (4) months (from December 1st, 2017 until April 1st, 2018) (the " Fourth Extension Term").

**Appendix P, Variable Rate** – From December 1st 2017 to commissioning of Unit #2 on LPG, the Variable Rate applicable to diesel operation shall cease to apply to APR Unit #2 and the Equipment #2.

**Change Order Validity:**  Upon execution of this Sixth Contract Change Order by both Parties, this Fourth Contract Change Order shall operate as an amendment to the Contract pursuant to Section 15(d) thereof. Except as expressly amended by the terms of this Sixth Contract Change Order, the Contract (as amended by any previous amendment(s) or Change Order(s) properly executed by the Parties) shall continue to be unchanged and shall remain in full force and effect. Nothing in this Sixth Contract Change Order shall be deemed to release any Party for any of its obligations arising under the Contract prior to the execution of this Sixth Contract Change Order.

**Terms and Conditions:**

All terms and conditions set forth in the Contract dated February 15, 2012 (as amended by previous properly executed amendment(s) or Change Order(s)), except as expressly modified herein, shall remain in full force and effect and govern the relationship of the Parties.

The Contract, as modified by this Sixth Contract Change Order and any fully executed prior amendment(s) or Change Order(s), embodies the entire agreement between the Parties

3

Buyer Initials:

Seller Initials:



## Contract Sixth Contract Change Order and Exhibits

| | |
|---|---|
| **Project Name:** Virgin Islands Water and Power Authority | **Contract Change Order No. 6**<br>("Sixth Contract Change Order") |
| **Contract/PO. No.:** SC-21-12 dated 15 Feb 2012/719463 | **Subject:**<br>APR Unit #1 Rental Term modification &<br>APR Unit #3 Mobilization scope modification |
| **Change Order Date:** March 6ᵗʰ 2018 | |

with respect to the subject matter of the Contract and this Sixth Contract Change Order, and supersedes any prior or contemporaneous agreements, representations and undertakings between the Parties with respect to such subject matter.

For the convenience of the Parties, this Sixth Contract Change Order may be executed in any number of separate counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts will together constitute the same agreement. Executed signature pages to this Sixth Contract Change Order may be delivered by facsimile and such facsimiles will be deemed as sufficient as if actual signature pages had been delivered.

[Signature Page Follows On Next Page]

4

Buyer Initials: 

Seller Initials:



## Contract Sixth Contract Change Order and Exhibits

| | |
|---|---|
| **Project Name:** Virgin Islands Water and Power Authority | **Contract Change Order No. 6** ("Sixth Contract Change Order") |
| **Contract/PO. No.:** SC-21-12 dated 15 Feb 2012/719463<br><br>**Change Order Date:** March 6th 2018 | **Subject:**<br>APR Unit #1 Rental Term modification &<br>APR Unit #3 Mobilization scope modification |

| Power Rental Op Co LLC | | Virgin Islands Water and Power Authority | |
|---|---|---|---|
| Name | SEAN WILCOCK | Name | Lawrence S. Kupfer |
| Title | CHEIF COMMERCIAL OFFICER | Title | Executive Director / CEO |
| Signature | | Signature | |
| Date | 3/7/2018 | Date | |

Buyer Initials:

Seller Initials:



## Contract Seventh Contract Change Order and Exhibits

| Project Name: Virgin Islands Water and Power Authority | Contract Change Order No. 7 ("Seventh Contract Change Order") |
|---|---|
| Contract/PO. No.: SC-21-12 dated 15 Feb 2012/719463 <br><br> Change Order Date: March 7th, 2018 | Subject: <br><br> APR Unit #3 Mobilization scope modification |

**Reason for Changes:**

To revise Seller's Balance of Plant scope of works to enable a new routing for the electrical interconnection for APR Unit #3, per the request of the Buyer.

**Defined Terms:** Capitalized terms used in this Seventh Contract Change Order, if not defined in this Seventh Contract Change Order, have the meanings given to them in the Contract, as amended.

**Description of Changes:**

**Article 2 Balance of Plant –** The Balance of the Plant to be provided by the Seller shall be amended to include interconnection in accordance with revised Buyer instructed routing, to the same transformer as APR Unit #1, more fully described in Exhibit A to this Seventh Contract Change Order.

**Article 4 Contract Price –** Notwithstanding anything to the contrary in the Contract or prior Change Order, the Contract Price shall be revised as set forth in this Article 4 of this Seventh Contract Change Order, which shall be subject to adjustment pursuant to the same terms of the Contract applicable to the original Contract Price set forth therein.

As consideration for the additional interconnection scope of works to satisfy the revised cable routing, as defined in Exhibit A of this Contract Change Order, the Contract Price shall be increased by forty seven thousand, five hundred United States Dollars ($47,500). Such amount shall be invoiced immediately upon completion of the electrical interconnection works, with payment of such amount due thirty (30) days thereafter.

Buyer Initials: _C.H._

Seller Initials: _(initials)_



## Contract Seventh Contract Change Order and Exhibits

| Project Name: Virgin Islands Water and Power Authority | Contract Change Order No. 7 ("Seventh Contract Change Order") |
|---|---|
| Contract/PO. No.: SC-21-12 dated 15 Feb 2012/719463 | Subject: APR Unit #3 Mobilization scope modification |
| Change Order Date: March 7th , 2018 | |

**Change Order Validity:** Upon execution of this Seventh Contract Change Order by both Parties, this Seventh Contract Change Order shall operate as an amendment to the Contract pursuant to Section 15(d) thereof. Except as expressly amended by the terms of this Seventh Contract Change Order, the Contract (as amended by any previous amendment(s) or Change Order(s) properly executed by the Parties) shall continue to be unchanged and shall remain in full force and effect. Nothing in this Seventh Contract Change Order shall be deemed to release any Party for any of its obligations arising under the Contract prior to the execution of this Seventh Contract Change Order.

**Terms and Conditions:**

All terms and conditions set forth in the Contract dated February 15, 2012 (as amended by previous properly executed amendment(s) or Change Order(s)), except as expressly modified herein, shall remain in full force and effect and govern the relationship of the Parties.

The Contract, as modified by this Seventh Contract Change Order and any fully executed prior amendment(s) or Change Order(s), embodies the entire agreement between the Parties with respect to the subject matter of the Contract and this Seventh Contract Change Order, and supersedes any prior or contemporaneous agreements, representations and undertakings between the Parties with respect to such subject matter.

For the convenience of the Parties, this Seventh Contract Change Order may be executed in any number of separate counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts will together constitute the same agreement.

Executed signature pages to this Seventh Contract Change Order may be delivered by facsimile and such facsimiles will be deemed as sufficient as if actual signature pages had been delivered.

[Signature Page Follows On Next Page]

2

Buyer Initials: _C.H._

Seller Initials: _____



## Contract Seventh Contract Change Order and Exhibits

| | |
|---|---|
| **Project Name:** Virgin Islands Water and Power Authority | **Contract Change Order No. 7**<br>("Seventh Contract Change Order") |
| **Contract/PO. No.:** SC-21-12 dated 15 Feb 2012/719463<br><br>**Change Order Date:** March 7th, 2018 | **Subject:**<br>APR Unit #3 Mobilization scope modification |

| Power Rental Op Co LLC | | Virgin Islands Water and Power Authority | |
|---|---|---|---|
| Name | Sean Warlock | Name | Clinton Hedrington Jr |
| Title | CHIEF COMMERCIAL OFF | Title | Acting Executive Director |
| Signature | *(signature)* | Signature | *(signature)* |
| Date | 3/7/2018 | Date | 3/28/18 |

3

Buyer Initials: *CH.*

Seller Initials: *(initials)*



## Contract Eighth Contract Change Order and Exhibits

| Project Name: Virgin Islands Water and Power Authority | Contract Change Order No. 8 ("Eighth Contract Change Order") |
|---|---|
| Contract/PO. No.: SC-21-12 dated 15 Feb 2012/719463<br><br>Change Order Date: March 7th, 2018 | Subject:<br>APR Unit #1 Rental Term modification |

**Terms and Conditions:**

All terms and conditions set forth in the Contract dated February 15, 2012 (as amended by previous properly executed amendment(s) or Change Order(s)), except as expressly modified herein, shall remain in full force and effect and govern the relationship of the Parties.

The Contract, as modified by this Eighth Contract Change Order and any fully executed prior amendment(s) or Change Order(s), embodies the entire agreement between the Parties with respect to the subject matter of the Contract and this Eighth Contract Change Order, and supersedes any prior or contemporaneous agreements, representations and undertakings between the Parties with respect to such subject matter.

For the convenience of the Parties, this Eighth Contract Change Order may be executed in any number of separate counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts will together constitute the same agreement. Executed signature pages to this Eighth Contract Change Order may be delivered by facsimile and such facsimiles will be deemed as sufficient as if actual signature pages had been delivered.

[Signature Page Follows On Next Page]

2

Buyer Initials:

Seller Initials:



## Contract Eighth Contract Change Order and Exhibits

| Project Name: Virgin Islands Water and Power Authority | Contract Change Order No. 8 ("Eighth Contract Change Order") |
|---|---|
| Contract/PO. No.: SC-21-12 dated 15 Feb 2012/719463<br><br>Change Order Date: March 7ᵗʰ, 2018 | Subject:<br>APR Unit #1 Rental Term modification |

**Reason for Changes:**

To amend the Rental Term, as set forth in Article 7 of the Contract (as extended by prior Change Orders) applicable to APR Unit #1 & Equipment #1 will be extended for an additional three (3) months from April 1ˢᵗ, 2018 to July 1ˢᵗ, 2018, as described in this Eighth Contract Change Order.

**Defined Terms:**

Capitalized terms used in the Eighth Contract Change Order, if not defined in this Eighth Contract Change Order, have the meanings given to them in the Contract, as amended.

**Description of Changes:**

**Article 7 Rental Term** – The Rental Term for the APR Unit #1 and the Equipment #1 will be extended for an additional three (3) months (from April 1st, 2018 until July 1st, 2018) (the " Fifth Extension Term").

**Change Order Validity:**

Upon execution of this Eighth Contract Change Order by both Parties, this Eighth Contract Change Order shall operate as an amendment to the Contract pursuant to Section 15(d) thereof. Except as expressly amended by the terms of this Eighth Contract Change Order, the Contract (as amended by any previous amendment(s) or Change Order(s) properly executed by the Parties) shall continue to be unchanged and shall remain in full force and effect. Nothing in this Eighth Contract Change Order shall be deemed to release any Party for any of its obligations arising under the Contract prior to the execution of this Eighth Contract Change Order.



Buyer Initials:

Seller Initials:



## Contract Eighth Contract Change Order and Exhibits

| Project Name: Virgin Islands Water and Power Authority | Contract Change Order No. 8 ("Eighth Contract Change Order") |
|---|---|
| Contract/PO. No.: SC-21-12 dated 15 Feb 2012/719463 | Subject: APR Unit #1 Rental Term modification |
| Change Order Date: March 7th, 2018 | |

| Power Rental Op Co LLC | | Virgin Islands Water and Power Authority | |
|---|---|---|---|
| Name | SEAN WILLCOCK | Name | Clinton Hedrington Jr. |
| Title | CHIEF COMMERCIAL OFF | Title | Acting Executive Director |
| Signature | | Signature | |
| Date | 3/7/2018 | Date | 3/28/18 |

3

Buyer Initials:

Seller Initials:



## Contract Ninth Contract Change Order and Exhibits

| | |
|---|---|
| **Project Name:** Virgin Islands Water and Power Authority | **Contract Change Order No. 9**<br>("Ninth Contract Change Order") |
| **Contract/PO. No.:** SC-21-12 dated 15 Feb 2012/719463<br><br>**Change Order Date:** May 8th, 2018 | **Subject:**<br>APR Scope modifications<br>APR Unit #3 Pricing modification |

**Reason for Changes:**

To revise Seller's Balance of Plant scope of works to modify the existing RMU connections to the station services, from T22 (RMU2) and U26 (RMU1) to XF22SA-North and XF22SB-South respectively. To clarify the pricing for APR Unit #3.

Buyer Initials: _H.H._

Seller Initials: _SW_



## Contract Ninth Contract Change Order and Exhibits

| | |
|---|---|
| **Project Name:** Virgin Islands Water and Power Authority | **Contract Change Order No. 9** ("Ninth Contract Change Order") |
| **Contract/PO. No.:** SC-21-12 dated 15 Feb 2012/719463 | **Subject:** APR Scope modifications  APR Unit #3 Pricing modification |
| **Change Order Date:** May 8th, 2018 | |

**Defined Terms:** Capitalized terms used in this Ninth Contract Change Order, if not defined in this Ninth Contract Change Order, have the meanings given to them in the Contract, as amended.

**Description of Changes:**

**Article 2 Balance of Plant** – The Balance of the Plant to be provided by the Seller shall be amended to modify the existing RMU connections to the station services, from T22 (RMU2) and U26 (RMU1) to XF22SA-North and XF22SB-South respectively, more fully described in Exhibit A to this Ninth Contract Change Order.

**Article 4 Contract Price** – Notwithstanding anything to the contrary in the Contract or prior Change Order, the Contract Price shall be as set forth in this Article 4 of this Ninth Contract Change Order, which shall be subject to adjustment pursuant to the same terms of the Contract applicable to the original Contract Price set forth therein.

As consideration for the the Equipment #3 and APR Unit #3, the Buyer shall pay to the Seller an amount equal to five hundred and fifty thousand United States Dollars (US$550,000) per month (or prorated accordingly based on number of days operation on Diesel for any partial month) from commissioning on diesel to commissioning on LPG. Also, for the Equipment #3 and the APR Unit #3, the variable fired hour payment for APR Unit #3 hours operated using diesel fuel at a rate of one hundred and fifty United States Dollars (US$150) per fired hour, shall be waived until APR Unit #3 is commissioned on LPG.

As consideration for the additional works to modify the existing RMU connections, as defined in Exhibit A of this Contract Change Order, the the Contract Price shall be increased by seventy two thousand, United States Dollars (US$72,000). Such amount shall be invoiced immediately upon completion of the RMU connection modification works, with payment of such amount due thirty (30) days thereafter.

**Appendix P, Monthly Rate** - As consideration for the the Equipment #3 and APR Unit #3, the Buyer shall pay to the Seller an amount equal to five hundred and fifty thousand United States Dollars (US$550,000) per month (or prorated accordingly based on number of days operation on Diesel for any partial month) from commissioning on diesel to commissioning on LPG, which will represent the commencement of the 18 month Rental Term.

2                                                                                     Buyer Initials: _N. d._

Seller Initials: _SW_



## Contract Ninth Contract Change Order and Exhibits

| | |
|---|---|
| **Project Name:** Virgin Islands Water and Power Authority | **Contract Change Order No. 9** ("Ninth Contract Change Order") |
| **Contract/PO. No.:** SC-21-12 dated 15 Feb 2012/719463<br><br>**Change Order Date:** May 8th, 2018 | **Subject:**<br>APR Scope modifications<br>APR Unit #3 Pricing modification |

**Variable Rate** – Until commissioning of Unit #3 on LPG, the Variable Rate applicable to diesel operation shall cease to apply to APR Unit #3 and the Equipment #3.

**Change Order Validity:**  Upon execution of this Ninth Contract Change Order by both Parties, this Ninth Contract Change Order shall operate as an amendment to the Contract pursuant to Section 15(d) thereof.  Except as expressly amended by the terms of this Ninth Contract Change Order, the Contract (as amended by any previous amendment(s) or Change Order(s) properly executed by the Parties) shall continue to be unchanged and shall remain in full force and effect. Nothing in this Ninth Contract Change Order shall be deemed to release any Party for any of its obligations arising under the Contract prior to the execution of this Ninth Contract Change Order.

**Terms and Conditions:**

All terms and conditions set forth in the Contract dated February 15, 2012 (as amended by previous properly executed amendment(s) or Change Order(s)), except as expressly modified herein, shall remain in full force and effect and govern the relationship of the Parties.

The Contract, as modified by this Ninth Contract Change Order and any fully executed prior amendment(s) or Change Order(s), embodies the entire agreement between the Parties with respect to the subject matter of the Contract and this Ninth Contract Change Order, and supersedes any prior or contemporaneous agreements, representations and undertakings between the Parties with respect to such subject matter.

For the convenience of the Parties, this Ninth Contract Change Order may be executed in any number of separate counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts will together constitute the same agreement. Executed signature pages to this Ninth Contract Change Order may be delivered by facsimile and such facsimiles will be deemed as sufficient as if actual signature pages had been delivered.

[Signature Page Follows On Next Page]

3

Buyer Initials: _NJH_

Seller Initials: _SW_



## Contract Ninth Contract Change Order and Exhibits

| Project Name: Virgin Islands Water and Power Authority | Contract Change Order No. 9 ("Ninth Contract Change Order") |
|---|---|
| Contract/PO. No.: SC-21-12 dated 15 Feb 2012/719463<br><br>Change Order Date: May 8th, 2018 | Subject:<br>APR Scope modifications<br>APR Unit #3 Pricing modification |

| Power Rental Op Co LLC | | Virgin Islands Water and Power Authority | |
|---|---|---|---|
| Name | Sean Wilcock | Name | Lawrence J. Kupfer |
| Title | Chief Commercial Officer | Title | Executive Director (CEO) |
| Signature | | Signature | |
| Date | 5/15/2018 | Date | 06-26-18 |

6/26/18

4

Buyer Initials:

Seller Initials: SW



## Contract Tenth Contract Change Order and Exhibits

| | |
|---|---|
| **Project Name:** Virgin Islands Water and Power Authority | **Contract Change Order No. 10** ("Tenth Contract Change Order") |
| **Contract/PO. No.:** SC-21-12 dated 15 Feb 2012/719463 | **Subject:** APR Unit #1 Rental Term modification |
| **Change Order Date:** June 25th, 2018 | |

**Reason for Changes:**

To extend the Rental Term, as set forth in Article 7 of the Contract applicable to APR Unit #1 & Equipment #1 (as defined below) will be extended for an additional two (2) months from July 1st 2018

Buyer Initials: _N H._

Seller Initials: _[signature]_



## Contract Tenth Contract Change Order and Exhibits

| | |
|---|---|
| **Project Name:** Virgin Islands Water and Power Authority | **Contract Change Order No. 10** ("Tenth Contract Change Order") |
| **Contract/PO. No.:** SC-21-12 dated 15 Feb 2012/719463 | **Subject:** APR Unit #1 Rental Term modification |
| **Change Order Date:** June 25ᵗʰ, 2018 | |

**Defined Terms:** Capitalized terms used in this Tenth Contract Change Order, if not defined in this Tenth Contract Change Order, have the meanings given to them in the Contract, as amended.

**Description of Changes:**

**Article 7 Rental Term** – The Rental Term for the APR Unit #1 and the Equipment #1 will be extended for an additional two (2) months (from July 1ˢᵗ, 2018 until August 31ˢᵗ, 2018)

**Change Order Validity:** Upon execution of this Tenth Contract Change Order by both Parties, this Fourth Contract Change Order shall operate as an amendment to the Contract pursuant to Section 15(d) thereof. Except as expressly amended by the terms of this Tenth Contract Change Order, the Contract (as amended by any previous amendment(s) or Change Order(s) properly executed by the Parties) shall continue to be unchanged and shall remain in full force and effect. Nothing in this Tenth Contract Change Order shall be deemed to release any Party for any of its obligations arising under the Contract prior to the execution of this Tenth Contract Change Order.

**Terms and Conditions:**

All terms and conditions set forth in the Contract dated February 15, 2012 (as amended by previous properly executed amendment(s) or Change Order(s)), except as expressly modified herein, shall remain in full force and effect and govern the relationship of the Parties.

The Contract, as modified by this Tenth Contract Change Order and any fully executed prior amendment(s) or Change Order(s), embodies the entire agreement between the Parties with respect to the subject matter of the Contract and this Tenth Contract Change Order, and supersedes any prior or contemporaneous agreements, representations and undertakings between the Parties with respect to such subject matter.

For the convenience of the Parties, this Tenth Contract Change Order may be executed in

2

Buyer Initials: _V. H._

Seller Initials: _[signature]_



## Contract Tenth Contract Change Order and Exhibits

| Project Name:  Virgin Islands Water and Power Authority | Contract Change Order No. 10 ("Tenth Contract Change Order") |
|---|---|
| Contract/PO. No.: SC-21-12 dated 15 Feb 2012/719463 | Subject: APR Unit #1 Rental Term modification |
| Change Order Date: June 25ᵗʰ, 2018 | |

any number of separate counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts will together constitute the same agreement. Executed signature pages to this Tenth Contract Change Order may be delivered by facsimile and such facsimiles will be deemed as sufficient as if actual signature pages had been delivered.

[Signature Page Follows On Next Page]

Buyer Initials: *N. H.*

Seller Initials:



## Contract Tenth Contract Change Order and Exhibits

| | |
|---|---|
| **Project Name:** Virgin Islands Water and Power Authority | **Contract Change Order No. 10** ("Tenth Contract Change Order") |
| **Contract/PO. No.:** SC-21-12 dated 15 Feb 2012/719463 | **Subject:** APR Unit #1 Rental Term modification |
| **Change Order Date:** June 25th, 2018 | |

| Power Rental Op Co LLC | Virgin Islands Water and Power Authority | |
|---|---|---|
| Name   SEAN WILCOCK | Name   NOEL HODGE | 6/29/18 |
| Title   CHIEF COMMERCIAL OFF | Title   ACTING CEO | |
| Signature | Signature | |
| Date   6/26/2018 | Date   06-29-18 | |

Buyer Initials: _N.H._

Seller Initials: 



## Contract Eleventh Contract Change Order and Exhibits

| | |
|---|---|
| **Project Name:** Virgin Islands Water and Power Authority | **Contract Change Order No. 11** ("Eleventh Contract Change Order") |
| **Contract/PO. No.:** SC-21-12 dated 15 Feb 2012/719463 | **Subject:** APR Unit #1 Rental Term modification |
| **Change Order Date:** August 17, 2018 | |

**Reason for Changes:**

To extend the Rental Term, as set forth in Article 7 of the Contract applicable to APR Unit #1 & Equipment #1 (as defined below) will be extended for an additional two (2) months from September 1st 2018, October 31st, 2018, as described in this Eleventh Contract Change Order.

Buyer Initials: _____

Seller Initials: _____



## Contract Eleventh Contract Change Order and Exhibits

| Project Name: Virgin Islands Water and Power Authority | Contract Change Order No. 11 ("Eleventh Contract Change Order") |
|---|---|
| Contract/PO. No.: SC-21-12 dated 15 Feb 2012/719463 | **Subject:** APR Unit #1 Rental Term modification |
| Change Order Date: August 17, 2018 | |

**Defined Terms:** Capitalized terms used in this Eleventh Contract Change Order, if not defined in this Eleventh Contract Change Order, have the meanings given to them in the Contract, as amended.

**Description of Changes:**

Article 7 Rental Term – The Rental Term for the APR Unit #1 and the Equipment #1 will be extended for an additional two (2) months (from September 1st, 2018 until October 31st, 2018)

Article 10 Contract Termination – The Buyer may terminate the APR Unit#1 portion of the Contract after thirty (30) days for Buyer's convenience, provided that the Buyer provides seven (7) days advanced written notice and the Buyer must pay to the Seller all remaining sums due under the Contract (as modified by Change Orders) not already paid by the Buyer to the Seller.

**Change Order Validity:** Upon execution of this Eleventh Contract Change Order by both Parties, this Fourth Contract Change Order shall operate as an amendment to the Contract pursuant to Section 15(d) thereof. Except as expressly amended by the terms of this Eleventh Contract Change Order, the Contract (as amended by any previous amendment(s) or Change Order(s) properly executed by the Parties) shall continue to be unchanged and shall remain in full force and effect. Nothing in this Eleventh Contract Change Order shall be deemed to release any Party for any of its obligations arising under the Contract prior to the execution of this Eleventh Contract Change Order.

Buyer Initials: _____

Seller Initials: _____



## <u>Contract Eleventh Contract Change Order and Exhibits</u>

| Project Name: Virgin Islands Water and Power Authority | Contract Change Order No. 11 ("Eleventh Contract Change Order") |
|---|---|
| Contract/PO. No.: SC-21-12 dated 15 Feb 2012/719463 | Subject: APR Unit #1 Rental Term modification |
| Change Order Date: August 17, 2018 | |

**Terms and Conditions:**

All terms and conditions set forth in the Contract dated February 15, 2012 (as amended by previous properly executed amendment(s) or Change Order(s)), except as expressly modified herein, shall remain in full force and effect and govern the relationship of the Parties.

The Contract, as modified by this Eleventh Contract Change Order and any fully executed prior amendment(s) or Change Order(s), embodies the entire agreement between the Parties with respect to the subject matter of the Contract and this Eleventh Contract Change Order, and supersedes any prior or contemporaneous agreements, representations and undertakings between the Parties with respect to such subject matter.

For the convenience of the Parties, this Eleventh Contract Change Order may be executed in any number of separate counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts will together constitute the same agreement. Executed signature pages to this Eleventh Contract Change Order may be delivered by facsimile and such facsimiles will be deemed as sufficient as if actual signature pages had been delivered.

[Signature Page Follows On Next Page]

3

Buyer Initials: _____

Seller Initials: _____



## <u>Contract Eleventh Contract Change Order and Exhibits</u>

| | |
|---|---|
| **Project Name:** Virgin Islands Water and Power Authority | **Contract Change Order No. 11** ("Eleventh Contract Change Order") |
| **Contract/PO. No.:** SC-21-12 dated 15 Feb 2012/719463 | **Subject:** APR Unit #1 Rental Term modification |
| **Change Order Date:** August 17, 2018 | |

| Power Rental Op Co LLC | Virgin Islands Water and Power Authority |
|---|---|
| Name   SEAN COLCOCK | Name |
| Title   C.C.O | Title |
| Signature | Signature |
| Date   8/20/18 | Date |

4

Buyer Initials: _____

Seller Initials: _____



## Contract Twelfth Contract Change Order

| | |
|---|---|
| **Project Name:** Virgin Islands Water and Power Authority | **Contract Change Order No. 12** ("Twelfth Contract Change Order") |
| **Contract/PO. No.:** SC-21-12 dated 15 Feb 2012/719463 **Change Order Date:** October 29, 2018 | **Subject:** APR Unit #1 Rental Term modification |

**Reason for Changes:**

To extend the Rental Term, as set forth in Article 7 of the Contract applicable to APR Unit #1 & Equipment #1 (as defined below) will be extended for an additional one (1) month from November 1st 2018, November 30th, 2018, as described in this Twelfth Contract Change Order.

**Defined Terms:**  Capitalized terms used in this Twelfth Contract Change Order, if not defined in this Twelfth Contract Change Order, have the meanings given to them in the Contract, as amended.

**Description of Changes:**

**Article 7 Rental Term** – The Rental Term for the APR Unit #1 and the  Equipment #1 will be extended for an additional one (1) months (from November 1st, 2018 until November 30th, 2018)

**Change Order Validity:**  Upon execution of this Twelfth Contract Change Order by both Parties, this Twelfth Contract Change Order shall operate as an amendment to the Contract pursuant to Section 15(d) thereof.  Except as expressly amended by the terms of this Twelfth Contract Change Order, the Contract (as amended by any previous amendment(s) or Change Order(s) properly executed by the Parties) shall continue to be unchanged and shall remain in full force and effect. Nothing in this Twelfth Contract Change Order shall be deemed to release any Party for any of its obligations arising under the Contract prior to the execution of this Twelfth Contract Change Order.

Buyer Initials:

Seller Initials:



## Contract Twelfth Contract Change Order

| Project Name: Virgin Islands Water and Power Authority | Contract Change Order No. 12 ("Twelfth Contract Change Order") |
|---|---|
| Contract/PO. No.: SC-21-12 dated 15 Feb 2012/719463 | Subject: APR Unit #1 Rental Term modification |
| Change Order Date: October 29, 2018 | |

**Terms and Conditions:**

All terms and conditions set forth in the Contract dated February 15, 2012 (as amended by previous properly executed amendment(s) or Change Order(s)), except as expressly modified herein, shall remain in full force and effect and govern the relationship of the Parties.

The Contract, as modified by this Twelfth Contract Change Order and any fully executed prior amendment(s) or Change Order(s), embodies the entire agreement between the Parties with respect to the subject matter of the Contract and this Twelfth Contract Change Order, and supersedes any prior or contemporaneous agreements, representations and undertakings between the Parties with respect to such subject matter.

For the convenience of the Parties, this Twelfth Contract Change Order may be executed in any number of separate counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts will together constitute the same agreement.
Executed signature pages to this Twelfth Contract Change Order may be delivered by facsimile and such facsimiles will be deemed as sufficient as if actual signature pages had been delivered.

| Power Rental Op Co LLC | | Virgin Islands Water and Power Authority | |
|---|---|---|---|
| Name | CHARLES Ferry | Name | Lawrence J. Kupfer |
| Title | PRESIDENT / COO | Title | Executive Director / CEO |
| Signature | *Charles P Ferry* | Signature | |
| Date | oct 30, 2018 | Date | 11/28/18 |

2

Buyer Initials: _____

Seller Initials: *CPF*



# Thirteenth Contract Change Order

**Project Name:** Virgin Islands Water and
Power Authority

**Contract/PO. No.:** SC-21-12 dated 15 Feb
2012/719463

**Change Order Date:** May 1, 2019

**Contract Change Order No. 13**
("Thirteenth Contract Change Order")

**Subject:**
APR Unit #25
APR Unit #26
APR Unit #27
Amended Pricing, Terms, and Conditions

**Reason for Changes:**
To amend monthly rates, rental terms, Letter of Credit, Liabilities, for APR Units #25, #26, and #27 as set forth in Article 7 of the Contract and as applicable to APR Units 25, 26, and 27 as defined in Article 4, Description of Changes.

**Defined Terms:**
Capitalized terms used in this Thirteenth Contract Change Order, if not defined have the meanings given to them in the Contract, as amended.

"APR" is defined as Power Rental Op Co LLC and/or APR Energy LLC and/or affiliated companies

**Description of Changes:**

**Article 4 Contract Price**   Notwithstanding anything to the contrary in the Contract or prior Change Orders, the Contract Price shall be as set forth in this Article 4 of this Thirteenth Contract Change Order, which shall be subject to adjustment pursuant to the same terms of the Contract applicable to the original Contract Price set forth therein.

Unit #25, (Appendix P): Monthly rate for Unit #25 shall be removed, and pricing shall be adjusted to a full Variable Rate of $400/Fired Hour. No minimum offtake obligation shall apply. This pricing shall be applied retroactively to November 1, 2018. If Unit #25 is operated due to the unscheduled unavailability of either Unit #26 or Unit #27, the Variable Rate will be waived for that period

Units #26 and #27, (Appendix P): Monthly rates for Units #26, and #27 are hereby adjusted to $475,000.00 per Unit per month based upon a 20 month contract term and operation on Diesel fuel only.

**Article 7 Rental Term:** The Rental Term for all three APR Units #25, #26, and #27, is hereby extended to December 31, 2020.

Buyer Initials: *ji*

Seller Initials: *CR*



# Thirteenth Contract Change Order

**Project Name:** Virgin Islands Water and
Power Authority

**Contract/PO. No.:** SC-21-12 dated 15 Feb
2012/719463

**Change Order Date:** May 1, 2019

**Contract Change Order No. 13**
("Thirteenth Contract Change Order")

**Subject:**
APR Unit #25
APR Unit #26
APR Unit #27
Amended Pricing, Terms, and Conditions

**Financing and Payments:**

As of 1st May 2019, WAPA owes an unpaid amount of $14,291,986.00 (the "Contract Arrearage") to APR for services performed by APR through April 30, 2019 (which Contract Arrearage includes $981,015.00 of accrued but unpaid interest). WAPA shall execute in favor of APR a promissory note as attached hereto as Exhibit A and incorporated herein by reference dated as of May 1st, 2019 to further evidence WAPA's obligation to repay the outstanding amounts due to APR (and to set forth the agreed terms for such repayment) (the "Note").

In order to compensate WAPA for its use of diesel fuel instead of propane, and in consideration for the execution of this Thirteenth Contract Change Order, APR and WAPA have agreed to reduce the Contract Arrearage to a total of $9,310,971.00 (the "Agreed Contract Arrearage"), to be payable with interest on the terms set forth below in equal monthly payments over a 20-month repayment period as detailed in the Note, subject to any acceleration of the loan as provided in the Note.

Loan Amount: $9,310,971.00
Term:          20 months
Interest Rate   10% (compounded annually)
First Payment Date:   1st May 2019
Final Payment Date:  1st December 2020
Payment:      $507,354.00 per month

The monthly loan payments of $507,354 shall be included in APR's invoices, along with payments for Unit #25, #26 and #27. In the event that WAPA exercises its right of early termination, payment of the balance of the loan then outstanding shall be due and payable ten days following the termination date. No pre-payment penalty will apply.

With respect to all services to be provided under the Contract from and after May 1, 2019, invoices will be issued by APR to WAPA by the 15th day of each month for rental (and any other payments under the Contract) attributable to the prior month, and shall be due and payable by the 1st business day of the next month. In the event that APR should deliver any such invoice late, such invoice will be due and payable by WAPA within 15 days after the issuance of such late invoice.

2

Buyer Initials:

Seller Initials: CH



## Thirteenth Contract Change Order

**Project Name:** Virgin Islands Water and
Power Authority

**Contract/PO. No.:** SC-21-12 dated 15 Feb
2012/719463

**Change Order Date:** May 1, 2019

**Contract Change Order No. 13**
("Thirteenth Contract Change Order")

**Subject:**
APR Unit #25
APR Unit #26
APR Unit #27
Amended Pricing, Terms, and Conditions

Notwithstanding the foregoing, the payment due from WAPA with respect to the services
attributable to the month of May 2019 will be paid by WAPA by June 1, 2019.

**Terms and Conditions:**

APR Best and Final Proposal dated April 15, 2019 is hereby incorporated into this Thirteenth
Contract Change Order; provided, however, that if there is any conflict between this Thirteenth
Contract Change Order and such proposal, the terms of this Thirteenth Contract Change Order
shall prevail.

Execution of this Thirteenth Change Order constitutes a release (a) by WAPA in favor of APR from
any and all claim(s) by WAPA in connection with WAPA's use of diesel fuel instead of propane
and (b) by APR in favor of WAPA with respect to all amounts owed prior to the effective date of
this Thirteenth Change Order pursuant to the Contract other than the Agreed Contract Arrearage.

WAPA may not terminate the Contract including all Contract Change Orders prior to May 1, 2020.
Termination requires a 30 day written notice and will apply to Units #25, #26, and #27
simultaneously.

All other terms and conditions set forth in the Contract dated February 15, 2012 (as amended by
previous properly executed amendment(s) or Change Order(s)), except as expressly modified

Buyer Initials:

Seller Initials: *CPf*



# Thirteenth Contract Change Order

**Project Name:** Virgin Islands Water and Power Authority

**Contract/PO. No.:** SC-21-12 dated 15 Feb 2012/719463

**Change Order Date:** May 1, 2019

**Contract Change Order No. 13** ("Thirteenth Contract Change Order")

**Subject:**
APR Unit #25
APR Unit #26
APR Unit #27
Amended Pricing, Terms, and Conditions

herein, shall remain in full force and effect and govern the relationship of the Parties.

The Contract, as modified by this Thirteenth Contract Change Order and any fully executed prior amendment(s) or Change Order(s), embodies the entire agreement between the Parties with respect to the subject matter of the Contract and this Contract Change Order, and supersedes any prior or contemporaneous agreements, representations and undertakings between the Parties with respect to such subject matter.

For the convenience of the Parties, this Thirteenth Contract Change Order may be executed in any number of separate counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts will together constitute the same agreement.

Executed signature pages to this Thirteenth Contract Change Order may be delivered by facsimile or email and such facsimiles or emails will be deemed as sufficient as if actual signature pages had been delivered.

**Change Order Validity:**

Upon execution of this Thirteenth Contract Change Order by both Parties, this Contract Change Order shall operate as an amendment to the Contract pursuant to Section 15(d) thereof. Except as expressly amended by the terms of this Contract Change Order, the Contract (as amended by any previous amendment(s) or Change Order(s) properly executed by the Parties) shall continue to be unchanged and shall remain in full force and effect.

[Signature page follows.]

Buyer Initials:

Seller Initials: CPL



# Thirteenth Contract Change Order

| | |
|---|---|
| **Project Name:** Virgin Islands Water and Power Authority | **Contract Change Order No. 13** ("Thirteenth Contract Change Order") |
| **Contract/PO. No.:** SC-21-12 dated 15 Feb 2012/719463 | **Subject:** APR Unit #25 APR Unit #26 APR Unit #27 Amended Pricing, Terms, and Conditions |
| **Change Order Date:** May 1, 2019 | |

**Power Rental Op Co LLC**

Name    *ChARLES Ferry*

Title    *President / CEO*

Signature    *Charles Ferry*

Date    *May 13, 2019*

**Virgin Islands Water and Power Authority**

Name    Lawrence J. Kupfer

Title    Executive Director/CEO

Signature

Date    May 13, 2019

**EXHIBIT A**

See attached.

Buyer Initials:

Seller Initials: *CAF*

**COMPOSITE EXHIBIT "D"**



3600 Port Jacksonville Parkway
Jacksonville, FL 32226, USA
📞 +1 904 223.2278
📠 +1 904 223.8955

aprenergy.com
info@aprenergy.com

February 6, 2020                                          VIA CERTIFIED MAIL

Executive Director
General Counsel
Virgin Islands Water and Power Authority
PO Box 1450
St. Thomas, Virgin Islands 00804

Re:  Notice of Default under Promissory Note and Change Order 13

Ladies and Gentlemen:

This letter serves as a notice to WAPA of an Event of Default under the Promissory Note
dated May 1, 2019 for WAPA's failure to make the January 2020 payment.  Pursuant to the
terms of the Promissory Note, WAPA has five business days to cure the default.  If APR has
not received payment by February 10, 2020, APR will declare WAPA in default of the
Promissory Note and the entire balance will be immediately due and payable.  Further, I
note that WAPA has breached its payment obligations in Change Order 13 by failing to
make the January 2020 rental payments by February 1, 2020. As is permitted under the
contract, APR has submitted a draw for the remaining balance of the letter of credit issued
in favor of APR by WAPA.  That balance is insufficient to cover the January contract
invoices.  Accordingly, WAPA is in default of its payment obligations under the contract and
must cure its default by making payment within 30 days of the date of this letter.

APR reserves all rights in connection with this matter.

Sincerely,

Joseph DiCamillo
General Counsel


cc: Chuck Ferry



3600 Port Jacksonville Parkway
Jacksonville, FL 32226, USA
📞 + 1 904 223.2278
📠 + 1 904 223.8955

aprenergy.com
info@aprenergy.com

February 27, 2020                                        VIA CERTIFIED MAIL


Executive Director
General Counsel
Virgin Islands Water and Power Authority
PO Box 1450
St. Thomas, Virgin Islands 00804

Re:  Default of Promissory Note

Ladies and Gentlemen:

I refer to my February 6, 2020 letter whereby I provided WAPA with notice of default
under the Promissory Note dated May 1, 2020 for failure to make required payments.
WAPA has failed to cure its default within the time proscribed by the Promissory Note.
Accordingly, WAPA is now in default of the Promissory Note and APR hereby demands
immediate payment of the outstanding principal and accrued interest totaling
$5,393,521.81.  I note that as of today, the interest rate on the outstanding balance is 13%.

Please remit payment immediately to the bank account referenced in the Promissory Note.
APR reserves all rights in connection with this matter.

Sincerely,


Joseph DiCamillo
General Counsel


cc: (via email)
    Chuck Ferry
    Anthony Thomas
    Colette Conroy Monroe
    Elizabeth Centeno